UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-24700--WILLIAMS-SIMONTON

WILLIAM L. ROBERTS, II p/k/a
RICK ROSS and ANDREW HARR and
JERMAINE JACKSON collectively p/k/a
THE RUNNERS,

      Plaintiffs,

v.

STEFAN KENDAL GORDY and
SKYLER AUSTEN GORDY collectively p/k/a
LMFAO, et al.,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANT DAVID & GOLIATH LLC'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

      Plaintiffs, WILLIAM L. ROBERTS, II p/k/a RICK ROSS ("ROSS") and

ANDREW HARR and JERMAINE JACKSON, collectively p/k/a THE RUNNERS

("THE RUNNERS"), hereby file their Response in Opposition to Defendant David &

Goliath, LLC's Motion to Dismiss for Lack of Personal Jurisdiction, and state:

    **A.**    **The Assertion of Personal Jurisdiction Over D&G Satisfies Both
Florida's Long-Arm Statute and the Requirements of Due Process**

      Defendant David & Goliath, LLC (D&G) is the advertising agency that conceived

and produced the Kia Soul automobile commercial featuring the infringing song, *Party

Rock Anthem,* that is the subject of Count II of Plaintiffs' Amended Complaint.  The

phrase "Everyday I'm Shufflin'" --  set to the music and beat, and imitating the sound of

*Hustlin*' -- was used as the commercial's tag-line,[1] and the melody of *Hustlin'* appears

prominently throughout as well.  D&G planned and implemented an integrated, national,

multi-media ad campaign featuring the commercial, which was the third commercial in

---

[1] "Tag-line," in this context, refers to the very last sound heard, and final impression made, at the end of the
commercial.  A video copy of the 60-second version of the commercial (DNG507, Exh. A) has been
conventionally filed simultaneously herewith for the Court's reference.

1

any already very successful and award-winning campaign featuring animated, "cool" hamsters.

As detailed below, personal jurisdiction over D&G is present under Florida's Long-Arm statute based on the well-settled principle that copyright infringement against a Florida plaintiff is, *inter alia*, a tortious act within the state supporting the exercise of specific personal jurisdiction.  Further, the assertion of personal jurisdiction over D&G also fully comports with due process.  Defendant's own documents show that, far from the protestation of "mere negligent use," D&G was specifically aware of the use of *Hustlin'* in *Party Rock Anthem* and of the potential for an infringement claim, but nevertheless proceeded to use the infringing material with willful and reckless disregard for Plaintiffs' rights.  Defendant's intentional tort against Florida plaintiffs and its other Florida contacts, including, *inter alia*, specifically directing the infringing commercial to Florida and D&G's use of the infringing material for its own solicitation purposes on D&G's own website accessible in Florida, are activities from which Plaintiffs' claims arise.  D&G's actions constitute purposeful availment, give rise to the reasonable expectation of being haled into court, and subject it to personal jurisdiction under the *Calder* "effects test."

**B.      Florida's Long-Arm Statute**

**Tortious Act Within the State[2]**

First, Defendant's contention that copyright infringement claims by Florida plaintiffs do not come within the provisions of Florida's Long Arm Statute is simply wrong.  To the contrary, clearly and without equivocation, copyright infringement against a Florida plaintiff is tortious conduct within the provisions of the Long Arm Statute.  For example, in *Foreign Imported Productions and Pub., Inc. v. Grupo Indus. Hotelero, S.A.,* No. 07-22066, 2008 WL 4724495 * 5 (S.D. Fla. 2008), the court stated:

> **Copyright infringement is a tortious act within the meaning of § 48.193(1)(b).** . . ."'[T]he breach of a common law copyright subjects the wrongdoer to liability in tort' within the reach of the Florida long-arm statute.**"). The Florida long-arm statute is not limited to an act in Florida causing injury in Florida, but includes "the situation in which a foreign tortious act causes injury within the forum." *Cable/Home Commc'n,* 902 F.2d at 856 (quoting *Rebozo v. Washington Post Co.,* 515

---

[2] Formerly §48.193(1)(b); renumbered as §48.193(1)(a)(2) in 2013.

F.2d 1208, 1212 (5th Cir. 1975)). The Florida Supreme Court has made explicit that a defendant's physical presence is not required to commit a tortious act in Florida. *Wendt v. Horowitz,* 822 So. 2d 1252, 1260 (Fla. 2002). If copyright infringement occurs on a website that is accessible in Florida, § 48.193(1)(b) is met even if the website was created outside of Florida. *See Licciardello v. Lovelady,* 2008 WL 4531668, at *2 (11th Cir. October 10, 2008) (referring to trademark infringement on a website created in Tennessee, "[I]n this case the alleged infringement clearly ... occurred in Florida by virtue of the website's accessibility in Florida.").

(emphasis added, citations omitted). *See also, Roca Labs, Inc. v. Boogie Media, LLC*, No. 12-2231, 2013 WL 2025806 (M.D. Fla. May 14, 2013) (copyright infringement caused harm to Florida plaintiff supporting specific jurisdiction under 48.193(1)(b)); *Gainesville Coins, LLC v. VCG Ventures, Inc.,* No. 13-1402, 2013 WL 4596968 * 3 (M.D. Fla. Aug. 28, 2013) ("Copyright infringement is a tortious act that satisfies Florida's long-arm statute."); *Yellow Pages Photos, Inc. v. Ziplocal, LP,* No. 8:12–cv–755–T26TBM, 2012 WL 2952452, at *5 (M.D. Fla. July 19, 2012) ("Because [plaintiff] is the copyright owner, and [plaintiff's] principal place of business is in Riverview, Florida, the situs of the injury for purposes of section 48.193(1)(b) is Florida.").

