## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 13-24700-CIV-WILLIAMS

WILLIAM L. ROBERTS, II, *et al.*,

      Plaintiffs,

vs.

STEFAN KENDAL GORDY, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS MATTER** is before the Court on Defendants' motion for summary judgment on counts I and II (DE 44), to which Plaintiffs filed a response in opposition (DE 100), and Defendants filed a reply (DE 114).   The Court heard oral argument on the motion on June 26, 2015.  Based upon the discussion had at the hearing and for the reasons set forth below, Defendants' motion for summary judgment (DE 44) is **DENIED.**

## I.    BACKGROUND

### A.  Factual Background

Plaintiffs, William L. Roberts, II, Andrew Harr, and Jermaine Jackson claim an undetermined ownership interest in the musical composition *Hustlin*'.[1]   *Hustlin*' was released as a single in March of 2006 as part of Plaintiffs Roberts' debut album, *Port of Miami*.  (Defendants' *Corrected* Statement of Undisputed Facts ("Def. SUF") DE 62 ¶

---

[1] Whether or not Plaintiffs are either legal or beneficial owners of the copyright to the musical composition *Hustlin*' is the subject of two other motions for summary judgment.

2).[2]  *Hustlin*' begins with the phrase "Everyday I'm hustlin'" sung numerous times, with the phrase "hustle, hustlin' hustlin'" interspersed throughout the opening.  (Lyrics of *Hustlin*', DE 45-2 at 13-16).  Additionally, the lyric "Everyday I'm hustlin'" is the chorus and hook[3] of the song.  In total, the phrase "Everyday I'm Hustlin'" is sung more than 35 times throughout the composition.[4]  (Def. SUF ¶ 20; Lyrics of *Hustlin*' DE 45-2 at 13-16; Plaintiffs Statement of Undisputed Facts ("Pl. SUF") DE 101 ¶¶ 86-87; Deposition of Dr. Ferrara, DE 100-8 at 50:17-25).  *Hustlin*' has enjoyed economic and popular success since its release in 2006.  (Def. SUF ¶ 22).

Defendant Stefan Gordy and Skyler Gordy – who performed[5] as the musical group LMFAO – are two of the four co-authors of the musical composition *Party Rock Anthem*.  (Def. SUF ¶ 7).  Unlike other songwriters who create music to express feelings or emotions, LMFAO creates music "with the specific intention of making the listener laugh and feel like he or she wants to party." (Def. SUF ¶ 12; Declaration of Stefan Kendal Gordy ("Gordy Decl."), DE 45-1 ¶ 10).

In May, 2010, LMFAO and Defendant David Jamahl Listenbee were engaged to write and produce songs for an artist known as Flo Rida.  (Gordy Decl. ¶16).  For several days in mid-May, 2010, LMFAO and Listenbee worked on, and recorded, a song for Flo Rida, tentatively titled *I Can Feel It in My Soul Tonight*.  (Gordy Decl. ¶ 16).  The chorus of *I Can Feel It in My Soul Tonight* was "I can feel it in my soul tonight/

---

[2] Unless otherwise noted, facts from Defendants' statement of material facts (DE 62) are not materially disputed.

[3] The hook has been described as the part of a song that is "most often repeated and remembered."  *See Copeland v. Bieber*, 789 F.3d 484, 494 (4th Cir. 2015).

[4] The lyrics of *Hustlin*' and *Party Rock Anthem* are included in the Appendix to this opinion.

[5] It is unclear from the record whether the group is still together.

2

Everybody's gonna have a good time." (Gordy Decl. ¶ 16). Ultimately, Flo Rida decided not to include any of the songs LMFAO and Listenbee had created on his new album, including *I Can Feel It in my Soul Tonight*. (Gordy Decl. ¶ 16).

In the summer of 2010, LMFAO and Listenbee began reworking the tracks they had recorded for *I Can Feel It in My Soul Tonight* with the goal of creating a new LMFAO song that would "work for people doing the 'Shuffling' dance."[6] (Gordy Decl. ¶ 20; Def. SUF ¶ 28). As part of the re-working, Stefan Gordy changed the original chorus lyrics from "I can feel it in my soul tonight/ Everybody's gonna have a good time" to "Party Rock is in the house tonight/ Everybody just have a good time." (Gordy Decl. ¶ 21; Def. SUF ¶ 29). Notwithstanding this lyrical change, "[t]he majority of – well all of our verses, our rap verses" for *Party Rock Anthem* "were recorded at . . . the Flo Rida session studio." (Deposition of Stefan Gordy, DE 100-1 at 116:10-14; Deposition of David Listenbee, DE 100-2 at 10:18-24 (testifying that 75% "or so" of the completed version of *Party Rock Anthem* had been submitted to Flo Rida as part of *I Can Feel It in My Soul Tonight*). By December 5, 2010 the final "drop synthesizer" melody for *Party Rock Anthem* was created and recorded (Declaration of Stefan Gordy In Support of Reply ("Gordy Decl. ISO"), DE 114-1 ¶ 5). All of the rap verses, the chorus, and the drop synthesizer melody for *Party Rock Anthem* were completed and recorded by December 5, 2010.

Although Stefan Gordy and Listenbee "liked the song," they did not believe it was "clearly branded as a Shuffle dance song," and began to brainstorm ways to focus the

---

[6] The Shuffle, also known as the Melbourne shuffle, is a dance that had become popular in rave culture (Gordy Decl. ¶ 19). While neither party has offered a description or explanation of the choreography or steps required to perform the shuffle, a review of the videos submitted by Defendants demonstrates the dance by various individuals, including Defendants.

audience on *Party Rock Anthem* as a Shuffle dance song.  (Gordy Decl. ¶ 22).  During a recording session on December 7, 2010, Listenbee "spontaneously" said the line "everyday I'm shuffling" in a "deep growl in the singing style of Plaintiff Roberts."  (Def. SUF ¶ 30; Gordy Decl. ¶ 22; Gordy Decl. ISO ¶ 6).[7]  Listenbee and Stefan Gordy both recognized Listenbee's reference to the Roberts recording *Hustlin*' (Def. SUF ¶ 30; Gordy Decl. ¶ 22).  Skyler Gordy also recognized "everyday I'm shufflin'" as having been taken from *Hustlin*' when he first heard it (Deposition of Skyler Austin Gordy, DE 100-9 at 23:16-20).

Stefan Gordy decided to use the "everyday I'm shufflin'" lyric "in order to clearly tell our audience that *Party Rock Anthem* was a Shuffling dance song."  (Gordy Decl. ¶ 22).  According to Stefan Gordy's declaration, he and Listenbee "also intended that the Tag 'everyday I'm shufflin'' would be understood by the LMFAO audience as a humorous parody of, and comment on, the drug dealing, daily hustle, and lifestyle of criminal activity described by Rick Ross in *Hustlin*.' . . . This parody was achieved by using the word 'shufflin' rather than hustlin.'"  (Gordy Decl. ¶ 23).  Stefan Gordy opines that "[t]he two words have polar opposite meanings – you cannot be hustling if you are Shuffling."  (Gordy Decl. ¶ 23).  At his deposition, Stefan Gordy explained:

> A: [W]ell, first purpose was because it was funny to do that. We needed a line.  We acknowledged that we wanted a line that prompted somebody to shuffle.  Me and [Listenbee] were discussing it.  And that, you know, I was saying to him something like, this is the part where it's time to shuffle, or something like that.  And I just remember him saying, "Every day I'm shufflin'."  And I said, yea, you know that's it.  And I liked it and thought it was funny because it reminded me of – of "Everyday I'm Hustlin'".