Here, the infringing advertisement was displayed, *inter alia*, on televisions viewed in Florida, on the internet accessible and viewed in Florida, and on D&G's own Florida-accessible website (where it remains accessible and is still being so used for D&G's promotional purposes).  Moreover, D&G produced versions of the commercial specifically targeted to the Miami, Orlando and Tampa markets and, it is believed, for display in Florida movie theaters, and possibly at Kia promotional events at LMFAO concerts in Florida.  *See*, pp. 11-15, *infra*.  The authorities cited above, and numerous others, clearly hold that such copyright infringement against Florida plaintiffs is a tortious act within the Long-Arm Statute. [3]

Defendant, ignoring this entire body of law, contends that the copyright infringement claim against D&G does *not* come within the provisions of the Long-Arm Statute, relying extensively and repeatedly upon Judge Scola's decision *Barrocos of*

---

[3] The significance of a Florida plaintiff in the application of former 48.193(1)(b) was noted in *Kernel Records Oy v. Mosley***,** No  09-21597, 2010 WL 2812565 * 5 (S.D. Fla. July 5, 2010), a decision upon which, as noted in the text *supra*, Defendant misplaces reliance since, *inter alia*, the plaintiff in Kernel was a Finnish corporation.

*Florida, Inc. v. Elmassian*, No. 11-, 2012 WL 1622988 *4 (S.D. Fla., May 9, 2012), which is woven throughout Defendant's argument for the incorrect proposition that a "*plaintiff's*" injuries and damages in "*copyright claims like that alleged against DnG*" will not support jurisdiction under the Florida Long-Arm Statute.  *See, e.g.*, Motion, pp. 8, 14.  Defendant repeatedly refers to *Barrocos* as though the claim involved a Florida "[plaintiff]" who was the victim of copyright infringement, stating, for example, at page 14 of its Motion:

> [S]ee also *Barrocos of Florida, Inc.,* 2012 WL 1622988, at *4 (where **an injury from alleged copyright infringement** "was arguably felt in Florida from a defendant's out-of-state tortious conduct, [but] the **in-state injury to [plaintiff]** rests on attenuation upon attenuation", that **in state injury is insufficient to support jurisdiction**).  (emphasis added)

The claims as to which personal jurisdiction were actually being discussed in *Barrocos*, however, were *not* the claims of the plaintiff (Barrocos) against the infringer (Charming Silver) for copyright infringement, but instead were the *third-party* claims of Charming Silver for indemnification, contribution and contributory infringement against a co-infringer (Heng Lee).  *Barrocos* never held that a Florida copyright plaintiff did not suffer injury in Florida; it held that the defendant seeking indemnification could not assert personal jurisdiction against its co-infringer based upon the attenuated connection to Florida of the transactions between the co-infringers (not the plaintiff):

> Accepting the allegations, Heng Lee committed contributory infringement in Hong Kong by manufacturing the flower design jewelry and then **selling it to Charming Silver in California,** which allegedly ultimately injured Charming Silver in Florida when it sold the infringing pieces to consumers at the Florida trade show, causing Barrocos to sue Charming Silver in Florida federal court. *Cf. Precision Software Servs., Inc. v. Fortune Fin. Sys., Inc.,* 1998 WL 1759759, at (M.D.Fla. Nov.9, 1998). While, under this scenario, an injury was arguably felt in Florida from a defendant's out-of-state tortious conduct, the in-state injury to Charming Silver rests on attenuation upon attenuation. As such, the Court finds it insufficient to support jurisdiction under subsection 1(b). Moreover, ***Charming Silver's injury was to a business interest existing outside of Florida***, irrespective of the fact that sales of the infringing product occurred here. The Eleventh Circuit has said that personal jurisdiction may not be grounded in section 48.193(1)(b) when the plaintiff's **injury is solely to an out-of-state business interest**. *See Estate of Scutieri v. Chambers,* 386 F. App'x 951, 953 (11th Cir.2010); *Posner,* 178 F.3d at 1220. Therefore, Heng Lee is not subject to jurisdiction under subsection 1(b).

*Barrocos* is simply inapplicable, notwithstanding Defendant's strategic use of brackets.[4]  Plaintiffs' claim of copyright infringement is a tortious act within the state, and specific personal jurisdiction exists pursuant to §48.193(1)(a)(2).

**Act Outside the State Causing Injury In the State[5]**

As to this alternate basis for specific personal jurisdiction (under §48.193(1)(a)(6)—former 48.193(1)(f)), Defendant once again uses *Barrocos,* this time to argue that a "plaintiffs'" harm from "copyright claims like that alleged against D&G" is not an injury in the state for purposes of the Long-Arm Statute because it is "solely to the pocketbook."  Defendant states:

> This is true for **copyright claims, like that alleged against DnG**. *See Barrocos,* 2012 WL 1622988, at *4 (finding former section 48.193(1)(f) inapplicable because **plaintiff's alleged injury** is "solely to its pocketbook").

Again, the citation is misleading and inaccurate, as the court was clearly discussing the economic claims of the party seeking indemnification, not the plaintiff's copyright claims:

> The Court also finds section 48.193(1)(f) inapplicable because **Charming Silver's alleged injury is solely economic**. Charming Silver seeks damages from Heng Lee as a contributory infringer, as well as contribution and indemnification. **Charming Silver's damages, then, are solely to its pocket book**.

Id. at *4.

Unlike the third-party plaintiff in *Barrocos*, an actual copyright plaintiff does not suffer harm "solely to its pocketbook."[6] *See, e.g, Community Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1203 (D. Utah 2014) ("Plaintiffs have amply demonstrated that Aereo's infringing activities threaten to impair Plaintiffs' control over

---

[4] Indeed, *Barrocos* is more akin to a claim by Kia against D&G for indemnification than it is to Plaintiffs' claim against D&G for copyright infringement.

[5] Formerly §48.193(1)(f); renumbered as §48.193(1)(a)(6) in 2013.