---

[7]  Listenbee could not recall any other lines that were part of the brainstorming session (Deposition of David Jamahl Listenbee, DE 100-2 at 11:18-22).

Q:  And what is funny about it to you?

A:  Because it –I think I can, you know – not sure.  You know, all the time it makes you laugh.  I think it's the opposite meaning that's kind of funny.  It's like, you know, I think that's funny, like in a parody where you – the original meaning is every day I'm hustlin' on the streets, selling drugs, things of that nature, and then, you know, dancing.  Shuffling is dancing, so it's funny to be said in a serious tone.  'Everyday I'm shufflin'' is funny.  It's funny because it's the total opposite of 'Hustlin'.'  I think that's what makes me laugh about it.  For instance, yeah – if they were similar in meaning, they wouldn't be funny to me.

* * *

Q:  Is there any other parody in [*Party Rock Anthem*]?

A:  Yes.  I'm not sure.  I'm – I'm not sure.  A lot of lyrics being written.  I'm not sure. . . .  I make so many jokes, sometimes I don't understand what methods I may be using.  So I said "like Drano" in the lyric, like the brand of Drano when you unclog a drain.  I referenced that.  I don't know if that's – you know, like Drano, I think like is a simile.  But I don't know since we're referencing a brand name if – I don't know what that's called.  That could be called, you know, something, a parody, or – or – clever.  You know, in my mind, oh, that's clever.  Poetry.

* * *

Q:  Is there anything – other than that reference, "Everyday I'm shuffling,'" is there anything else in the song lyrically or musically that references hustling in any way?

A:  No.

(Deposition of Stefan Gordy, DE 100-1 at 112:6-132:7, DE 114-2 at 112:6-132:7).

Similarly, Listenbee explained:

We were trying to figure out a line before, what is called the drop of the song, which is like the dance portion of the song.  And we needed a line to go right before the drop, and we wanted something that was very colorful and fun and very dancy, positive.

* * *

5

> [T]hat was the whole goal, was to say it like [Rick Ross], to kind of poke fun or make jest of his hustling ways, because we were kind of the opposite.  We like the have fun and partying.  So we just wanted to kind of make light of this hustling thing that was getting so much notoriety across the board.  We wanted to put a different kind of take, a different spin, a different energy into the world.

(Deposition of David Jamahl Listenbee, DE 114-2, 11:8-13:3).

The same day Listenbee spontaneously uttered the "everyday I'm shufflin'" lyric, Stefan Gordy recorded it.  (Gordy Decl. ¶ 24).  Stefan Gordy "listened to Rick Ross's *Hustlin'* to make sure [his] performance of the "tag" (i.e., "everyday I'm shufflin'") in *Party Rock Anthem* mimicked Ross' voice as closely as possible," and tried to record the lyric to sound like the low, growling voice on *Hustlin'*.[8]  (Gordy Decl. ¶ 24; Def. SUF ¶ 32).  When the tag was added to the song in December 2010, it was further electronically enhanced to sound more like the way "everyday I'm hustlin'" was recorded in *Hustlin'*.  (Gordy Decl. ¶ 24).  The lyrics "everyday I'm shufflin'", "shufflin', shufflin'" and "everyday I'm shuff-fl-lin'" each appear once in the sound recording *Party Rock Anthem* (Def. SUF ¶ 33).  The lyrical phase "everyday I'm shufflin'" is one of three hooks in *Party Rock Anthem* and is one of the most memorable, important, and popular parts of the song (Pl. SUF ¶ 88; Defendants Response to Plaintiff's Statement of Additional Facts ("Def. Resp. SUF"), DE 116 ¶ 88).

The sound recording of *Party Rock Anthem* was first released as a single by Interscope Records on January 25, 2011 (Def. SUF ¶ 16).  LMFAO's second album, *Sorry for Party Rocking*, was released in June of 2011 and contained the song *Party*

---

[8] It should be noted that the lyric "Everyday I'm Hustlin'" was not performed by Plaintiff Roberts but rather by a recording artist associated with Plaintiffs Jackson and Harr.  Plaintiffs do not own the copyright to the sound recording of *Hustlin'* and ownership of the musical composition has yet to be determined.

*Rock Anthem* (Def. SUF ¶ 15).  Following the release of the *Party Rock Anthem* music video, *Party Rock Anthem* became extremely popular, reaching number one on the Billboard Hot 100 Charts on July 16, 0211, where it remained for six straight weeks (Def. SUF ¶ 19).  *Party Rock Anthem* was subsequently licensed to Defendant Kia Motors America, Inc., for use in a commercial advertisement (Def. SUF ¶ 9).

All of the parties in this matter are longstanding members of the music industry and are either licensors or licensees of music (Pl. SUF ¶ 67; Def. Resp. SUF ¶ 67). After the release of *Party Rock Anthem*, domestic digital income from the sound recording of *Hustlin'* increased, generating more income in 2011 and 2012 than it had in 2010 (Def. SUF ¶¶ 59-61).  Likewise, domestic music publishing income for *Hustlin'* was greater in 2011, 2012, and 2013 than it was in 2012 (Def. SUF ¶ 62).  Additionally, following the release of *Party Rock Anthem*, online searches for the terms "hustlin'" and "everyday I'm hustlin'" increased (Def. SUF ¶ 66;).  And, both *Hustlin'* and *Party Rock Anthem* are "songs played at clubs where people dance."  (Pl. SUF ¶ 78).

## B. The Expert Reports

### 1. Dr. Lawrence Ferrara

Dr. Ferrara is a professor of music who has been retained by Defendants as an expert.  Dr. Ferrara completed a musicological analysis of the musical and lyrical compositions in *Hustlin'* and *Party Rock Anthem*.  (DE 49-1 ¶ 4).  On the basis of this analysis, "it is [Dr. Ferrara's] opinion that the 'Party Rock Anthem' album and video versions[9] each parody *Hustlin'.*" (DE 49-1 ¶ 5). He also believes that "in a more macro

---

[9] Defendants do not own the copyright in the sound recording of *Hustlin'*.  Accordingly, the pertinent question does not focus on the song recordings of *Party Rock Anthem* or *Hustlin'* or their album versions, but rather the musical compositions.

sense, the Electric Dance Music genre in which '*Party Rock Anthem*' can be categorized is transformative of the Hip Hop genre in which *Hustlin*' can be categorized." (DE 49-2 at 30, ¶ 79).