[6] Plaintiffs' Amended Complaint alleges:  "59.  The conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiffs are entitled to injunctive relief prohibiting Defendants from further infringing Plaintiffs' copyrights, and ordering Defendants to destroy all copies of the infringing work and/or other material made in violation of Plaintiffs' exclusive rights."  DE 34, ¶ 59.

its copyrighted programs, threaten Plaintiffs' goodwill and business reputation and relationships, cause Plaintiffs to lose business and standing in the marketplace, and subject Plaintiffs' copyrighted work to viral infringement and piracy.");  *Kevin Harrington Enterprises, Inc. v. Bear Wolf, Inc.,* 1998 WL 35154990 (S.D. Fla. 1998) (likelihood of irreparable harm shown where infringement leaves plaintiff without the ability to control its own reputation).

In *Precision Software Services, Inc. v. Fortune Financial Systems, Inc.*, No. 98-136, 1998 WL 1759759 *5 (M.D. Fla. Nov. 9, 1998), the court ruled that copyright infringement was specifically within 48.193(1)(f) as causing injury to property within the state:

> Precision claims that Telecomm **injured its property, namely its copyright** when Telecomm sold infringing copies of the computer software to Fortune for distribution in Florida. A copyright is considered a form of property. *Borden v. Katzman,* 881 F.2d 1035, 1038 (11th Cir.1989). It is clear that Telecomm manufactured the computer software which was consumed in the State of Florida. In addition, Telecomm had advertising on the Internet which was accessible in Florida. Further, **it is clear if the allegations of infringing the copyright are proven, Precision's property in Florida will have been injured by Telecomm's actions**.

(emphasis added).  Additionally, this alternative basis for jurisdiction is supported by Defendant's solicitation activity on its website within the state (detailed below) (48.193(1)(a)(6)(a)), and the production of products (commercials) for distribution and viewing within the state (48.193(a)(6)(b)).

**General jurisdiction 48.193(2)**

*Barrocos* is also noteworthy in that the declaration of the party resisting personal jurisdiction there addressed crucial topics as to which Defendant's declaration in this case is conspicuously silent, including that the defendant "does not engage in any advertising or marketing in Florida, does not send employees to conduct business or marketing in Florida, and has never attended trade shows or business events in Florida." 2012 WL 1622988 *3.  D&G's Declaration (DE 78-1) does not so state, and fails to even address any of those topics, and is also silent as to Defendant's customers.  *See, e.g., Smith v. Trans-Siberian Orchestra*, No. 09-1013, 2011 WL 824675, *3 (M.D. Fla. March 3, 2011) (defendant's declaration did not meet burden of showing defendant is not amenable to

jurisdiction). It is apparent that D&G must have extensive contacts with Florida, *inter alia*, in order to carry out its contractual duties under its contract with Kia, as discussed *infra* at pp. 13-14, including direct contact and participation in marketing meetings with Florida dealers. Moreover, based upon limited discovery to date, it is clear that D&G does engage in marketing and solicitation via its website, including in Florida. Given Defendant's failure to address its Florida marketing, advertising, business meetings and events, it has not carried its burden of refuting the existence of general personal jurisdiction and its Motion should be denied on this basis. Alternatively, while Plaintiffs believe that specific personal jurisdiction is clearly established under the Long-Arm Statute, if the Court deems it appropriate to consider general jurisdiction as an alternative basis for personal jurisdiction, additional jurisdictional discovery would be required.

     **C.**    **Due Process is Satisfied**

In addition to coming within Florida's Long-Arm Statute, the exercise of personal jurisdiction over D&G also comports with due process. Defendant's due process argument hinges on the contentions that, despite the allegations of intentional tort,[7] D&G's conduct was "merely negligent," and that no activities were directed at Florida. To the contrary, Defendant's intentionally tortious conduct directed at a Florida plaintiff and its other actions directed at Florida, including those from which the cause of action arises, support the exercise of personal jurisdiction consistent with due process, and under the "effects test" of *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), as set forth in *Licciardello v. Lovelady*, 544 F. 3d 1280 (11th Cir. 2008).

Discovery obtained to date[8] shows strong support for both the intentional tort claim, and that there are significant additional contacts with Florida detailed below, including, *inter alia*, the targeting of the commercial in question (which was part of an ongoing highly successful national campaign ) specifically at Florida markets and the use

---

[7] The Amended Complaint alleged that "Plaintiffs are informed and believe that the foregoing acts of infringement have been willful and intentional, in utter disregard of and with indifference to the rights of Plaintiffs." DE 34, ¶ 56.

[8] Plaintiffs served a subpoena upon D&G prior to its joinder as a Defendant herein (Exh. B), to which D&G responded with a number of objections to virtually every request and the production of some documents over the course of three months, with much information redacted. (Exh. C). Plaintiffs are currently pursuing further discovery from D&G, including seeking the production herein of the previously subpoenaed documents and have noticed the deposition of Carol Lombard, D&G's former Executive Producer and Managing Director, for November 20, 2014.

of the infringing material by Defendant on its own Florida-accessible website for promotional and solicitation purposes.  Defendant's documents show that it created and produced the commercial and planned, designed and implemented the entire integrated advertising campaign.  *See* Exhs. D (filed under seal at Defendant's request) and E.[9] While Defendant's argument and declaration (executed by an individual not among the four D&G witnesses identified on Defendants' Initial Disclosures as having knowledge about the ad) seeks to portray D&G as having a somewhat passive and isolated role, it is clear that D&G was not only responsible for creating advertisements, but was also thereafter involved in the day-to-day supervision, implementation and execution of all advertising campaigns and the regular reporting of progress and results. *See* Agreement for Advertising Services Between Kia Motors America, Inc. and David and Goliath, LLC ("KIA/D&G Agreement"), Exh. F (filed under seal at Defendant's request)[10] at KMA1121-1123.  Although the Affidavit of Gerald R. Duran reads as though D&G did no more than create a commercial in a studio and turn it over to Kia, with no further knowledge or responsibility thereafter, its agreement with Kia makes clear that is hardly the case.  D&G's level of involvement in Kia's advertising is demonstrated by the number of man-hours a year it was anticipated by the parties to be needed to service the account by D&G: 126,880 man-hours of full time employees per year (or about 2440 hours per week).  Exh. F, KMA1132.  While Plaintiffs recognize that the advertising campaign at issue may not have been the only advertisement created by D&G for Kia during the 3-year term of the parties' Agreement, the fact remains that the Agreement shows extensive obligations by D&G with respect to all advertising created thereunder, of which the ad at issue was one, and a very popular and important one.