Dr. Ferrara opines that *Party Rock Anthem* parodies[10] *Hustlin*' because "Party Rock Anthem's lyrics 'ev-ry day I'm shufflin'' represent dancing and partying 'everyday', and thereby parodies the lyrics 'ev'-ry day I'm hustlin'' in Rick Ross' seemingly autobiographical 'Hustlin'' and its dark and more serious world of a drug dealer who is working/hustlin' 'every day.'" (DE 49-1, ¶ 6(f)(i); DE 49-2 at 31-32, ¶¶ 83-84).[11] "Thus, the lyrical message changes from the 'work' related to drug selling/'hustlin' in 'Hustlin' to the lyrical message of dancing, partying, drinking, and having a good time in Party Rock Anthem." (DE 49-2 at 32, ¶ 84).[12]   Dr. Ferrara also opines that "the 7-note vocal melody" the lyrics "everyday I'm hustlin'" sung in Ross' low-pitched vocal style "is parodied by a high-pitched 14-note (2-measure) synthesizer melody in '*Party Rock Anthem*' that creates a light-hearted and comical parody of the vocal melody in '*Hustlin*'." (DE 49-1 ¶ 6(f)(ii); *see also* DE 49-2 at 29-30; 32-33 [stating that the pitch

---

[10] "The issue of whether a work is a parody is a question of law, not a matter of public majority opinion," and "every court to address the issue of whether a defendant's work qualifies as parody has treated this question as one of law to be decided by the Court." *Mattel, Inc. v. Walking Mountain Prods.,* 353 F.3d 792, 801 (9th Cir. 2003).

[11] Dr. Ferrara uses *The New Grove Dictionary of Music and Musicians* (2001) definition of parody, which defines parody as: "A composition of generally humorous or satirical intent in which turns of phrase or other features characteristic of another composer or type of composition are employed and made to appear ridiculous, especially in light of their application to ludicrously inappropriate subjects." (DE 49-2 at 30, ¶ 80).

[12] In Dr. Ferrara's opinion, the lyrical message of *Hustlin*' focuses on the "dark and dangerous world associated with selling drugs, and the financial rewards that are accrued from those actions" (DE 49-2 at 16; *see also* DE 49-2 at 32-32). In contrast, Dr. Ferrara believes that Party Rock Anthem's lyrics "*are* meant to be about 'fun', and places importance on 'just' dancing, partying, drinking, and having a good time" (DE 49-2 at 16; DE 49-2 at 31-32). Dr. Ferrara does not explain how this "change in lyrical message" equates to the critical juxtaposition the law requires for a work to be considered parody.

8

sequence, intervals, and melody of the synthesizer creates a "comical referential meaning" compared to the low-pitched and "more serious" vocal melody in *Hustlin'*]).  In Dr. Ferrara's opinion, *Party Rock Anthem* incorporates "a sufficient portion of the lyrical and musical expression from 'Hustlin'' to conjure up" *Hustlin'* but that "the copying from 'Hustlin'' is far from excessive."  (DE 49-5 ¶ 5).[13]

Dr. Ferrara notes that fewer than 4% of the measures in *Party Rock Anthem* contain lyrical expression related to *Hustlin'*.  (DE 49-2 at 13).  He also states that 23 measures of *Party Rock Anthem* contain melodic expression related to *Hustlin'*, resulting in 25% of the measures in *Party Rock Anthem* having some relation to *Hustlin'.*  (DE 49-2 at 34).[14]  According to Dr. Ferrara, the remaining 75% of the measures in *Party Rock Anthem* contain lyrical or musical expression that is independent of *Hustlin'*.  (DE 49-2 at 34).  In analyzing the lyrics and notes of the two compositions, Dr. Ferrara concludes that 98% of the total lyrics and 96.8% of the total notes in *Party Rock Anthem* are independent of *Hustlin'*.  (DE 49-2 at 36).

### 2. Anthony Ricigliano

Mr. Ricigliano is a musicologist retained by Plaintiffs as an expert.  After reviewing Dr. Ferrara's report, Mr. Ricigliano agrees that "overall the basic lyrics in [*Party Rock Anthem*] are essentially different from those in *Hustlin'*."  (DE 100-13 at 3). Mr. Ricigliano notes that the more than 30 iterations of the phrase "everyday I'm hustlin'" appear in *Hustlin'* and comprise approximately 42% of the total music in

---

[13] Again, the Court regards Dr. Ferrara's opinion in this regard as outside the purview of expert opinion. "Although the actual amount taken is a factual issue susceptible of proof, it is a question of law whether the taking is excessive under the circumstances." *See Fisher v. Dees*, 794 F.2d 432, 438 n.4 (9th Cir. 1986).

[14] Specifically, Dr. Ferrara states that "25% of the measures in 'Party Rock Anthem' . . . contain expression that is transformative of expression in Hustlin'".  (DE 49-2 at 34).

*Hustlin'*.  (DE 100-13 at 3).  As to *Party Rock Anthem*, Mr. Ricigliano concludes that elements from *Hustlin'* are present in approximately 31% of *Party Rock Anthem*.  (DE 100-13 at 8).

With respect to the lyrics of the two works, Mr. Ricigliano opines that "the only significant lyrical similarity between these works is the lyric phrase 'ev'ry day I'm hu-stl-in' from *Hustlin'* and the phrase 'ev'ry day I'm shuff-fl-in' utilized in [*Party Rock Anthem*]."  (DE 100-13 at 3).  In Mr. Ricigliano's opinion, "there are no significant duplications of subject or 'message' matter" in the two works.  (DE 100-13 at 8).  Mr. Ricigliano states that he did not find "any indication or lyric phrases in [*Party Rock Anthem*] that constitute parody, commenting directly about the lyric content of *Hustlin'* or making fun of the lyrics of *Hustlin'*." (DE 100-13 at 8).[15]

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The moving party bears the initial burden of establishing the nonexistence of a triable fact issue." *Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000) (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986)).  If the movant establishes the

---

[15] Because parody is a question of law, the Court will treat Mr. Ricigliano's conclusion regarding parody in the same manner as Dr. Ferrara's.

absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(c)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted). When a motion for summary judgment is presented to the Court, it opens the entire record for consideration, and the Court may enter judgment in favor of the nonmoving party on any grounds apparent in the record, even where there is no formal cross-motion. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999).

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

III.    **ANALYSIS**

In moving for summary judgment, Defendants assume, without waiving, that but for the affirmative defense of fair use, Plaintiffs could prevail on their copyright claims. (*See* DE 44 at 5).  Accordingly, for the purposes of this motion, the Court makes the same assumption.  Thus, the Court does not analyze whether Plaintiffs have standing to sue, the scope of their copyright, or whether the copied portions are original; rather, the Court determines only whether Defendants are entitled to summary judgment on their affirmative defense of fair use.

Defendants argue that the use of *Hustlin'* in *Party Rock Anthem* is a fair use for two reasons.   First, and primarily, Defendants contend that the use constitutes parody. Second, Defendants argue that even if it is not parody, the use of *Hustlin'* in *Party Rock Anthem* is highly transformative because it gives "new meaning and message to brand *Party Rock Anthem* as a song to which a specific dance – the Shuffle – is to be performed." (DE 44 at 1).

**A. Overview of the Fair Use Doctrine**

The fair-use doctrine was initially developed by courts as an equitable defense to copyright infringement and is ordinarily a mixed question of fact and law.  *See, e.g., Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 n.32 (11th Cir. 2001); *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 844 (11th Cir. 1990); *Fisher v. Dees*, 794 F.2d 432, 435-36 (9th Cir. 1986).  The fair use doctrine creates a limited privilege for persons other than the owner of a copyright to use the

copyrighted material in a reasonable manner without the owner's consent. *Fisher*, 794 F.2d at 435-36.