### D&G's Violation of Plaintiff's Copyrights with Willful and Reckless Indifference

Preliminarily, the due process analysis is strongly impacted by the allegations of the intentional tort of copyright infringement against Florida Plaintiffs.  Defendant,

---

[9] Although D&G's contract with Kia provides that the agreement shall not be construed as either a partnership or joint venture, the agreement provides that D&G's compensation is a combination of D&G salary costs, overhead and a "profit" component.  See Exh. F, KMA1133 and KMA1148.

[10] It should be noted that D&G failed to produce a copy of its Agreement with Kia although the subpoena served on it certainly called for it to be produced; Plaintiffs obtained a copy of the Agreement from Kia during discovery.  Exh. F, KMA1121-1234.

claiming that it "properly entered into license agreements" with the parties that controlled the copyrights for *Party Rock Anthem*, seeks to re-characterize the intentional tort claim against it as being for "mere negligent use" of a copyright protected work.  Motion p. 16. In fact, internal e-mails reveal a far different story:

- D&G initially required Universal (one of two licensors of *Party Rock Anthem*), as a precondition to the license it was negotiating, to: "Identify & clear all Samples in the track...[and] Provide options of mixes that do not include samples if possible (i.e. **Rick Ross**)."  And to "[p]rovide any existing musicology reports for this track." See Composite Exh. G,  DNG5304

D&G nevertheless entered into the licensing agreement to use *Party Rock Anthem* without any of these preconditions having been met.

- D&G was so concerned about the possibility of being sued by Rick Ross for using the tag line at issue, that it asked Universal to include the following specific language in the license's indemnification clause: ". . . that the Licensee's exercise of such rights will not violate the rights of any third party (including, without limitation, **Rick Ross**)."  Exh. G, DNG5406.

Ultimately, D&G entered into its licensing agreement with Universal (Exh. H, DNG5164-5167) with a general indemnification clause that did not specifically reference Rick Ross.  Exh. H, DNG5165.   D&G sought the same specific indemnification clause referring to Rick Ross from its other licensor, Kobalt, Exh. G, DNG5419, but as with Universal, ultimately entered into the Kobalt licensing agreement (Exh. I, DNG375-378) with only a general indemnification clause, not the clause that specifically referenced Rick Ross as it had requested.

- D&G sought written assurances from the licensors that there was no sample or interpolation on PRA ("please have them put on the approval that there is 'no legal infringement with **Rick Ross lyrics lifts'** on the song") [Exh. G, DNG5393] but Universal would provide no written assurances, purportedly because "their lawyers told them not to." [Exh. G, DNG5395]

- D&G repeatedly internally discussed the need for a musicologist report ("Good for eventual lawsuit defense") [Exh. G, DNG3855]) and the intent to "send out for our own musicology report" [Exh. G, DNG3870] "I'm sending today.  Shouldn't be more than $500 or so" [Exh. G, DNG3857], but no musicologist report was ever obtained.

- Instead, D&G inquired internally: "And does the indemnification language cover us for the lyric, '**everyday I'm shuffling**' or do I need to make sure that's not in the track?" [Exh. G, DNG3831] <u>The content of the reply to this inquiry has been redacted in its entirety by D&G</u>. *Id.*

Ultimately, "Everyday I'm Shufflin'," with sound and music imitating *Hustlin'*, was used as the prominent tag line for the commercial.  Giving all inferences to Plaintiffs, as the Court must, David & Goliath recklessly and with willful disregard for Plaintiffs' rights, proceeded to use the infringing material.  Because it was obviously an interpolation (composition sample) of well-known Miami-based hip-hop star Rick Ross' *Hustlin,'* D&G sought repeatedly to have its licensors provide indemnification language specifying that any infringement claim by Ross would be covered.  Rather than receiving assurances that legal rights had been obtained for the use of the material, Defendant was purportedly verbally told by Universal/Interscope that it was not an interpolation [Exh. G, DNG5395] and decided to forego any review by a musicologist and simply rely upon the fact that it had an indemnification clause to protect *itself* from economic harm due to copyright infringement.[11]  There is nothing "merely negligent" here.  Rather, it was a calculated decision --  Defendant wished to use the material for its commercial and was indifferent to Plaintiffs' rights. *See also, e.g.*, *Yellow Pages Photos, Inc. v. Ziplocal, LP*, No 12-775 2012 WL 2952452 , *4, n.37 (M.D. Fla. July 19, 2012) (and cases cited therein) ("For purposes of determining personal jurisdiction, courts have generally held that the tort of copyright infringement is an intentional one.").

Defendant's actions are not "mere negligent use," and stand in stark contrast to those in *Edwards v. Trade Pub. Ltd.*, No., 10-1883, 2011 WL 5416190 * 10 (M.D. Fla. July 20. 2011), upon which Defendant misplaces reliance.[12]  There the defendant publisher:

[H]ad no reason to believe that use of her material would constitute infringement because Jacobs repeatedly assured him that he had secured

---

[11] *See, e.g.*, Exh. H, DNG5165, With regard to copyright claims by third-parties, Universal "will indemnify and hold you harmless against any and all claim, liabilities, losses, damages, or  expenses, (including but not limited to reasonable attorney's fees and reasonable legal expenses), incurred by you or arising out of or associated with any third party claim . . .'

[12] In addition to the fact that this case does not involve "mere negligent use," in *Edwards*, unlike D&G here, the defendant did not target Florida, and did not advertise or promote itself in Florida.  2011 WL 5416190 *5.

> legal rights to publish all of the content in the book.  . . . Based on this evidence, Trade Publishing's publication of Edwards' article falls within the category of negligent use of a protected work that will not satisfy the first prong of the effects test.