In 1976, Congress codified the fair use doctrine in section 107 of the Copyrights Act of 1976 and enumerated four nonexclusive factors for courts to consider in analyzing fair use: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;(2) the nature of the copyrighted work;(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *See* 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576-578 (1994).

"[T]he statute, like the doctrine it recognizes, calls for case-by-case analysis" of the four factors, among other considerations, to determine whether a particular use is fair.  *Campbell*, 510 U.S. at 577-578.  Neither the examples of possible fair uses in the preamble, nor the four enumerated factors, are to be considered exclusive or exhaustive.  *Peter Letterese and Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1308 (11th Cir. 2008).  And no one factor is dispositive; each factor must be weighed and considered under the specific circumstances of the case.  *Cambridge Univ. Press v. Patton,* 769 F.3d 1232, 1260 (11th Cir. 2014).  The Court is obligated to avoid a rigid application of the copyright statute which would stifle the very creativity the fair use doctrine was designed to foster.  *See Campbell*, 510 U.S. at 577-78.

Parody is a form of comment and criticism that may constitute a fair use of the work being parodied.  *Suntrust Bank*, 268 F.3d at 1268; *see also Fisher*, 794 F.2d at 435 (describing parody as a "branch of the fair-use doctrine").  Parody, like any other

use, must still "work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Campbell*, 510 U.S. at 581. "[W]hen fair use is raised in defense of parody," the "threshold question . . . is whether a parodic character may reasonably be perceived." *Id.* at 582; *Suntrust Bank*, 268 F.3d at 1269 ("Before considering a claimed fair-use defense based on parody, however, the Supreme Court has required that we ensure that 'a parodic character may reasonably be perceived' in the allegedly infringing work."). For the reasons set forth below,[16] the Court finds that no parodic character may reasonably be perceived and thus Defendants are not entitled to assert a parody-based fair use defense. However, given the non-exhaustive nature of the fair use factors and delicate balancing necessary in determining fair use, the Court finds that, outside of the parody context, Defendants have failed to meet their burden, and this issue is inappropriate for resolution on summary judgment. .

## B. Application of the Fair Use Factors

### 1. Purpose and Character of the Use

The first factor in a fair use analysis – the purpose and character of the allegedly infringing work – has several facets. *Suntrust*, 268 F.3d at 1269; *see also* 17 U.S.C. § 107. Two such facets are: (1) the degree to which the use is a transformative use as opposed to superseding use; and (2) whether the use serves a nonprofit or educational purpose as opposed to a commercial purpose. *Letterese*, 533 F.3d at 1309. A third facet of this factor that the Court may consider is "the propriety of the defendant's conduct" because "fair use presupposes good faith and fair dealing." *Letterese*, 533 F.3d at 1312 n.27; *see also Harper & Row*, 471 U.S. at 562-63 (noting that defendants "knowingly exploited a purloined manuscript"). The Court's analysis of the first factor "is

---

[16] *See* section B.1.a.1.

14

guided by the examples provided in the preamble to § 107, looking to whether the purpose of the use is for criticism, or comment, or news reporting and the like." *Campbell*, 510 U.S. at 578-79.

### a. Transformative or Superseding Use

Although a transformative use "is not absolutely necessary for a finding of fair use . . . the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579 (internal citations and quotations omitted).

### 1. Parody as a Transformative Use

"[P]arody transforms a work by appropriating elements of the work for purposes of comment or criticism, and thus reflects transformative value because it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." *Cambridge Univ. Press*, 769 F.3d at 1262 (internal citations and quotations omitted); *Henley v. DeVore*, 733 F. Supp. 2d 1144, 1151 (C.D. Cal. 2010) ("[P]arody has been considered transformative because it provides socially-valuable criticism or commentary of the subject work."). "A parody is a work that seeks to comment upon or criticize another work by appropriating elements of the original." *Suntrust*, 268 F.3d at 1271. Unlike satire, which more broadly addresses the institutions and mores of a slice of society, parody is "directed toward a particular literary or artistic work." *Suntrust*, 268 F.3d at 1268. Accordingly, "[t]he parody must target the original, and not just its general style, the genre of art to which it belongs, or society as whole (although if it targets the original, it may target those features as well)." *Campbell*, 510 U.S. at 597 (Kennedy, J., concurring). The "only significance of deeming a work a parody is the concomitant

determination that the work contains elements of commentary and criticism" of the original work; thus "the important, if not dispositive, issue is whether [the] use of plaintiff's material amounted to comment or criticism." *Kane v. Comedy Partners,* No. 00 CIV. 158 (GBD), 2003 WL 22383387, at *4 (S.D.N.Y. Oct. 16, 2003) *aff'd*, 98 F. App'x 73 (2d Cir. 2004); *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986) (noting that parody "deserves protection under the fair-use doctrine only if the copied work is at least partly the target of the work in question").

In *Campbell*, the Supreme Court noted that it is the "joinder of reference and ridicule that marks off the author's choice of parody from the other types of comment and criticism that traditionally have had a claim to fair use protection as transformative works." *Campbell*, 510 U.S. at 583; *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998) (finding parody because the striking contrast between the original and allegedly infringing work achieved "the effect of ridicule that the Court recognized in *Campbell* would serve as a sufficient 'comment' to tip the first factor in a parodist's favor."). As the Eleventh Circuit explains:

> The difference between a transformative use and a superseding use is illustrated by the contrast between two works derived from Margaret Mitchell's novel, *Gone With the Wind* ("GWTW"). Alice Randall's novel, *The Wind Done Gone,* inverts the original storyline of GWTW in order "to explode the romantic, idealized portrait of the antebellum South during and after the Civil War." *Suntrust Bank,* 268 F.3d at 1270. Whereas the original novel "describes how both blacks and whites were purportedly better off in the days of slavery," Randall's highly transformative parody "flips GWTW's traditional race roles, portrays powerful whites as stupid or feckless, and generally sets out to demystify GWTW and strip the romanticism from Mitchell's specific account of this period of our history." *Id.* By contrast, despite the inclusion of several elements of parody or satire in the 1979 musical production, *Scarlett Fever,* the work "as a

whole is not a critical commentary" of the original work, but rather a work that fulfills the same "overall function"—"to entertain." *Metro–Goldwyn–Mayer, Inc. v. Showcase Atlanta Coop. Prods., Inc.,* 479 F.Supp. 351, 357, 361 (N.D. Ga. 1979).

*Letterese*, 533 F.3d 1287, 1311 (11th Cir. 2008).

Thus, heart of a parody-based fair use defense "is the use of some elements of a prior author's composition to create a new one that, at least in part, *comments on that author's work*." *Campbell*, 510 U.S. at 580 (emphasis added). This use is deemed fair because "[p]arody needs to mimic an original to make its point." *Campbell*, 510 U.S. at 580-81; *see also Suntrust*, 268 F.3d at 1271 ("It is hard to imagine how [defendant] could have specifically criticized [the original work] without depending heavily upon the copyrighted elements of that book. . . [defendant] has fully employed those conscripted elements from [the original work] to make war against it."); *Henley*, 733 F. Supp. 2d at 1152 ("The parodist has no alternative but to use the work."). The more directly the parodist targets the original work, the greater protection and justification for the borrowing the law provides, whereas the "loose" parodist has "a greater burden of proving the necessity of the use." *Henley*, 733 F. Supp. 2d at 1152. As such, the Court looks at the work as a whole to see if it serves as a critical commentary on the original work. *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op Productions Inc.*, 479 F. Supp. 351, 357 (N.D. Ga. 1979).