Here, the situation was the very opposite.  D&G never received any assurance that there was any clearance from Plaintiffs, and to the contrary was so aware of the potential issue that it tried repeatedly to have the indemnification language specifically include Rick Ross because the risk was so obvious.

Moreover, although D&G attempts to characterize itself in the most ministerial passive role possible, in fact, D&G bore primary responsibility for ensuring that no third-party rights were violated in the commercial.  Exh. F, KMA1142 at ¶ 9(c) ("D&G shall acquire for KMA from all Suppliers all consents, licenses and releases for the use of third-party materials and elements . .").  Further, D&G agreed not to include any materials "owned or copyrighted by others, or in which other rights may be claimed by others" without Kia's prior consent, and warranted that "no portion of the Work Product prepared for KMA under this Agreement is unlawfully derived from third-party material."  ¶¶ 9(e) and (f).  Further, D&G agreed to indemnify Kia for copyright infringement.  Exh. F, KMA1124.

### D&G's Targeting of the Infringing Commercial at Florida

The "Fact Sheet" prepared by David & Goliath in August, 2011, prior to the commercial's premier, described the planned national exposure for the commercial:

> Where Airing: National: Beginning August 28, the spot will debut on MTV's Video Music Awards.  Starting September 2 "More Soul" will start running in movie theaters across the country, and on September 5 the spot will start airing on network and cable televisions as well as have a presence online at KMA's Kia.com, Facebook and YouTube.   The following networks are on the schedule: ABC, CBS, FOX, NBC, CW, ABC Family, A&E, Adult Swim, BET, Bravo, CMT, Comedy Central, Discovery, E!, Food, FX, FUSE, Golf Ch., History, MTV, Nick@Nite, Oxygen, Spike, TBS, TNT, Travel, Tru-TV, TV One, USA, VH!, ESPN, Speed, WGN

Exh. E, DNG626.  Quite clearly, it was not "fortuitous," happenstance, unexpected or merely likely that the commercial would air in Florida.  It was a certainty, based upon D&G's specific plan for the campaign's extremely broad and pervasive reach, that the

commercial would be viewed in Florida.  In fact, the commercial remains available for viewing on YouTube (https://www.youtube.com/watch?v=BNYzrmdzktk ), where it is entitled "LMFAO - KIA Soul Hamster Commercial HD - Everyday I'm Shuffling Party Rock Anthem 2011."  Exh. J.  As of this filing, it has been viewed 2,069,501 times, no doubt in part by Florida residents.

Aside from the certain reach into Florida based upon the national campaign, Defendant's documents show that Florida was specifically targeted.  The documents show that certain versions of the ad were set to air in specific Florida cities, and that each was assigned its own unique "ISCI code." [13]

Defendant's documents show that the commercial at issue was specifically targeted to Florida as part of the campaign called "Tier II Creative Rotation," and that versions of the ad for airing in **Miami, Orlando and Tampa** were prepared, each with their own unique ISCI identifying number assigned:

YKML-5532000H    Soul/ShareSomeSoul/PushButton/30/Miami
YKML-5533000H    Soul/ShareSomeSoul/PushButton/30/Orlando
**
YKML-5536000H    Soul/ShareSomeSoul/PushButton/30/Tampa

Exh. K, DNG622.  The Tier II Creative Rotation lists a schedule of various versions of the commercial referencing a limited number of cities in 10 states, including the three Florida cities.  It is clear from the document that the ISCI Code identifies specific versions of the commercial in connection with the particular cities; each time a city is repeated on the list (for example Chicago, Cincinnati or Kansas City) the ISCI Code pertaining to that city remains the same.  *Id.*  Thus, in addition to being a national campaign intended and certain to reach Florida along with the rest of the nation, the campaign also specifically targeted distinct Florida markets.  Defendant's product, the commercial, was directed into Florida, and specifically Miami, Orlando and Tampa, and Defendant was certain it would be disseminated there.  Similar activities were considered

---

[13] ISCI Code is term in the industry defined as follows:  "ISCI is an acronym for industry standard commercial identifier, and every commercial has its own unique ISCI code . . .made up of a series of letters and numbers determined by the commercial's producer often ranging from eight to sixteen characters (ie: ABCD1234).  A commercial's ISCI code is actually more important than its title in terms of making sure the correct spot gets on the air. Having a unique identifier prevents misunderstandings of  . . .which spot is supposed to air during which time slot. .With the ISCI codes, the station's traffic department is able to easily differentiate them all.
http://smartmediagroup.com/2013/05/what-is-an-isci-code-why-do-we-need-it/

as supporting personal jurisdiction in *Yellow Pages Photos, Inc. v. Ziplocal, LP*, No 12-775, 2012 WL 2952452 * 6 (M.D. Fla. July 19, 2012):

> YPG, a sophisticated company in the publishing industry, was responsible for manipulating the copyrighted photographs in advertisements that were obviously directed at various markets in Florida. The photographs were placed and positioned on the pages as part of advertisements with Florida businesses and Florida addresses. YPG created the very advertisements directed at Florida consumers. **This act was more than a general exploitation of an infringing work into the stream of commerce**.

(emphasis added).[14]  The contention that Defendant did not itself directly purchase media buys does not change the fact that the campaign was specifically created and implemented by D&G to certainly reach Florida, and included components specifically intended for the Miami, Orlando and Tampa markets.

Moreover, the Kia/D&G Agreement has numerous provisions which make clear that the overall campaign had many geographic-specific components in which D&G was directly involved, specifically including, with regard to the Kia Dealer Marketing Group (referred to as "DMG") to:

> Coordinate local market tagging, production and shipping of creative, including television, radio, newspaper, magazines, and outdoor, as approved and instructed by KMA.

Exh. F, KMA1122.  This duty of D&G with regard to local market tagging would appear to coincide with the preparation of the Miami, Orlando and Tampa versions of the commercial as part of the Tier II Creative Rotation referenced above.