However, if "the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Campbell*, 510 U.S. at 580. If the infringed

upon song "was used merely as a vehicle to achieve a comedic objective unrelated to the song, its place, and time," then such use may not properly be considered fair as a parody. *Fisher*, 794 F.2d at 436; *see also Campbell*, 510 U.S. at 597 (J., Kennedy concurring) ("[I]t is not enough that the parody use the original in a humorous fashion, however creative that humor may be. The parody must target the original"); *see also Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 91 (S.D.N.Y. 2003) ("A work that appropriates material from an existing work for humorous effect, without directing its criticism or ridicule at the copied work itself, does not have parody's need to appropriate material from the subject work in order to make its point, and is therefore not entitled to the allowances made for parody in considering the other fair use factors."); *Metro-Goldwyn-Mayer,* 479 F. Supp. at 357 (to be "eligible for fair use protection, parody must do more than merely achieve comic effect. It must also make some critical comment or statement about the original work which reflects the original perspective of the parodist thereby giving the parody social value beyond its entertainment function.").

In determining whether a use constitutes parody, the Court is cognizant of the "concern about the ease with which every purported parodist could win on the first factor simply by pointing out some feature that contrasts with the original. But being different from an original does not inevitably 'comment' on the original." *Leibovitz*, 137 F.3d at 114-15. As Justice Kennedy cautioned, courts should be wary of post-hoc rationalizations of parody. *Campbell*, 510 U.S. at 600. The defendant must demonstrate "[m]ore than arguable parodic content" and "doubts about whether a given use is fair should not be resolved in favor of the self-proclaimed parodist." *Id.* at 599.

Consequently, courts often consider evidence regarding the author's goal in creating the work, including whether it was initially conceived of as a parody or with the intent to criticize or mock the original work. *See MCA, Inc. v. Silzon*, 677 F.2d 180, 184 (2d Cir. 1981) (considering defendants' admission that when song was composed "it was not intended to make any statement" about the original work and finding that the use was not fair because it was done simply to reap the advantages of a well-known tune and short-cut the rigor of composing original music); *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp. 2d 499, 508 (S.D.N.Y. 2009) (noting that defendants presented "uncontroverted evidence" of their intent to "make a point about Disney's alleged anti-Semitism" including evidence that the criticism "was discussed in the writer's room prior to the recording of the song" and that defendants "have attempted to make the same joke, subsequent to their creation of the Episode, but prior to this litigation" which lent credence to their argument that the parody was intended); *Suntrust*, 268 F.3d at 1270 (noting that the defendant's "literary goal is to explode" the original work's view and that the defendant's work "is principally and purposefully a critical statement that seeks to rebut and destroy the perspective, judgments, and mythology of" the original work). And even though the infringing work may contain some parodic elements, the use will not be fair if the overall effect or impression of parody or satire is lacking. *Metro-Goldwyn-Mayer,* 479 F. Supp. at 357. The question, as always, is whether a parodic element may reasonably be perceived.

No parodic element "may reasonably be perceived" in *Party Rock Anthem*. Although the parties agree that the line 'everyday I'm shufflin'' mimics *Hustlin'*, it does not hold *Hustlin'*, its themes, its lyrics, its style, or even its genre, up to criticism,

19

commentary, or ridicule.  Nor are Plaintiffs the subject of ridicule[17] in the context of *Party Rock Anthem* and *Party Rock Anthem* does not present a "striking contrast" with *Hustlin'*.  And it cannot be said that *Hustlin'* is the target of *Party Rock Anthem* or that *Party Rock Anthem* makes any critical comment or statement about *Hustlin'*.  As Stefan Gordy testified, other than the lyric 'everyday I'm shufflin'' there is nothing else in *Party Rock Anthem*, either lyrically or musically, that references *Hustlin'* in any way (Gordy Dep. 132:3-7).  At best, *Party Rock Anthem* uses *Hustlin'* in a humorous way,[18] but in the absence of any directed criticism, comment, or ridicule, this (slight) element of humor is insufficient to support a parody defense.

To avoid this inescapable conclusion, Defendants describe *Party Rock Anthem* as "simply [] a paean to good, hardcore partying" and contend that its light-hearted, party-focused message contrasts directly with, what they perceive to be, the darker drug-dealing message of *Hustlin'* thereby parodying *Hustlin'*.  But the law is clear that merely being different from the original is not parody.  *See Leibovitz*, 137 F.3d at 114-15.  In an effort to contort this purported contrast into parody, Defendants further assert

---

[17] Some Courts have recognized that a use might constitute parody if the intent is to ridicule the author of the work as opposed to the work itself.  *See Henley v. DeVore*, 733 F. Supp. 2d 1144, 1153 (C.D. Cal. 2010).  Whether such a use constitutes parody is of no moment here because as Stefan Gordy testified:

> Q:  Is the use of "Everyday I'm shufflin'" in any way ridiculing Rick Ross?
> A:  I'm not clear on the definition of ridicule.
> Q:  Making fun of.
> A:  Making fun of him?
> Q:  Right.
> A:  That wasn't so much my intention was to make fun of Rick Ross.

(Stefan Gordy. Dep., DE 114-2 at 114:16-21).

[18]  At his deposition, Stefan Gordy explained:  "Q:  So I think you said that, "Everyday I'm Hustlin'" – I'm sorry – Everyday I'm shuffling'" was intended to parody the drug dealing and hustling; is that correct?  A:  I just thought it was funny.  Funny line."  (Gordy Dep. 131:21-25).

that *Hustlin'* is used in *Party Rock Anthem* to send the message that "we would all be better off shuffling at a party rather than hustlin in the life of a drug dealer." (DE 44 at 15).[19] Notwithstanding that that message is wholly undetectable in *Party Rock Anthem*, even if such a message could be discerned, that use of *Hustlin'* would be closer to satire than parody. *See Salinger v. Colting*, 641 F. Supp. 2d 250, 256 (S.D.N.Y. 2009) ("Unlike satire, which critiques and comments on aspects of society more broadly, parody sharpens its knives for the very work form which it borrows."); *Suntrust*, 268 F.3d at 1258 (noting that satire "more broadly addresses the institutions and mores of a slice of society"). Satire requires an even greater justification for the borrowing, which Defendants cannot meet. *Campbell*, 510 U.S. at 581; *Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 972 (C.D. Cal. 2012); *Henley*, 733 F. Supp. 2d. at 1163 (finding that the song at issue "is pure satire which fails to take aim at the original or its author. It therefore lacks justification to borrow from [the original].").