Additional contractual duties of D&G regarding contact with Kia dealers evidence other Florida contacts, and include:  "Ongoing requests for artwork, footage, tv spots, digital assets (Regions, Dealers)." (Exh. F, KMA1151);  "Annual, quarterly and monthly creative campaign and rotation plans by market." (Exh. F, KMA1152);  "Study and continuously analyze current and future trends in the marketplace with a view to conceive potential market opportunities in specific regions and DMA's or across the country." *Id.*

---

[14] Defendant's effort to rely upon *Kernel Records Oy v. Mosley*, No 09-21597, 2010 WL 2812565  (S.D. Fla. July 5, 2010), and other similar music licensing cases is off the point and to no avail.  There is nothing similar about the generalized commercial exploitation attendant to music licenses in cases such as *Kernel* (where there was no Florida plaintiff) and D&G's advertising campaign, which was neither the passive placement of the infringing material into the stream of commerce, nor was it akin to a non-specific, generalized right to commercially exploit music.

"Work with Kia National to fulfill various requests for <u>Region-specific</u> information." *Id.* "<u>Regional presentations</u> of new marketing campaigns/creative." *Id.* "<u>Serves as the primary point-of-contact for all dealers (DMG and non-DMG) regarding Tier I and Tier II advertising</u>" [15] *Id.* "Develop communication to consumers, field and <u>dealers</u>" (Exh. F, KMA1153);   "<u>Schedules and attends DMG meetings/conference calls in all markets</u>." Exh. F, KMA1184.

It is also apparent that the Hispanic market was specifically targeted as part of the overall campaign [*see, e.g.*, Exh. F, KMA1154], making it unlikely that Florida would not have been specifically targeted.  Further, D&G's campaign included a specific NBA marketing plan which focused, in part, on Florida:

> Work with KMA/IMG to manage programs and produce materials for up to 16 teams, including: ...Miami Heat...Orlando Magic.

Exh. F, KMA1157.  This work would have included "9 specific creative adaptations" for local market television, local market radio, Hispanic market radio, print and online for use in Miami and Orlando (*Id.*) and the supervision of creative materials to be displayed at Miami Uptown Showroom.  Exh. F, KMA1157.

**Florida cinemas**

Further, David & Goliath's campaign included the placement and showing of the commercial in "movie theaters across the country" (Exh. E, DNG626) beginning in September, 2011, and it is believed that the commercial was displayed in Florida movie theaters as part of this plan.  Defendant's documents indicate that D&G "Shipped In-Cinema, 8/25 (due 8/26) Screen Version."  Exh. L, DNG316.  Plaintiffs have sought discovery from Defendant as to the dates and cinema locations where the commercial was displayed, but have not been provided this information.  The targeting of the infringing advertisement directly to Florida theaters is another Florida contact from which Plaintiffs' claims arise and this would be an appropriate topic for jurisdictional discovery if deemed necessary.[16]

---

[15] It appears, based upon publicly available information, that there are at least 12 Kia dealerships in Miami-Dade, Broward, Palm Beach and Monroe Counties.  See, Exh. M.  D&G was the primary point of contact for these, as well as the numerous other Florida dealers, regarding Tier I and Tier II advertising.

[16] **Florida tour dates.**  Plans for the integrated advertising campaign also included sponsorship related to LMFAO's concert tour, with Defendant's proposal documents stating:

**D&G's Use of the Infringing Commercial for its Own Advertising and Solicitation Purposes on Its Own Florida-Accessible Website**

Discovery to date shows that David & Goliath, in addition to conceiving and implementing the entire advertising campaign for Kia, also used the infringing ad for its own advertising and solicitation purposes on its own website, viewable in Florida.  The Deal Memo/Licenses that David & Goliath executed with Universal Music Enterprises and Kobalt Music Publishing for the use of *Party Rock Anthem* in the commercial (Exhs. H and I, DNG375-378 and DNG5164-5167) identify the Licensee as "David & Goliath, LLC ('Agency') on behalf of Kia Motors America, Inc.," but, in addition to rights for the Licensee, the Licenses also grant directly to David & Goliath, as Agency, the right to utilize the commercials featuring *Party Rock Anthem* for sales and publicity purposes, including on David & Goliath's own website:

> Licensee and Agency may retain file copies of the Materials for use as frequently as Licensee and/or Agency shall determine at sales meetings and for intracompany, research, file, reference, publicity (including, without limitation, on Agency's "reel" and website) and award purposes.

Exhs. H and I, DNG-375 and 5164.

Having contracted for the right to utilize the infringing ad for its own solicitation and publicity purposes on its own website (www.dng.com), viewable in Florida, David & Goliath did exactly that.  Based on the publicly available internet archive website Wayback Machine, D&G's website, as of October, 17, 2011, displayed the infringing ad for promotional purposes, under the heading "Recent Work," directly next to a column entitled "In The News," which listed articles, including "Top 10 Video Ads: Kia Soul's Hamsters Dominate Over Volkswagen, Lexus," "Ad Age: Kia's Hamster's Are Back and Teaching Robots to Dance," "Mashable's Viral Global Ads: Party Rock Anthem – Kia Soul," "Advertising Week 88 Days of Creativity: Kia Soul."

---

"We'll sponsor the LMFAO tour and create a whole experience at each venue.  The hamsters and some of the warriors from our spot will be on site with the new Kia Soul.  We'll hold dance offs outside the venues."  Exh. N, DNG57.  The LMFAO Tour included shows in Miami on June 22, 2012 and in Orlando on June 23, 2012.  *See*, Exh. O.  It is not currently known whether the infringing commercial was displayed at these Florida venues in connection with the tour as part of the advertising campaign.  This would be an appropriate subject for jurisdictional discovery if deemed necessary.

See http://web.archive.org/web/20111017001453/http://www.dng.com/ and
http://web.archive.org/web/20111216015815/http://www.dng.com/work/campaign/more_
soul?campaignID=512&mediaID=511, screenshot copies attached to Affidavit of
Christopher Butler of Internet Archive, Exh. P.