---

[19] The Court notes that Stefan Gordy submitted a declaration that LMFAO does not create music to express emotions but rather with "the specific intention of making the listener laugh and feel like or she wants to party." (Def. SUF ¶ 12; Gordy Decl. ¶ 10). In a December 7, 2011 interview, Stefan and Skyler Gordy discussed the use of "Rick Ross' melody" in *Party Rock Anthem*. (DE 100-12). During that same interview, they explained that they do not use music to spread anti-drug messages or other political or societal messages:

> Q: Obviously coming from LA, you must be aware of some societal issues. . .
>
> Skyler Gordy:  Crips and the Bloods
>
> Q:  Would you ever consider making music help alleviate those issues?
>
> Stefan Gordy:  I think there's a lot of ways to alleviate issues.  Music is a way but I don't know if it's the *best* way.  Through a forum (is more ideal) but through a song – made for a party; it's tough to have a political song at a party or a club! So if you make a song like (sings) 'Stop the drugs, stop the gangs'
>
> Skyler Gordy:  You'd get shot with that!
>
> Stefan Gordy:  They'd probably inject you with drugs and kill you! But the point is that song wouldn't live in a lot of places.  So it wouldn't be effective of reaching people. . .

(DE 100-12).

Additionally, the unrebutted evidence is that *Party Rock Anthem*, with the exception of the disputed line, was finished before any allusion to *Hustlin'* was conceived.[20]   As Stefan Gordy testified, he felt the only thing lacking in *Party Rock Anthem* was a signal to the audience that it was time to shuffle and the clear branding of *Party Rock Anthem* as a shuffling song.  The Defendants were searching for a catchy line prompting someone to shuffle when they came up with the idea of mimicking *Hustlin'*.  Unlike a true parody, where the author has no choice but to use the original work in order to make his point, Defendants had innumerable options with which to "prompt[] somebody to shuffle" that did not involve using Plaintiffs' work.  *See Henley*, 733 F. Supp. 2d at 1158 (finding use was not parody in part because the "[d]efendants have innumerable alternatives" with which to make their point without appropriating plaintiff's work).  Accordingly, the justification for the use is lacking here.

It appears that *Party Rock Anthem* merely uses *Hustlin'* "to get attention" or to "avoid the drudgery in working up something fresh."  *Campbell*, 510 U.S. at 580.  The Court finds that Defendants' assertion of parody is an unconvincing post-hoc rationalization and that Defendants simply cannot meet their burden of proving the necessity of the use.  *See Henley*, 733 F. Supp. 2d at 1152; *Campbell*, 510 U.S. at 600.  Because no parodic character can reasonably be discerned, Defendants are not entitled to summary judgment on their parody defense.  The Court now turns to fair use outside of the parody context.

---

[20] For this same reason, the Court finds Defendants' assertion, and Dr. Ferrara's conclusion, that the drop synthesizer melody further emphasizes the parodic element of *Party Rock Anthem* to be unpersuasive given that the synthesizer melody was created prior to Plaintiffs having any thought, reference, consideration, or notion of *Hustlin'* as a part of their work.

## 2. Non-Parodic Transformative Use

The Court's "initial inquiry under the first factor asks whether Defendants' use is transformative, i.e., 'whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *Cambridge University Press*, 769 F.3d at 1262 (quoting *Campbell*, 510 U.S. at 579). "A 'transformative' use is one that 'employ[s] the quoted matter in a different manner or for a different purpose from the original,' thus transforming it." *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 638 (4th Cir. 2009) (quoting Pierre N. Leval, Commentary, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105, 1111 (1990)).

Transformation is most readily recognized "[i]f 'the secondary use adds value to the original—if copyrightable expression in the original work is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (quoting Leval at 1111); *Letterese*, 533 F.3d at 1311 (finding use was not transformative when it did not reshape the overall purpose or function of the original work nor did it cast the original work in a new light, through a new meaning, message or expression). A transformative use has value because it "can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." *Campbell*, 510 U.S. at 579. "Allowing would-be fair users latitude for transformative uses furthers the goal of copyright to, promote science and the arts." *Cambridge University Press*, 769 F.3d at 1262 (internal quotations omitted).

The Court also considers the list set out in the copyright statute's preamble, which although not exhaustive, identifies "purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research" as illustrative of the types of uses for which fair use may provide an affirmative defense. 17 U.S.C. § 107.  While neither dispositive nor exhaustive, the Court finds that *Party Rock Anthem* does not clearly fall within any of the enumerated purposes identified in the statute's preamble.[21]

Defendants argue that even if their use is not parody, it is still fair because they have "transformed" *Hustlin'* by giving "new meaning and message to brand *Party Rock Anthem* as a song to which a specific dance – the Shuffle – is to be performed." (DE 44 at 1).  Specifically, Defendants contend that *Party Rock Anthem* transforms *Hustlin'* because "[i]n *Hustlin'*, that lyric describes the life of the drug dealing Rick Ross . . . *PRA*'s lyric change to 'everyday I'm shufflin'' has an entirely different meaning and message.  The *PRA* lyric tells *PRA's* audience that the song is meant to be danced to by people doing a specific dance – the Shuffle." (DE 44 at 16).  Thus, Defendants contend that because *Hustlin'* "says nothing about the Shuffle dance nor is it a dance song at all[,] *PRA* . . . is a Shuffle dance song and 'conveys new information, new aesthetics, new insights, and understandings that are plainly distinct from *Hustlin'*.'" (DE 44 at 12).  There have also been fleeting references throughout the voluminous filings in this case, that the use of *Hustlin'* was an "homage" to Plaintiff Roberts.[22]

---

[21] *See Katz v. Chevaldina*, Case No. 14-14525 (11th Cir. Sept. 17, 2015) (affirming finding of fair use where blogger's use of a photograph was transformative because the blog used the work not only as commentary and criticism but also to ridicule and satirize the character of the person featured as the subject of the original work).

[22] At least one court has suggested that an "homage" may be a fair use under appropriate circumstances.  *See Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 277-78 (6th Cir. 2009) (no error in jury instruction that homage or tribute is "not necessarily fair use").

While the Court is dubious that Defendants' use is transformative under the law, the Court finds that Defendants have not met their burden of establishing that no questions of material fact exist as to whether their use was transformative and fair. Recognizing that would-be fair users are entitled latitude under the law and in light of the Parties' disagreement regarding the lyrical messages, genres, and audiences of the two works, and the extent to which – if at all – *Party Rock Anthem* transforms *Hustlin'*, the Court finds that summary judgment is not appropriate.

### b. The Commercial Nature of the Work

The commercial or nonprofit educational character of a work is just one factor to be weighed in determining whether a particular use is fair. *See Campbell*, 510 U.S. at 584-85. Under the law, *Party Rock Anthem* qualifies as a commercial work because "[t]he crux of the profit/nonprofit distinction is not whether the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562; *see also Letterese*, 533 F.3d at 1310 (noting the question is "whether the *nature* of defendants' use vis-à-vis the public was such that defendants stood to profit commercial from it") (emphasis in original). It is undisputed that Defendants stood to profit, intended to profit, and did profit substantially, from *Party Rock Anthem*. *Party Rock Anthem* was extremely popular, so much so that Defendants licensed the work to Kia for use in a commercial. The fact that the work "was published for profit is the first factor weighing against a finding of fair use." *Suntrust*, 268 F.3d at 1269.