     The ad continued to be utilized and displayed on Defendant's website for
solicitation purposes as of January, 2012, appearing in the "Recent Work" column and
next to a list of "In the News" articles including ""Kia 'Share Some Soul' Makes Five
Most-Watched Car Ads of 2011," "Kia Soul's Hamster Commercials win Acclaim, Boost
Sales," "Kia Soul Wins the Hearts of Its Intended Young Consumers—Advertising Age."
See http://web.archive.org/web/20120105082957/http://www.dng.com/, screenshot copy
attached to Butler Affidavit, Exh. P.

     As of the filing of this Response, the infringing ad remains on David & Goliath's
website for solicitation purposes, and is accessible and viewable in Florida.  See,
http://www.dng.com/work  and
http://www.dng.com/work/campaign/more_soul?campaignID=512&mediaID=511 and
the supporting Declaration of Jeiman Reyes, attached hereto as Exh. Q.  Such continued
use of the infringing material by D&G shows that personal jurisdiction is appropriate
under both the Long-Arm Statute and the effects test.  *See, e.g., Smith v. Trans-Siberian
Orchestra*, No. 09-1013, 2011 WL 824675, *4-5 (M.D. Fla. March 3, 2011), holding that
a declaration establishing that infringing material remained accessible from Florida on
defendant's website supported jurisdiction under both the Long-Arm Statute and showed
intentional tort for the effects test, citing *Internet Solutions Corp. v. Marshall,* 611 F.3d
1368 (11th Cir. 2010) (internet postings accessed in Florida constitute an electronic
communication into Florida).

     Moreover, such continued use by Defendant of the infringing material following
the institution of this action, which explicitly notified D&G that the commercial was
infringing the Florida Plaintiffs' copyrights, shows that the conduct is willful, intentional
and directed at Florida.  *See, e.g.*, *Roca Labs, Inc. v. Boogie Media, LLC*, No. 12-2231,
2013 WL 2025806, * 6 (M.D. Fla. May 14, 2013) (continued infringement after receipt
of cease and desist letter shows intentional infringement and satisfies effects test).  *See*

*also, e.g.*, *Arista Records v. Becker Enters.*, 298 F. Supp. 2d 1310, 1313 (S.D. Fla. 2003) (finding willfulness when infringing conduct continued after notice).

Defendant's past and ongoing solicitation of customers via the infringing advertisement has been seen by an unknown number of Florida residents and constitutes one of the acts out of which Plaintiffs' claim arises.  Defendant has not provided any information regarding its dealings with Florida customers, which would be an appropriate area for jurisdictional discovery if deemed necessary.

### D&G's Contact Through the Kia Soul Shuffle Slam Competition

David & Goliath, as part of the integrated advertising campaign, also devised and implemented the Kia Soul Shuffle Slam Competition, an on-line, national competition soliciting consumers to submit videos of themselves dancing to *Party Rock Anthem*, the Official Rules of which identify David & Goliath as one of the "Contest Entities" and further provide that contest participants were granted a license to use the infringing recording for the purpose of creating videos:

> If you download "Party Rock Anthem" from the Contest Website, you are granted a limited revocable and non-sublicensable license to use the music file provided on the Contest Website for the sole purpose of creating a Video Submission in this Contest in the manner set forth herein.

Exh. R, GGK 018082.  Moreover, each of the Entrants in the Contest granted to the Contest Entities (including D&G) the right to use and exploit their video submissions in any and all media.  Exh. R, GGK 018085.  It is believed, and would appear quite likely based upon the reach of the campaign and Florida's prominence as a market, that the participants in this national, interactive, internet campaign included an unknown number of Florida residents who downloaded and were granted licenses by D&G as one of the "Contest Entities" to use *Party Rock Anthem*, submitted videos utilizing the music, and granted licenses back to D&G to utilize their videos.  D&G's reciprocal licenses with Florida residents is another aspect of the infringement directly connected to Florida unless D&G denies that any of the contest submissions were from Florida residents.  If so, this would be an appropriate topic for jurisdictional discovery.

### The "Effects" Test is Satisfied

Defendant's willful and reckless use of Plaintiffs' copyrighted material is an intentional tort intended to capitalize on and profit from the Plaintiffs' copyrighted

material and such actions were specifically recognized as aimed at Rick Ross, the effects of which were suffered in Florida. Defendant was rightfully concerned about using "every day I'm shufflin'" because it copied and imitated *Hustlin*', knew its use would have an impact in Florida, yet continued to use the infringing material even after being sued by the Florida Plaintiffs. Defendant's conduct is quite similar to the defendant's actions in *Licciardello v. Lovelady*, *supra*, and supports the exercise of personal jurisdiction under the "effects test" for the same reasons:

> In this case, Lovelady is alleged to have committed an intentional tort against Carman—using his trademarked name and his picture on a website accessible in Florida in a manner to imply Carman's endorsement of Lovelady and his products. The use was not negligent, but intentional. The purpose was to make money from Carman's implied endorsement. The unauthorized use of Carman's mark, therefore, individually targeted Carman in order to misappropriate his name and reputation for commercial gain. These allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum. The Constitution is not offended by the exercise of Florida's long-arm statute to effect personal jurisdiction over Lovelady because his intentional conduct in his state of residence was calculated to cause injury to Carman in Florida. *See Calder*, 465 U.S. at 791, 104 S.Ct. 1482. Lovelady cannot now claim surprise at being haled into court here. *See id.* at 789–90, 104 S.Ct. 1482.

544 F.3d at 1287-88. *See also*, *Waterproof Gear, Inc. v. Leisure Pro, Ltd.,* 08-2191, 2009 WL 1066249, at * 1 (M.D. Fla. Apr. 20, 2009) (defendant purposefully availed itself of the forum when defendant copied and placed plaintiff's copyrighted marketing materials on defendant's website and satisfied effects test); *Gainesville Coins, LLC v. VCG Ventures, Inc.,* No. 13-1402, 2013 WL 4596968 * 3 (M.D. Fla. Aug. 28, 2013) (intentional copyright infringement on website supported personal jurisdiction). *See also, Brennan v. Roman Catholic Diocese of Syracuse New York, Inc.*, 322 Fed. Appx. 852, 856 (11th Cir. 2009) ("effects" test provides that due process is satisfied when the plaintiff brings suit in the forum where the "effects" or "brunt of the harm" caused by the defendant's intentional tortious activity was suffered).