## 2. Nature of the Copyrighted Work

The second factor in the fair use analysis is premised on the recognition that some works are closer to the core of intended copyright protection than others. *Campbell*, 510 U.S. at 586.[23]   Works that are higher in the hierarchy of copyright protection "include original as opposed to derivative works; creative as opposed to factual works; and unpublished as opposed to published works." *Letterese*, 533 F.3d at 1312.   "[B]ecause works that are highly creative are closer to the core of copyright—that is, such works contain the most originality and inventiveness—the law affords such works maximal protection, and hence it is less likely that use of such works will be fair use." *Cambridge University Press*, 769 F.3d at 1268.   On the other hand, it is more likely that the use of a factual or informational work will be a fair use because the law generally recognizes a need to disseminate factual works as opposed to works of fiction or fantasy. *Id.*

With respect to Defendant's argument that their use is fair, even if it is not a parody, the Court notes that the musical composition *Hustlin'* is a creative, original work. As such, it ranks higher in the hierarchy of copyright protection and this factor therefore weighs against a finding of fair use.[24]   *See Song BMG Music Entertainment v.*

---

[23] The second factor "is not much help . . . or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works." *Campbell*, 510 U.S. at 586.   Because no reasonable parodic comment can be perceived, the Court need not address this factor in the parody context.

[24] Defendants argue that the lyric "everyday I'm hustlin'" "should be allowed, if any, only 'thin' copyright protection as a simple, virtually factual statement of some questionable originality to Plaintiffs." (DE 44 at 19).   Defendants also argue that the phrase "lacks copyright protection." (DE 44 at 20).   In moving for summary judgment, Defendants conceded, without waiving, the originality of "everyday I'm hustlin'" for purposes of this motion.   Thus, their arguments regarding the originality of *Hustlin'* are irrelevant.   And, Defendants suggestion that the lyric "everyday I'm hustlin'" is a "virtually factual statement" or that "everyday I'm hustlin'" is a "simple, factual

*Tenenbaum*, 672 F. Supp. 2d. 217, 229 (D. Mass. 2006) ("The species of copyrighted work at issue in this case is music, which commands robust copyright protections. . . this factor weighs against fair use."); *Henley*, 733 F. Supp. 2d at 1160 (fact that defendants borrowed "from a musical composition, a highly expressive work that is at the core of copyright, weighs against the Defendants in the fair use balancing.").

### 3. Amount and Substantiality of the Portion Used

In addressing the third factor, the Court analyzes whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying. *Campbell*, 510 U.S. at 586.  The amount and substantiality of the portion used "is measured with respect to the copyrighted work as a whole, not to the putatively infringing work." *Letterese*, 533 F.3d at 1314-15.  This enquiry harkens back to the first factor because the extent of permissible copying varies with the purpose and character of the use.  *Campbell*, 510 U.S. at 586-87.  A taking "may not be excused merely because it is insubstantial with respect to the infringing work." *Harper & Row*, 471 U.S. 539 (finding this factor weighed against fair use even though defendants only copied approximately 300 out of 200,000 words in the plaintiffs' work because they used the "most interesting and moving parts" or the "heart" of the book); *see also Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 503 F. Supp. at 1145 (taking of fifty-five seconds of 1 hour and 29-minute film deemed qualitatively substantial).

In considering the amount and substantiality of the portion used, the court looks not only the quantity of the material used, but also its quality and importance to the original work.  *Campbell*, 510 U.S. at 587.  Even if the amount of copying or

declaration" is, as Plaintiffs describe it, "ludicrous" (DE 100 at 18) and has no basis in law or the record before the Court. *Hustlin'* is undoubtedly a creative, non-factual, work, as are its lyrics.

paraphrasing taken appears to be quantitatively small, it may nonetheless be substantial from a qualitative perspective if the defendant has copied the "heart" of the work. *Letterese*, 533 F.3d at 1315.

As other courts have noted, it is "the chorus—often termed the 'hook,' in recognition of its power to keep a listener coming back for more—that many listeners will recognize immediately or hear in their minds when a song title is mentioned. As the part of a song that is most often repeated and remembered, a chorus hook is important not only aesthetically but also commercially, where it may be central to a song's economic success." *Copeland v. Bieber*, 789 F.3d 484, 494 (4th Cir. 2015). The Parties and their experts do not dispute that "everyday I'm hustlin'" is the chorus, hook, and "heart" of *Hustlin*' and its most memorable feature. Consequently, it is clear that the lyric 'everyday I'm hustlin'' is qualitatively important to *Hustlin*'. Likewise, there is no genuine issue of material fact that 'everyday I'm hustlin'' is also quantitatively important to *Hustlin*'. A review of the lyrics of *Hustlin*', as well as the expert reports, confirms that "everyday I'm hustlin'" is quantitatively important to *Hustlin*', comprising at least 40% of the total music in *Hustlin*' and appearing more than 30 times. (*See* DE 100-13 at 3; Lyrics of *Hustlin*' DE 45-2 at 13-16; Pl. SUF ¶ 87). The parties debate whether, and to what extent, the line "everyday I'm shufflin'" is qualitatively and quantitatively important to *Party Rock Anthem*. However, because this factor is considered solely in reference to the original work, the amount and substantiality of the portion used weighs against a finding of fair use.

It is interesting to note that in analyzing the third factor through the parody lens, the Court's focus is on the "persuasiveness of a parodist's justification for the particular

copying." *Campbell*, 510 U.S. at 586-87.  Parody presents a more difficult case than other types of fair use because parody's humor or comment "necessarily springs from recognizable allusion" to the original work "through distorted imitation." *Id.* at 588. Consequently, to be successful, "the parody must be able to 'conjure up' at least enough of that original to make the object of its *critical* wit recognizable." *Id.* (emphasis added).  Often, "[w]hat makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know." *Id.*  Copying will not be excessive in relation to parody just because the "heart" of the original is used, but once enough has been borrowed from the original work to conjure it up, how much more is reasonable depends on the extent to which the work's "overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." *Id.*

Defendants used the "heart" of *Hustlin'* and they themselves immediately recognized the allusion to *Hustlin'* when the line was created.  No party disputes that Defendants borrowed enough to "conjure up" *Hustlin'*.  However, a parodist must do more than conjure up the original, he must also make it perceptible that the original is the target of his critical wit.  While Defendants went to the "heart" of *Hustlin'*, the overriding purpose or character of their use was not to criticize *Hustlin'* or to make *Hustlin'* the direct object of critical wit.  Rather, Plaintiffs' used *Hustlin'* because it was catchy and in order to "brand" their song as a shuffling dance song.  As Stefan Gordy testified, there is nothing, other than the line "everyday I'm shufflin'," that references *Hustlin'* in any way.  As the Supreme Court cautioned, "[t]his is not, of course, to say that anyone who calls himself a parodist can skim the cream and get away scott free. . .

Context is everything, and the question of fairness asks what else the parodist did besides go to the heart of the original." *Campbell*, 510 U.S. at 589.  This is, quite simply, a case where the purported parodist did nothing more than go to the heart of the original and seeks to get away scott free.

### 4.  Effect of the Use on the Market or Value of the Copyrighted Work

The final factor in the fair use analysis requires the Court to undertake two inquiries:  (1) the extent of market harm caused by the actions of the alleged infringer; and (2) and whether unrestricted and widespread conduct of the sort engaged in by the infringer would result in a substantially adverse impact on the potential market for the original or derivative works, which includes those markets that the creators of the original work would in general develop or license to others to develop. *Campbell*, 510 U.S. at 590; *Letterese*, 533 F.3d at 1315.  The adverse impact the Court is primarily concerned with is that of market substitution. *Cambridge University Press*, 769 F.3d at 1275; *Letterese*, 533 F.3d at 1287; *see also* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.05 [A][4] (1994) ("The fourth factor looks to adverse impact only by reason of usurpation of the demand for plaintiff's work through defendant's copying of protectable expression from such work.").