Defendant asserts that, in addition to the presence of the Plaintiff in Florida and an intentional tort, "something more" must be shown to satisfy due process under the effects test. Here there is clearly "something more," including, at a minimum, D&G's

targeting of the infringing ad at Miami, Orlando and Tampa; D&G's soliciting business with the licensed use of the infringing ad on Defendant's website viewable in Florida; D&G's serving as the primary point-of-contact for Florida Kia dealers regarding advertising; D&G's scheduling and attending Dealer Marketing Group meetings in all markets, and, it is believed, D&G's engaging in licensing activity with Florida residents in connection with the infringing song and causing the infringing advertisement to be displayed in Florida cinemas.  By no means is Plaintiff "the only link to the forum" and the assertion of personal jurisdiction over D&G is consistent with *Walden v. Fiore*, 134 S.Ct. 1115 (2014) as it is based on intentional conduct by the defendant that creates the necessary contacts with the forum. [17]

**C.      Fair Play and Substantial Justice**

In addition to having constitutionally sufficient contacts with Florida, the assertion of personal jurisdiction over D&G also comports with fair play and substantial justice as required by *International Shoe,* 326 U.S. at 320, 66 S.Ct. 154.  Relevant factors include the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute.  *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559.  Florida has a very strong interest in providing a forum for its residents to obtain relief for intentional torts causing injury in Florida.  As set forth in *Licciardello v. Lovelady*, 544 F. 3d 1280, 1288 (11th Cir. 2008):

> In this case, the Florida plaintiff, injured by the intentional misconduct of a nonresident expressly aimed at the Florida plaintiff, is not required to travel to the nonresident's state of residence to obtain a remedy. The Supreme Court in *Calder* made clear that "[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." 465 U.S. at 1487, 104 S.Ct. 1401. Additionally, Florida has a very strong

---

[17]   Based upon D&G's intentional tort and its various Florida contacts in connection therewith, the due process effects test for personal jurisdiction is satisfied.  As an alternative to the effects test, personal jurisdiction may be established over D&G based on the traditional "minimum contacts" test.  As noted above, Defendant's declaration is silent as to the solicitation of business in Florida, Florida customers, business travel into Florida and similar contacts.  Thus, while specific personal jurisdiction has been shown, if deemed necessary, additional discovery into these matters would be required to demonstrate general personal jurisdiction.  "The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction" *Foreign Imported Productions and Pub., Inc. v. Grupo Indus. Hotelero, S.A.,* No. 07-22066, 2008 WL 4724495 * 11 n. 13 (S.D. Fla. 2008) *quoting Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000).

> interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida. *Allerton,* 635 So.2d at 40; *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 632 (11th Cir.1996). The Constitution is not offended by Florida's assertion of its jurisdiction over such nonresident tortfeasors. *Calder,* 465 U.S. at 791, 104 S.Ct. 1482.

*See also*, e.g., *Waterproof Gear, Inc. v. Leisure Pro, Ltd.*, No. 08-2191, 2009 WL 1066249 *4-5 (M.D. Fla. 2009) (fair play and substantial justice satisfied in asserting jurisdiction over New York-based copyright infringement defendant).

### D.    Venue In this District is Appropriate

Defendant's assertion of improper venue also fails because a substantial part of the events giving rise to this claim occurred in this district, including, *inter alia*, the specific direction of the commercial into Florida and the Defendant's past and continuing display of the infringing material on Defendants website for solicitation purposes.  28 USC § 1391 (b)(2).

Additionally, venue is appropriate under section (b)(2) where a substantial part of the property that is the subject of the action is situated.  Here, the harm to Plaintiffs' copyright from Defendants intentional tort occurred in this district, constituting injury to Plaintiffs' property.  *See, e.g., Precision Software Services, Inc. v. Fortune Financial Systems, Inc.*, No. 98-136, 1998 WL 1759759 *5 (M.D. Fla. Nov. 9, 1998) ("Precision claims that Telecomm injured its property, namely its copyright . . . [I]t is clear if the allegations of infringing the copyright are proven, Precision's property in Florida will have been injured by Telecomm's action.").

### CONCLUSION

Based upon information already obtained, it is clear that personal jurisdiction may be properly asserted over D&G both under the Long-Arm-Statute and consistent with the requirements of due process, and that venue is proper here.  If, for any reason, however, the Court determines that the record is not sufficiently developed, then Plaintiffs would request leave to conduct jurisdictional discovery, including on the topics specified herein.

WHEREFORE, Plaintiffs request the Court to enter an Order denying Defendant's Motion to Dismiss, or, if deemed necessary, permitting jurisdictional

discovery as set forth above, and granting whatever additional relief the Court deems just and proper.

> GrayRobinson, P.A.
> *Attorneys for Plaintiffs*
> 1221 Brickell Avenue
> Suite 1600
> Miami, FL 33131
> Telephone: (305) 416-6880
> Facsimile:  (305) 416-6887
>
> By:___/s/Karen L. Stetson_____
>         Karen L. Stetson
>         Florida Bar No. 742937
>         Jonathan L. Gaines
>         Florida Bar No. 330361

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via CM/ECF to:  **BARRY LAWRENCE ROTHBERG, ESQ.,** Greenberg Traurig, 333 SE 2d Avenue, Suite 4400 Miami, FL 33131 and to **VINCENT H. CHIEFFO, ESQ.,** Greenberg Traurig LLC, 1840 Century Park East, Suite 1900, Los Angeles, CA 90067 this 13th day of November, 2014.

> By: /s/ Karen L. Stetson