"The central question under the fourth factor is not whether Defendants' use of Plaintiffs' works caused Plaintiffs to lose *some* potential revenue. Rather, it is whether Defendants' use—taking into account the damage that might occur if 'everybody did it'—would cause *substantial* economic harm such that allowing it would frustrate the purposes of copyright by materially impairing Defendants' incentive to publish the work." *Cambridge Univ. Press*, 769 F.3d at 1276 (emphasis in original).  The "potential" market

analysis "is aided by what Nimmer calls the 'functional test'." *Metro-Goldwyn-Mayer*, 479 F. Supp. at 361. Nimmer explains that in determining the effect of the defendants' use upon the potential market for or value of Plaintiffs' work, a comparison must be made not only of the media in which the two works appear, but also in terms of the function of each work regardless of the media:

> If both the plaintiff's and defendant's works are used for the same purpose, then under the functional test the defense of fair use should not be available since the defendant's work serve the same function as that of the plaintiff's. The scope of fair use is then constricted where the two works in issue fulfill the same function in terms of actual or potential consumer demand, and expanded where such function differ.

*Id.* If a work supersedes the object of the original creation, it is less likely to be entitled to fair use because of the increased risk that it will supplant the market for the original work. *Letterese*, 533 F.3d at 1310.

The Court also considers whether or not a licensing system or established market exists for a putative infringer to access the work. While the ability to license the original work does not demand a finding that the use is not fair, 'it is sensible that a particular unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an unauthorized use should be considered 'less fair' when there is a ready market or means to pay for the use.'" *Cambridge Univ. Press*, 769 F.3d at 1276-77 (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 931 (2d Cir. 1994)). However, absent evidence to the contrary, if a copyright holder has not made a license available to use a particular work in a particular manner, the inference is the author did not think there would be a viable market to make the work available for such use. *Id.*

While the evidentiary burden of fair use rests with the defendants as to all four factors, Plaintiffs are expected to have evidence as to the availability of licenses for their own works. *Cambridge Univ. Press*, 769 F.3d at 1280. It is therefore reasonable to place the burden on plaintiffs to come forward with evidence of license availability. *Id.* If plaintiff does so, defendants, retaining their overall burden on all factors, must demonstrate that their use does not materially impair the existing or potential market in order to prevail. *Id.* The Court may also consider whether defendants have presented evidence that their song will "not usurp the potential licensing market for remakes or remixes of the Plaintiffs' songs, should [Plaintiffs] choose to license them" and whether others might be deterred from using plaintiff's music "because it had been used before." *Henley*, 733 F. Supp. 2d. at 1162-63.

Market harm is a matter of degree and the importance of this factor varies with the amount of the harm and the strength of the showing on other factors. *Campbell*, 510 U.S. at 590 n. 21. The defendant bears the burden of bringing forward favorable evidence about the relevant markets. *Id.* at 590; *Henley*, 733 F. Supp. 2d at 1162. Uncontroverted submissions that there is no likely effect on the market will not suffice. *Dr. Seuss Enterprises*, 109 F.3d at 1403.

Here, significant factual disputes exist regarding the market effect of *Party Rock Anthem* on the market or potential market for *Hustlin'* and derivative works.[25] The

---

[25] "As to parody, pure and simple, it is more likely that the new work will not affect the market for the original in a way that is cognizable under this factor, that is, by acting as a substitute for it" *Campbell*, 510 U.S. at 591. This is because parody and the work which it parodies usually serve different market functions. *Id.* And, as explained above, because parody is defined by its critical aim at the original work, "[i]n assessing the economic effect of the parody, the parody's critical impact must be excluded" because a "parody may quite legitimately aim at the garroting the original, destroying it commercially as well as artistically." *Fisher*, 794 F.2d at 437. The Court notes that there does not appear to have been any noticeable "critical impact" which

Parties agree that following the release of *Party Rock Anthem*, more annual digital album units of *Hustlin'* were sold than in the year prior, more digital stream units for *Hustlin'* were received than the years prior, the sound recording of *Hustlin'* earned more digital revenue than the year prior, and that domestic publishing income earned by *Hustlin'* was greater than in the year prior.  (Def. SUF. ¶¶ 59-62).  Likewise, on-line searches for the term "hustlin'" and the phrase "everyday I'm hustlin'" increased following the release of *Party Rock Anthem* (Def. Suf. ¶ 66).  However, the Parties disagree as to the reason for this increase and whether the purported boon to *Hustlin'* demonstrates cognizable market harm or proves that the works serve the same market.[26]  *See Campbell*, 510 U.S. at 590 n.21.

Although it is undisputed that a licensing system and established market exists for use of musical compositions and that all Parties are familiar with the licensing system, the parties differ as to what is customary in that market.  For example, Defendants proffer that no license has ever been granted to a third party to "sample" *Hustlin'*.  (Def. SUF. ¶ 64).  And while the Parties agree that synchronization licenses have been granted for *Hustlin'*, they disagree as to whether those licenses included the use of the lyric "everyday I'm hustlin'". (Def. SUF. ¶ 63).  Additionally, questions of fact remain regarding what effect, if any, *Party Rock Anthem* has had, or will have, on the market for other artists to utilize or sample *Hustlin'*.  Moreover, questions exist as to

"destroyed" the market for *Hustlin'*, further supporting the conclusion that *Party Rock Anthem*, is not, as a matter of law, a parody of *Hustlin'*.  Nonetheless, the central inquiry under this factor, regardless of whether defendant puts forward a parody-based fair use defense, is that of market substitution. *Campbell*, 510 U.S. at 569.

[26] While correlation is not causation, it appears that the release of *Party Rock Anthem* is the most likely cause for the increased interest in *Hustlin'*.  Although Plaintiffs argue that there are other possible causes for the increased demand and interest in *Hustlin'*, such as Plaintiff Roberts' career trajectory, they offer scant evidence in support of that argument. (*See* DE 100 at 22 n.21).

whether *Hustlin'* and *Party Rock Anthem* serve the same market, given that both songs are played at nightclubs, and the differences between electronic dance music and hip-hop or "gangsta" rap.  (*See* Pl. SUF. ¶ 92; Def. SUF ISO ¶ 92).  Consequently, the Court finds that, as to Defendants' non-parodic fair use argument, questions of fact exist making summary judgment inappropriate.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (DE 44) is **DENIED.**   The parties have had a full opportunity to be heard on the Defendants' affirmative defense of fair use.  Because Defendants' use does not, as a matter of law, constitute parody, Defendants are precluded from arguing that *Party Rock Anthem* parodies *Hustlin'* at trial.   However, material questions exist (outside of the parody context) regarding the purpose and transformativeness of Defendants' use and the market impact of their use, precluding a determination as to the first and fourth factors. Accordingly, the Court finds that questions of fact remain regarding whether Defendants' use, outside of the parody context, is fair and summary judgment must be denied.

**DONE AND ORDERED** in chambers in Miami, Florida, this _____ day of September, 2015.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

34