UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 13-24700-CIV-WILLIAMS

WILLIAM L. ROBERTS, II, *et al.*,

      Plaintiffs,

vs.

STEFAN KENDAL GORDY, *et al.*,

      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on the Parties' competing motions for summary judgment (DE 228, DE 230), which are fully briefed. This case, which has been pending for more than two years, has taken a circuitous route only to arrive at where it should have begun:  Was the musical composition *Hustlin*' validly registered with the Copyright Office, and, if so, do Plaintiffs have an ownership interest in the exclusive right to prepare derivative works for the musical composition *Hustlin*'?

## I.   BACKGROUND AND UNDISPUTED FACTS

### A.   Procedural History

Plaintiffs William L. Roberts, Jermaine Jackson, and Andrew Harr filed this action on December 31, 2013 alleging that the musical composition *Party Rock Anthem* infringed on their copyright to the musical composition *Hustlin*'.[1] (DE 1). In that complaint, Plaintiffs alleged that they were "copyright owners under United States copyright law with respect to the musical composition entitled '*Hustlin*'' which is the subject of a valid Certificate of Copyright Registration issued by the Register of

---

[1] This dispute involves only the musical composition, and not the sound recording, to *Hustlin*'.

Copyrights." (DE 1 ¶ 35) (emphasis added). Plaintiffs did not identify any specific certificate of copyright registration for *Hustlin'*. On March 9, 2014, Defendants filed an answer, identifying at the outset, a crucial problem with Plaintiffs' case:

> [C]opyright registration records of the United States Copyright Office identify Plaintiffs Roberts, Harr, and Jackson and non-party Bernard Rogers as the co-authors of either lyrics or words and music of one or more compositions entitled *Hustlin'*; said Defendants further allege that copyright registration records filed February 28, 2006 in the United States Copyright Office identify Plaintiff Roberts (but no other Plaintiff) and non-party Bernard Rogers as two of four copyright claimants to a composition created in 2005 entitled *Hustlin'*; said Defendants further allege that the copyright registration records filed February 28, 2007 in the United States Copyright office identify Plaintiffs Harr and Jackson (but no other Plaintiff) as two of six copyright claimants to a composition created in 2006 entitled *Hustlin'*; said Defendants further allege that other copyright registration records filed February 28, 2006 in the United States Copyright office do not identify Plaintiffs, or any of them, as the copyright claimants to a composition created in 2006 entitled *Hustlin'*, and, except as so alleged, said Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 35 of the Complaint, and therefore deny them.

(DE 14 ¶ 35).

On September 15, 2014,[2] Plaintiffs filed an amended complaint again asserting that they were owners under copyright law with respect to the musical composition *Hustlin'* which "is the subject of a valid Certificate of Copyright Registration." (DE 34 ¶¶ 44, 53, 61). Plaintiffs did not identify their particular ownership interests or which of the three registrations identified by Defendants in their answer was the "valid Certificate of Copyright Registration" referenced in the amended complaint. On September 29, 2014, Defendants filed an answer to the amended complaint, again pointing out the fatal

---

[2] In the interim, the Court entered a scheduling order and the Parties engaged in discovery.

inconsistencies posed by multiple copyright registrations and denying that Plaintiffs had a valid copyright registration.  (DE 38 ¶¶ 44, 53, 61).  Two days later, on October 1, 2014, Defendants moved for summary judgment, arguing that any use of *Hustlin'* in *Party Rock Anthem* was a fair use.  (DE 44).  Two days after that, Defendants filed a motion for judgment on the pleadings.  (DE 55).  Because the motions were filed before discovery would be completed, on October 15, 2014, the Court granted Plaintiffs' motion for an extension of time to respond to the summary judgment motion.  (DE 65).  That same day, Defendants filed a 13-page motion for reconsideration of the Court's order granting the motion for extension of time along with more than 170 pages of exhibits in support of that motion.  (DE 66, 67, 68, 69).

On February 27, 2015,[3] the Parties had a discovery hearing before the Honorable Magistrate Judge Andrea M. Simonton.  At that hearing, Defendants raised the issue of multiple copyright registrations and requested information regarding the original copyright registration and the relationship of Bernard Rogers to the dispute. (DE 190 at 53-54; 58-59).  In response, Plaintiffs informed Judge Simonton—although they never addressed this issue in their papers before this Court or in their amended complaints—that they "did not stand behind" the first copyright registration.  (*Id.* at 58-59).  Plaintiffs asserted that "it's not unusual for there to be more than one registration" and that "as far as [Plaintiffs] were concerned that the – you know, it was not a valid registration, that the superseding registrations were the valid registrations."  (*Id.* at 63).

---

[3] In the interim, the Parties continued to conduct discovery and Defendant David & Goliath filed a motion to dismiss for lack of personal jurisdiction and improper venue, which engendered extensive briefing. Ultimately, it was determined that the Parties had misapprehended the appropriate venue statute and that both personal jurisdiction and venue were proper.

On March 6, 2015, Plaintiffs filed a second amended complaint. (DE 158).  In that complaint, Plaintiffs repeated that they were copyright owners of the musical composition *Hustlin*' "which is the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights."  (DE 158 ¶ 44).  Again, and despite having discussed the issue with Judge Simonton, Plaintiffs did not identify any certificate of copyright registration nor did they identify their ownership interests.  On March 18, 2015, Defendants answered the second amended complaint and, as they had done previously, denied that Plaintiffs had a valid copyright and pointed out the inconsistencies presented in the three copyright registrations.  (DE 174 ¶ 44).

On March 13, 2015, a week after the second amended complaint was filed and more than a year after the litigation commenced, First-N-Gold Publishing Inc. ("FNG") filed a motion to intervene. (DE 172).  In that motion, FNG stated both that it was a "50% owner of the copyright to the composition entitled 'Hustlin'" and that it claimed "a 25% ownership interest in the copyright of Hustlin' attributable to the contributions of Plaintiff, Williams Roberts a/k/a Rick Ross, equivalent to a 25% income interest in the composition, having acquired same pursuant to written contract dated June 25, 2001." (*Id.* ¶¶ 1, 2).  As would become emblematic of the ownership claims in this case, FNG did not identify what rights it owned in the composition.  FNG asserted that it had "filed a timely registration with the U.S. Copyright Office asserting it's (sic) interest in the copyright to 'Hustlin'"" and attached to its motion Registration PA-1-334-589—the first copy of any registration presented to the Court after nearly a year and a half of litigation. (*Id.* ¶ 3; DE 179-3).  Defendants opposed the motion to intervene (DE 177).  Plaintiffs

advised that "FNG's joinder is not essential to the action (it is certainly not an indispensable party)." (DE 178). The Court denied the motion. (DE 189).

On June 26, 2015, the Court heard argument on Defendants' first motion for summary judgment on the affirmative defense of fair use. (DE 215). At that hearing, the Court asked Plaintiffs:

> THE COURT: Where is it in the complaint and what is the ownership interest your clients have? That was not -- we went straight to the affirmative use we have kind of glossed over all the rest. . . I really have no idea what we are talking about in terms of your client's interest. Maybe we could talk about that . . .
>                                          * * * *
> MS. STETSON: I will address that Your Honor. My clients are either legal and/or equitable owners of the copyright of *Hustlin*'.
>
> THE COURT: When will we know whether they are one or the other or both?
>
> MS. STETSON: This will all be laid out.
>                                          * * * *
> THE COURT: All right. It is not clear to me – and it may be clear to all of you – what interest your clients have at this juncture in the copyrighted musical composition.
>
> MS. STETSON: They are legal and/or beneficial owners of the copyright of the composition of *Hustlin*'.

The Parties filed additional summary judgment motions on July 13, 2015 (DE 228, 230), which are presently before the Court. On September 15, 2015, the Court granted Defendants' motion for partial summary judgment on Count 3 of the second amended complaint. (DE 331). In that Order, the Court stated:

> For the purposes of this Order, the Court assumes, without deciding, that Plaintiffs are either the legal or beneficial owners of some portion of the copyright in the musical composition *Hustlin*'. However, ownership of the copyright in the musical composition (for which three registrations exist)

> is a serious, unresolved issue and the subject of two other
> motions for summary judgment.

(*Id.*).  Two days later, on September 17, 2015, the Court denied Defendants' motion for summary judgment on fair use.  (DE 347).  In that Order, the Court noted that the issue of whether Plaintiffs had standing to bring suit by virtue of some yet undetermined ownership interest still had not been addressed and was the subject of two other motions for summary judgment, which were not fully briefed.  (*Id.* at 1).

Following the summary judgment motions, the Parties filed numerous pre-trial motions *in limine*, *Daubert* motions, motions to strike, as well as proposed jury instructions (DE 353) and a pre-trial stipulation (DE 355).  The Court held a pre-trial conference in this matter on October 6, 2015.  (DE 367).  At that hearing, the Court returned to the matter of Plaintiffs' failure to take a definitive position regarding what ownership interest, if any, they held.   The Court also inquired why three separate copyright registrations had been filed for *Hustlin'*, why Plaintiffs had failed to identify and explain which registration they believed was valid, and why each of the registrations, on its face, contained indisputably inaccurate information.  The Court asked the Parties:

> THE COURT: Let me ask this question: Do you all agree that any single work, a song, a book, can have only one valid copyright registration? Do you agree with that premise?
>
> THE PLAINTIFF: No.
>
> THE DEFENSE: With one exception. You're allowed, at one time, to register – and I believe you still can – an unpublished copyright. We don't really have that concept anymore. And then, once published, you would register a published copyright. With that exception, I think copyright has one registration.
> THE PLAINTIFF: No. I would say that copyright has one copyright, but there can be and there often is multiple registrations –

> THE COURT: Really?
>
> THE PLAINTIFF: – for the same work. Yes, Your Honor.[4]
>
> THE COURT: And how could the courts in Morris Concepts, St. Luke's Cataract, Lanard Toys, Vogue Rings, Olem Shoe, Judge Huck, how could they all have gotten it so wrong?[5]

(DE 367 at 62-63).  After a lunch recess, during which the Parties reviewed the cases

cited by the Court, the Court continued:

> THE COURT: I had cited a series of cases which talk about the fact that only one copyright per work. And here, we have three. . . Which copyright am I proceeding on?
>
> THE PLAINTIFF: The registration that we are proceeding on is the last in time registration. Once you're in court, proceeding on a registration -- you have to have a registration to proceed in court. Once you're in court, you're entitled to a presumption of the accuracy of what is in the registration. It's a rebuttable presumption. The defendants are entitled to attack the accuracy of that.
>
> * * * *
>
> THE COURT:   I can't just ignore the first two, right? I mean, your theory is it's Number 3, which, by the way, gives Mr. Ross no interest that I can see. But I have to have that cleared up by the Copyright Office before we go to the jury... I see the statute as a clear mandate to me about this.

(*Id.* at 65-74).  In response to the Court's query, defense counsel agreed that referral

was appropriate; plaintiff opined that referral was unnecessary and "optional."

Following the hearing, the Court ordered the Parties to file proposed questions to

---

[4] Plaintiffs have never provided any support for their argument that "there can be and there often is multiple registrations." As explained *infra,* the case law, the response from the Copyright Register, and learned treatises make clear that there cannot be multiple registrations for a single composition.

[5] *See Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 506 (2d Cir. 2002); *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1202 (11th Cir. 2009); *Lanard Toys Ltd. v. Novelty Inc.*, 511 F. Supp. 2d 1020, 1035 n.10 (C.D. Cal. 2007) ("Plaintiffs' misrepresentation in the 2005 registration that the toy had not previously been registered could invalidate the 2005 registration."); *Vogue Ring Creations, Inc. v. Hardman*, 410 F. Supp. 609, 614 (D.R.I. 1976); *Olem Shoe Corp. v. Washington Shoe Co.*, No. 09-23494-CIV, 2010 WL 3505100, at *1 (S.D. Fla. Sept. 3, 2010).

submit to the Register of Copyrights.  The Court subsequently issued a Request pursuant to Title 17 U.S.C. § 411(b) regarding the three registrations.  (DE 380).  In its response to the Court, the Register of Copyrights stated that had the Office been aware of the information cited in the Court's Request, it would have refused registration for all three copyrights for *Hustlin'*.  (DE 383).  The Court held a hearing on the Register's response on February 8, 2016 and gave the Parties the opportunity to submit limited additional briefing regarding this development.  Having recited the procedural history of this case, the Court turns to the undisputed facts.

    B.   <u>Undisputed Facts</u>

        1.  <u>The Composition</u>

On June 25, 2001, Roberts signed a recording agreement with Slip 'N Slide Records ("SNS").  (DE 376 ¶ 8).  Under that agreement, SNS became the owner of 50% of Roberts' copyright in any composition Roberts wrote during the term of the agreement.  (*Id.* ¶ 13).  Although the agreement is between SNS and Roberts, Exhibit 1 to the agreement is signed by Ted Lucas as the authorized signatory for FNG.  (DE 228-1 at 18).[6]  In November of 2003, Roberts established 3 Blunts Lit at Once, LLC ("3 Blunts") to serve as the publishing company for songs that he wrote.  (DE 376 ¶¶ 9, 10).  Roberts was the sole owner or member of 3 Blunts.  (*Id.* ¶ 11).  3 Blunts was administratively dissolved in October of 2004.  (*Id.* ¶ 9).

Plaintiffs Harr and Jackson have been musical and business partners since 2003, when they created Trac-N-Field Entertainment, LLC ("TNF") to conduct their entertainment business.  (*Id.* ¶ 35).  Harr and Jackson are the sole owners and

---

[6] SNS and FNG are used interchangeably through many contracts in this case.  (DE 376 ¶ 20).

members of TNF and they make all material decisions concerning the business.  (*Id.* ¶¶ 35, 93; DE 228 at 7).  In October of 2005, TNF, furnishing the services of Jackson and Harr, entered into a producers' agreement with SNS specifically for the composition and master musical recording of *Hustlin*'.  (DE 376 ¶ 38).  Harr, Jackson, and Roberts are authors of the musical composition *Hustlin*' which was created in 2005,[7] while Roberts was signed to SNS. (*Id.* ¶¶ 1, 4).  *Hustlin*' was released as a single in March 2006 by Island Def Jam, a label owned by UMG Recordings, Inc.  (DE 51 ¶ 2).

Roberts began with a 50% ownership of *Hustlin*'.  (DE 376 ¶ 7).  Pursuant to the 2001 SNS/FNG recording agreement, SNS/FNG acquired a 50% share of Roberts' 50% share in *Hustlin*'.  (DE 376 ¶¶ 13, 14).  On January 31, 2006, Roberts and SNS/FNG amended the recording agreement.  (*Id.* ¶ 15).  Under the amended agreement, FNG acquired a 12.5% share in *Hustlin'* and Roberts obtained a 37.5% share.  (*Id.* ¶ 17).  A few months later, on May 1, 2006, despite the fact that 3 Blunts had been administratively dissolved in 2004, Sony/ATV Tunes LLC, entered into an agreement with 3 Blunts under which Roberts assigned "one hundred percent (100%) of Assignor's interest in the copyright(s) . . . in and to, and all of the right, title and interest of the Assignor in and to, all musical compositions Assignor owns" including his 37.5% interest in *Hustlin*' to 3 Blunts.  (*Id.* ¶¶ 22-23; DE 230-5 at 2).  In turn, 3 Blunts assigned 50% of its 37.5% interest in those rights to Sony/ATV Tunes, or 18.75%.  (DE 376 ¶ 23; DE 230-5 at 2-3).  The May 1, 2006 Sony Agreement explicitly refers to SNS/FNG's agreement with Roberts and acknowledges SNS/FNG's 25% share of Roberts' original 50% share in *Hustlin*'.  (*See* DE 230-5 at 7).  Also in May of 2006, FNG, 3 Blunts, and

---

[7] *See* DE 228 at 8; DE 372-4, Deposition of Leonard Zackheim, 85:23-25 (testifying *Hustlin*' was created in 2005); DE 245-3, Harr Deposition 72:15-23 (testifying that he and Jackson had completed the demo for *Hustlin*' beats in October of 2005.).

TNF signed a publishing split agreement, which provided that "they had secured a copyright interest" in *Hustlin'* and that FNG held a 12.5% interest, TNF held a 50% interest, and 3 Blunts held a 37.5% interest.  (DE 376 ¶ 28).

Then, on July 24, 2006:

> Sony/ATV and 3 Blunts amended the 2006 Sony/ATV Co-Publishing Agreement to provide that 3 Blunts d/b/a 4 Blunts Lit At Once Publishing (BMI) rather than 3 Blunts Lit At Once LLC d/b/a/ 3 Blunts Lit At Once (ASCAP) would assign as of January 1, 2006 50% of its 37.5% interest in *Hustlin'* to Sony/ATV Songs LLC (BMI) instead of to Sony/ATV Tunes LLC (ASCAP) (owned by Sony/ATV) (as otherwise provided in the 2006 Sony/ATV Co-Publishing Agreement) and otherwise ratifying and reaffirming all of the terms of the 2006 Sony/ATV Co-Publishing Agreement

(*Id.* ¶ 30; DE 230-5 at 36-37).  4 Blunts Lit at Once was the d/b/a of Roberts and his dissolved company 3 Blunts.  (DE 376 ¶ 30).

## 2.  The Copyright Registrations

For reasons that have never been made clear, the musical composition *Hustlin'* is the subject of three different registrations with the Copyright Office.  (*Id.* ¶ 6).  On February 28, 2006, copyright registration Pau3-024-979 was filed for the musical composition *Hustlin'*.  (*Id.* ¶ 21).  Registration Pau3-024-979 states that *Hustlin'* was completed in 2005, identifies the composition as unpublished, and lists Bernard Rogers as well as Plaintiffs Roberts, Harr and Jackson as authors.  The registration lists Roberts as a claimant, and TNF and FNG as claimants "by written contract."  (*Id.* ¶ 21).[8] The first registration was filed by Leonard Zackheim, Harr and Jackson's entertainment lawyer, as the authorized agent of TNF.  (DE 230-4 at 26).

---

[8] There is no record that any of the numerous written contracts, transfers, or assignments referenced by the Parties regarding the three registrations were ever filed with the Copyright Office.

Exactly four months later, on June 28, 2006, copyright registration PA 1-334-589 was filed for the musical composition *Hustlin'*.  (DE 376 ¶ 29).  That registration asserts (incorrectly) that *Hustlin*' had not been previously registered with the Copyright Office.  It also states that *Hustlin*' was created in 2006 and was first published on March 28, 2006. It identifies Harr, Jackson, and Roberts as the authors of the work.  Notwithstanding the fact that 3 Blunts was administratively dissolved in 2004, 3 Blunts is listed as a claimant on the registration.  In addition, FNG c/o Warner-Tamerlane Publishing Corp., and TNF are listed as claimants by written agreement.  None of the Plaintiffs is identified as a claimant.  Although this registration indicates it was filed by Warner-Chappell Music, FNG—who had an "exclusive administration agreement" with Warner-Chappell—has asserted that it was responsible for this "timely registration" of *Hustlin*'.  (DE 172 ¶ 3; DE 179-3; DE 230-4 at 32; DE 230-5 at 7; DE 235-2 at 32-33).

One year later, on February 28, 2007, a third registration, PA 1-367-972, was filed for the musical composition *Hustlin*'. (DE 376 ¶ 31). This third registration also incorrectly states that no prior registrations for *Hustlin*' had been made.  Registration PA 1-367-972 states that *Hustlin*' was created in 2006 and that it was first published on August 8, 2006.[9]  In fact, the sound recording of *Hustlin*' was released as a single in March 2006, the work was created and first published in 2005, and two prior registrations had been filed.  (DE 51 ¶ 2).  This registration identifies Harr, Jackson, and Roberts as the authors of the work and lists "1.) Sony/ATV Songs LLC 4 Blunts Lit At Once" and "2.) J. Jackson & A. Harr Trac-N-Field Entertainment First-N-Gold" as the

---

[9] This is the date the album, Port of Miami, was released.  (DE 51 ¶ 6; DE 101 ¶ 6).

claimants by assignment.  (DE 376 ¶ 31).  This third registration was filed by Sony/ATV, which currently has an exclusive right to license *Hustlin'* (DE 376 ¶ 26).

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

"The moving party bears the initial burden of establishing the nonexistence of a triable fact issue."  *Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000) (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986)).  If the movant establishes the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)).  Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted."  *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).  In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . ."

Fed. R. Civ. P. 56(c)(1)(A).   The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant."  *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008).

When a motion for summary judgment is presented to the Court, it opens the entire record for consideration, and the Court may enter judgment in favor of the nonmoving party on any grounds apparent in the record, even where there is no formal cross-motion. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999). And, "[a] district court possesses the power to enter summary judgment *sua sponte* provided the losing party was on notice that she had to come forward with all of her evidence." *Id.*  Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quotation omitted).

## III.   ANALYSIS

### A.   The Copyright Act

Article I, section 8, clause 8, of the Constitution provides:  "The Congress shall have Power . . . To promote the Progress of Science and useful Arts by securing for limited Times to Authors . . . . the exclusive Right to their . . . Writings . . ."  U.S. CONST. art. I, § 8, cl. 8.  The plain text of the Constitution grants no substantive protections to authors; rather, Congress is empowered to provide copyright protection.   *See id.*; *Silvers v. Sony Pictures Entm't, Inc.,* 402 F.3d 881, 883-84 (9th Cir. 2005).   As the Supreme Court wrote 180 years ago:

> This right [in copyright] . . . does not exist at common law-it originated, if at all, under the acts of congress. No one can deny that when the legislature is about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed. . .

*Wheaton v. Peters,* 33 U.S. (8 Pet.) 591, 663-64, 8 L.Ed. 1055 (1834); *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 432 (4th Cir. 1986) ("The right of copyright is a creature of federal statute, with its constitutional base in Article I, § 8, cl. 8.").

Accordingly, the Court begins with the statute.  Section 501(b), Infringement of Copyright, establishes who is legally permitted to sue for infringement of a copyright:

> The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(b).   The statute is clear: To be entitled to sue for copyright infringement, the plaintiff must be the legal or beneficial owner of an exclusive right. The "exclusive right(s) under a copyright" consist of the right "to do and to authorize" six things: to reproduce the work, to prepare derivative works based upon the work, to distribute copies of the work, to perform the work publicly, to display the work publicly, and to record and perform the work by means of an audio transmission. *Id.* § 106.  This list is exhaustive.  *See Silvers*, 402 F.3d at 883-84.

Until the passage of the Copyright Act of 1976, a copyright was seen as "an indivisible 'bundle of rights,' which were 'incapable of assignment in parts.'" *Gardner v. Nike, Inc.*, 279 F.3d 774, 778 (9th Cir. 2002) (quoting Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.01[A]). The Copyright Act, however, "eradicated much of the doctrine of indivisibility," by permitting a copyright owner to transfer "any of the exclusive rights comprised in a copyright, including any subdivision of any of these

14

rights," to someone else. *See id;* 17 U.S.C. § 201(d)(2).  The ownership of an exclusive right may be transferred via "an assignment, exclusive license, or any other conveyance."  *Id.* § 101.  Any such transfer must be done by operation of law or by a written and signed agreement.  *Id.* § 204(a).[10]

If a party is a legal or beneficial owner of an exclusive right under a copyright, he is entitled to sue, subject to the requirements of Title 17 U.S.C. § 411.  *Id.* § 501(b). Title 17 U.S.C. § 411 provides that:  "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."  In turn, 37 C.F.R. § 202.3 sets forth the criteria for properly registering a copyright:  "An application for copyright registration may be submitted by any author or other copyright claimant of a work, or the owner of any exclusive right in a work, or the duly authorized agent of any such author, other claimant, or owner."

A claimant is either:

> (i)     The author of a work;
>
> (ii)    A person or organization that has obtained ownership of all rights under the copyright initially belonging to the author.  This category includes a person or organization that has obtained, from the author or from an entity that has obtained ownership of all rights under the copyright initially belonging to the author, the contractual right to claim legal title to the copyright in an application for copyright registration.[11]

---

[10]  Although Plaintiffs consistently refer to transfer or ownership of "the copyright," it is the six exclusive rights identified in § 106 that are capable of being owned and transferred.

[11]  As explained *infra*, the registrations and the chain of legal title raise serious questions regarding whether any of the claimants or filers listed on the registrations own *all rights* under the *Hustlin'* copyright and, therefore, whether they were eligible to register the work.

*Id.* § 202.3(a)(3).  As part of the application, the applicant shall state, *inter alia*, the name and address of the claimant; whether the work was made for hire; and, if the claimant is not the author, a brief explanation of how the claimant obtained ownership. 17 U.S.C. § 409.  The application must also contain "[a] declaration that information provided within the application is correct to the best of that party's knowledge."  37 C.F.R. § 202.3(c)(iii).

> ### B.   Registration is an Element of an Infringement Claim and a Pre-Condition to Suit

To prevail on an infringement action, a copyright holder must prove: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). To establish the first element, Plaintiffs must demonstrate that they have "satisfied the requirements for registration set forth in the federal regulations promulgated by the Register of Copyrights." *Olander Enters., Inc. v. Spencer Gifts, LLC*, 812 F. Supp. 2d 1070, 1075 (C.D. Cal. 2011).  "Although copyright protection attaches at the time of an author's creation of an original work susceptible to copyright under Title 17 U.S.C. § 102(a), an owner's cause of action for infringement of that copyright is unenforceable until compliance with the formalities of registration, including payment of fees and deposit of copies of the work, is shown."  *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986).  "Proper registration is a prerequisite to an action for infringement." *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 453 (2d Cir. 1989); *see also A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 852-53 (9th Cir. 2012), *as amended on denial of reh'g and reh'g en banc* (June 13, 2012) ("Copyright registration is a precondition to filing a copyright

16

infringement action."); *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532 (11th Cir. 1994) (explaining that the dispositive issue is whether the copyright was effectively registered such that a subsequent assignee could enforce the original registration; if the original registration was invalid then no suit could be brought even if ownership was not disputed). Consequently, regardless of whether a plaintiff is a legal or beneficial owner of an exclusive right, in order to bring suit, he bears the burden of demonstrating compliance with the Act's formalities, including proper registration. *See Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999); *Smith v. Casey*, 741 F.3d 1236, 1241-42 (11th Cir. 2014); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012).

As a general matter, Copyright Office regulations permit only one registration for the same version of a particular work. *See, e.g.*, 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.18[D][1] (ed. 2015); *Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 506 (2d Cir. 2002). A certificate of registration made before or within five years after first publication of the work constitutes *prima facie* evidence of the validity of the copyright and of the facts established in the certificate. *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996); 17 U.S.C. § 401. Accordingly, Title 17 U.S.C. § 411(b) provides:

> **(1)** A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—
>
> **(A)** the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
>
> **(B)** the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

**(2)** In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411.  When there is a question regarding the accuracy of the information contained on a registration, the Court's referral of the matter to the Register of Copyrights under § 411(b)(2) is mandatory. *See id.* ("the Court *shall*") (emphasis added); *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 624 (7th Cir. 2013) (finding that referral under section 411(b)(2) is mandatory); *Schenck v. Orosz*, No. 3:13-CV-00294, 2015 WL 2402436, at *6 (M.D. Tenn. May 20, 2015) ("By its terms, § 411(b)(2) requires the court to seek an advisory opinion from the Register in any case that 'alleges' inaccurate information."); *Lennar Homes of Texas Sales & Mktg., Ltd. v. Perry Homes, LLC*, No. CIV.A. H-14-1094, 2015 WL 4633514, at *6 (S.D. Tex. July 24, 2015) (noting that referral of the issue does not appear to be discretionary).

As part of the 2008 PRO IP amendments, Congress enacted Title 17 U.S.C. § 411(b), in order "to ensure that no court holds that a certificate is invalid due to what it considers to be a misstatement on an application without first obtaining the input of the Register as to whether the application was properly filed or, in the words of § 411(b)(2), whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." *DeliverMed Holdings,* 734 F.3d at 623-24.  Plaintiffs insist that the Court can ignore the fact that three registrations exist for the musical composition *Hustlin'*.  Under Plaintiffs' theory of the law, for which they have provided no authority, a claimant who has multiple registrations for a single work – each of which contains obvious and undisputed errors – can simply choose which registration satisfies

the Act's requirements prior to bringing suit.[12]  If the Court were to permit Plaintiffs to unilaterally adjudicate which registration is valid and, therefore, which one satisfies the Act's requirements, the Court not only would be abdicating its own responsibilities but also would be, in effect, invalidating the other two registrations.  This the Court cannot do without seeking the Register's advice under § 411(b).[13]

Here, the undisputed facts clearly demonstrate that inaccurate information was included on all three registrations.  Because of the numerous misrepresentations on all three copyright registrations for *Hustlin*', the Court sought an opinion from the Register as to whether the Register would have issued the registrations had it known of the inaccuracies.[14]  (DE 380).  Plaintiffs opposed the Court's referral of this matter, contending the Court lacked the authority to do so and asserting that Defendants had not raised the issue of an invalid registration in their pleadings.[15]  In fact, Defendants

---

[12] Plaintiffs have never explained how the presumption of validity, which attaches to a timely obtained certificate of registration, ought to be applied in a case such as this, where Plaintiffs have three inconsistent registrations. Plaintiffs knew or should have known of the conflicting registrations (none of which comports with their ownership claims) since the inception of this matter, or, at the very least, once Defendants filed their initial answer.  In circumstances such as this, given the clear directive of Congress, the undisputed inaccuracies on the registration, and the fact that, as always, Plaintiffs bear the burden of proof, the Court finds referral to the Register is appropriate.

[13] The Court may not invalidate a copyright registration without consulting the Register, even if the Parties do not ask the Court to refer the matter to the Copyright Office.  *See DeliverMed Holdings,* 734 F.3d at 624 ("[I]gnoring a clear statutory directive due to the inadvertence of the parties would defeat the purpose of 17 U.S.C. § 411(b)(2) and deprive the Register of its right to weigh in on precisely this issue.").

[14] The Court did not present to the Register all the inaccuracies contained in the registrations.  For example, the Court did not ask whether the fact that 3 Blunts was administratively dissolved at the time it was listed as a claimant on PA 1-334-589 would have caused the Register to decline registration.  The Court also neglected to inquire as to whether the Register would have refused registration for PA 1-367-972 had it known that the date of publication was incorrect.

[15] As explained *supra,* because registration of a copyrighted work is a mandatory precondition to suit, the Court may consider *sua sponte* whether a plaintiff has met this requirement. *See Marc Anthony Builders, Inc. v. Javic Properties, LLC,* No. 8:11-CV-00432-EAK, 2011 WL 2709882, at *2 (M.D. Fla. July 12, 2011) (finding that the Court should consider registration of a work even though defendant did not raise the specific issue); *Burruss v. Zolciak-Biermann*, No. 1:13-CV-789-WSD, 2013 WL 5606667, at *3 (N.D. Ga. Oct. 11, 2013) (holding that the court should dismiss a copyright

raised the issue in each of their answers and denied that *Hustlin'* was the subject of a valid copyright registration; referred to the issue in moving for summary judgment on their fair use defense; and argued that referral to the Register was appropriate.  In any event, Plaintiffs have the burden of proving that they have complied with the statutory formalities and have a valid copyright registration.

In response to the Court's § 411(b) Request, the Register indicated that, based on the undisputed facts, the misrepresentations identified by the Court were material and that she would have refused registration for all three copyrights.  (DE 383-1). Although prior to the PRO IP amendments some courts found that inaccuracies – like an incorrect date of creation – were immaterial and did not preclude an infringement action, those decisions were premised on the assumption that such inaccuracies would not have influenced the Register's decision to issue the registration.  *See Gallup, Inc. v. Kenexa Corp.*, 149 F. App'x 94, 96 (3d Cir. 2005); *Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F. Supp. 1329, 1341 (S.D.N.Y. 1986).  With the conclusive guidance from the Register in this case, the Court believes that the decision of whether the inaccurate information is material is best left to the Register's expertise.  Moreover, the Court finds that the Register's opinion should be afforded substantial deference.  *Cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

---

infringement claim *sua sponte* where the plaintiffs failed to allege that the work was registered); *Patrick Collins, Inc. v. John Does 1-7*, No. 12 CV 2963 VB, 2012 WL 1889766, at *2 (S.D.N.Y. May 24, 2012) (same).  "[C]ourts enforce mandatory (though non-jurisdictional) rules—even if the parties do not raise them—in a variety of ways." *Brooks-Ngwenya v. Indianapolis Pub. Sch.*, 564 F.3d 804, 808 (7th Cir. 2009); *see also Brownstein v. Lindsay,* 742 F.3d 55, 76-77 (3d Cir. 2014) ("It also goes without saying that courts are authorized to police copyright registrations through authorship claims and infringement claims.").  Furthermore, because Plaintiffs have asked the Court to enter final summary judgment in their favor on the basis that they have proven ownership of a valid copyright and compliance with the corresponding statutory formalities, the Court must determine whether they have established these necessary elements of their claim.

In light of the Register's unequivocal response that it would not have registered any of the copyrights for *Hustlin*', Plaintiffs now claim that the Court ignored the statutory language of 411(b), directed to whether the inaccurate information "was included on the application for copyright registration with knowledge that it was inaccurate."[16]  Plaintiffs make two main arguments in this regard.  First, Plaintiffs assert that the Court was required to find, or Defendants were required to prove, that each filer knowingly and intentionally defrauded the Copyright Office in submitting the registration. Second, Plaintiffs claim "[t]here is no evidence that any of the filers were aware of other registrations at the time the applications were filed."  (DE 372).

Title 17 U.S.C. § 411(b) says nothing about an intent to defraud the Copyright Office.  Rather, the plain text of the statute requires only that the application be made "with knowledge that it was inaccurate."   A "tight reading of the 2008 amendment preserves a differential impact in that context, whereby inadvertent errors deprive the certificate of its presumption of validity." 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.120[B][1] n. 25.2 (ed. 2015). Further, when the error on the registration form is not a minor technical error, but rather a material one that would have caused the Register to refuse registration, "this issue is more appropriately dealt with by ascertaining whether the registration should have issued in the first place, and that analysis does not require a showing of fraud." *Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, 896 F. Supp. 2d 223, 233 (S.D.N.Y. 2012) (explaining that a showing of fraud is only required "where a party seeks to invalidate a copyright based on simple technical errors in a registration application. . . The fraud requirement does not come

---

[16] In its Request to the Copyright Office, the Court expressly addressed this argument and identified undisputed facts from the record demonstrating the implausibility of the notion that the registrations were submitted without knowledge of the inaccuracies.  (*See* DE 380 at n.2).

into play when material omissions or errors were made in the registration application."). As Nimmer explains, while an immaterial misrepresentation, unaccompanied by fraud, will not render the registration incapable of supporting an infringement action, "this conclusion pertains only to the extent that the work in question would still have been eligible for copyright had the registration application contained a correct statement of facts. If the claimant . . . fails to state a fact that, if known, might have caused the Copyright Office to reject the application, then the registration may be ruled invalid." 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.20[B][1] at 7-212.(4)(3)-(4) (ed. 2015).  The Register has stated unequivocally that she considers the misrepresentations cited in the Court's request material and would have rejected all of the *Hustlin*' registrations.

The record in this case belies any notion that the errors were inadvertent. Plaintiffs' contention that a single work may have multiple, inaccurate, inconsistent registrations so long as: each filer never intended to defraud the Copyright Office; each filer was willfully blind to the actual facts attested to in the registration; and each filer did not have actual knowledge of prior registrations, is directly contrary to well-established copyright law.  "A copyright registration certificate in the Copyright Office provides constructive notice as to the ownership of the copyright and the facts stated in the registration certificate." *Latin Am. Music Co. v. The Archdiocese Of San Juan of Roman Catholic & Apostolic Church*, 499 F.3d 32, 40 (1st Cir. 2007); *see Jordan v. Sony BMG Music Entm't Inc.*, 354 F. App'x 942, 946 (5th Cir. 2009) (finding that registration of a 2002 album put other parties on constructive notice of the facts stated in the registration); *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 329 (4th Cir. 2007)

("Registration promotes orderly resolution of copyright disputes because it creates a permanent record of the protected work, putting the world on constructive notice of the copyright owner's claim.").

Moreover, adopting such a position would eviscerate the strictures of the Copyright Act and permit a party to avoid the consequences of its (or its authorized agent's) actions by requesting that a lawyer or some other party register the copyright without verifying the information, or even telling the other claimants or owners that a registration was filed.  It should be noted that second and third registrations were filed by major, global music corporations.  Even the most minimal due diligence, through a basic search of the Register's records (which are easily accessible online), would have revealed these prior registrations.

Indeed, this is why the Register encourages Parties to record transfers of copyright ownership as well as to register the copyright in the first instance.[17]  17 U.S.C. § 205.  Recordation of a document gives "all persons constructive notice of the facts stated in the recorded document, but only if--(1) the document, or material attached to it, specifically identifies the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title or registration number of the work; and (2) registration has been made for the work."  *Id.*  And, notwithstanding the fact that each of these registrations was filed on behalf of Plaintiffs, either by Plaintiffs' lawyer or by Plaintiffs' long-standing music-

---

[17] The Court has not been presented with any evidence that any of the transfers outlined *infra* were recorded with the Copyright Office. "[W]hen a copyright interest is transferred it must be recorded to protect the copyright holder's right to bring an infringement suit. 17 U.S.C. § 205(d); *see* H.R.Rep. No. 94–1476, at 129 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5744 ('The provisions of subsection (d)] require recordation of transfers as a prerequisite to the institution of an infringement suit')."  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005).

industry partners, with information indisputably provided by Plaintiffs through negotiations and myriad contracts, Plaintiffs now argue that there is no evidence that the filers were aware of the inaccuracies.  The Court will not adopt such a tenuous view of the record.  *See Vogue Ring Creations, Inc. v. Hardman*, 410 F. Supp. 609, 615-16 (D.R.I. 1976) (holding registration unenforceable because of unexplained omissions in the application and noting that the copyright application which asks if the work was previously registered or published is "not restricted to the author's conduct. To be so it would need additional qualifying words such as 'by you or . . .' and such other parties of interest as the Copyright Office would want listed.").

As discussed above, only certain specified persons can register a copyright. *See Arthur Rutenberg Homes,* 29 F.3d at 15; 37 C.F.R. § 202.3.  Each copyright registration in this case was submitted by the authorized agent of a claimant or author.  In light of – or despite – the labyrinthine contractual transactions (*see* appendix) between the filers, Plaintiffs, and Plaintiffs' various companies and attorneys, the record belies any assertion that the parties were unaware of the inaccuracies contained in the registrations, the actual underlying facts regarding the composition, or the prior registrations.[18]

For example, Plaintiffs contend that PA 1-367-972, the latest filed copyright registration, filed by Sony/ATV on behalf of two entities—(1)"Sony/ATV Songs LLC 4 Blunts Lit at Once"; and 2) "J. Jackson & A. Harr Trac-N-Field Entertainment First-N-Gold"—is valid and the Court should merely disregard the previous registrations.  (DE 228 at 4).  Plaintiffs have repeatedly asserted that Roberts' transfers to 3 Blunts, and

---

[18]  As noted *supra,* a filer must submit "[a] declaration that information provided within the application is correct to the best of that party's knowledge."  37 C.F.R. § 202.3(c)(iii).

then to 4 Blunts, were ineffective, and that (despite appearing on two of the registrations as claimants) neither 3 Blunts nor 4 Blunts is a copyright claimant or owner.[19]  As such, even under Plaintiffs' own theory of the case, the third registration contains a material misrepresentation as to the identity of a claimant, in addition to the other errors identified by the Court.  It is undisputed that Roberts, 4 Blunts, 3 Blunts, and Sony/ATV knew that *Hustlin*' was created in 2005, knew that it was released as a single in March of 2006, and knew that *Hustlin*' had been distributed and published in 2005.[20]

It is also undisputed that the registration was submitted by the authorized agent of "1). Sony/ATV Songs LLC 4 Blunts Lit At Once P.O. Box 1273 Nashville TN 3702" and that in May of 2006, 3 Blunts had authorized Sony to register the copyright and to sign documents in 3 Blunts' name.  (DE 230-5 at 11, 13).  It is simply not plausible that Sony/ATV Songs, with whom Roberts entered into an agreement with in May 2006, two months after the single *Hustlin*' was released by Def Jam Records, was unaware of the single's release date.  Moreover, the May 2006 agreement under which Sony acquired an interest in *Hustlin'* specifically referenced and incorporated the June 25, 2001 agreement with SNS, further undermining Plaintiffs' contention that Sony was not aware of the true facts regarding the composition, such as its date of creation, publication, or the prior registrations.  (DE 230-5 at 7).  In addition, this registration lists FNG (who was identified as a claimant on the two prior registrations), Harr, and Jackson as claimants.

---

[19] *See, e.g.*, DE 245 at 3 ("Plaintiffs submit that Roberts remains a legal owner due to the ineffective transfer of copyright to a dissolved corporation."); DE 265 at 2-4 ("The legal and contractual effect of Ross' failed transfer to a dissolved entity is that Ross remains the legal owner of copyright . . . No assignment was needed since Ross is a beneficial owner of copyright."); DE 228 at 5 ("Sony/ATV and Roberts agree that, under the circumstances, Roberts is the party to the Sony/ATV Agreement in place of 3 Blunts Lit at Once LLC.").

[20] Indeed, this conclusion would be inescapable were the Court to accept Plaintiffs' assertion that "Roberts is 3 Blunts."  *E.g.*, (DE 393 n.4).

Importantly, the second registration was filed on FNG's behalf, and it correctly identified the release date of *Hustlin*' (although not the publication date).  The argument that FNG, Harr, and Jackson were not aware of the prior registrations, the inaccuracies on the second registration, or of the filing of this registration is untenable.

The second filed registration, PA-1-334-589, was filed by Warner at FNG/SNS's behest.  (*See* DE 172 ¶ 3; DE 230-5 at 7; DE 228-1 at 3, 13).  When *Hustlin*' was created, Roberts was signed as a recording artist with SNS/FNG.  (DE 376 ¶ 20). Under the June 25, 2001, agreement, SNS/FNG had the right to register copyrights for Roberts' compositions, including *Hustlin*'.  It cannot be disputed that SNS/FNG – the recording label which oversaw Roberts' creation of *Hustlin*' and with whom Harr and Jackson contracted to create *Hustlin*' – was aware of *Hustlin*'s creation date or that FNG, who was a claimant on the first unpublished registration, was aware of the prior registration.

Moreover, and more damaging to Plaintiffs' argument, each of the registrations identifies Plaintiffs as authors and lists either Plaintiffs or their companies as claimants. It is undisputed that Jackson and Harr make all decisions concerning TNF's business and that TNF is identified as a claimant on all three registrations.  (DE 376 ¶ 93). Likewise, two of the registrations identify Roberts' companies, 3 Blunts and 4 Blunts, as claimants.  Roberts is the only owner or member of 3 Blunts. There is no doubt that Roberts, Harr, and Jackson, knew when *Hustlin*' was created, knew when it was released as a single, and knew when it was published.  And there can be no doubt that the Plaintiffs -- as authors and claimants -- knew when *Hustlin*' was published, undermining the accuracy of the first registration; namely, that *Hustlin*' was unpublished.

"The knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitutes reason for holding the registration invalid and thus incapable of supporting an infringement action." *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980); *see*, *e.g.*, *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986) ("An owner's cause of action for infringement of that copyright is unenforceable until compliance with the formalities of registration . . . Ownership is also demonstrated through such compliance."); *Whimsicality, Inc.*, 891 F.2d at 453 ("It is the law of this Circuit that the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitutes reason for holding the registration invalid and thus incapable of supporting an infringement action.  Faced as we are with that exact situation in the instant case, we hold that Whimsicality, because of its misrepresentations, does not have valid copyrights capable of enforcement. . . We hold that Whimsicality obtained its copyright registrations by misrepresentation of its costumes to the United States Copyright Office. We therefore decline to reach the issue of copyrightability, since proper registration is a prerequisite to an action for infringement."); *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 667-68 (3d Cir. 1990) ("It has been consistently held that a plaintiff's knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application constitutes grounds for holding the registration invalid and incapable of supporting an infringement action."); *Raquel v. Educ. Mgmt. Corp.*, 196 F.3d 171, 176 (3d Cir. 1999) *vacated on other grounds*, 531 U.S. 952 (2000) ("Although a failure properly to register a work does not invalidate the copyright itself, it does preclude the

maintenance of an infringement action until such time as the purported copyright holder obtains a valid registration."); *R. Ready Prods., Inc. v. Cantrell*, 85 F. Supp. 2d 672, 691 (S.D. Tex. 2000) (Under copyright law, "the knowing failure to advise the Copyright Office of material facts constitutes grounds for holding the registration invalid and incapable of supporting an infringement action."); *Olander Enterprises, Inc*, 812 F. Supp. 2d at 1075 ("[T]he Court concludes that Olander cannot prove that it owns a valid copyright registration, which is a required element of Olander's claims for copyright infringement"); *GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 776 (W.D.N.Y. 1991) (declining to enforce a copyright because the registration contained inaccurate information); *Vogue Ring Creations,* 410 F. Supp. at 614 ("The equitable maxim of unclean hands is applicable in determining the enforceability of copyright registrations; and it has been held, in a suit challenging the copyright of a brochure, to be inequitable conduct not to inform the Copyright Office of earlier publications. . . . The unexplained omission in the copyright application, coupled with the testimony set forth in the margin in note 2, Supra, and the misleading 'Copyright Warning', cause me to conclude that even if this copyright were otherwise valid I would have to hold it unenforceable because of unclean hands").

"It also goes without saying that courts are authorized to police copyright registrations through authorship claims and infringement claims. . . [A] registration does not secure or create a copyright, as a right, or guarantee success on the merits of a claim—it entitles an author to bring an action under the Copyright Act." *Brownstein v. Lindsay*, 742 F.3d 55, 76-77 (3d Cir. 2014).  Although Plaintiffs have failed to carry their burden of showing proper registration and compliance with the Copyright Act's statutory

formalities, registration does not confer copyright, nor can an erroneous registration take it away. *Arthur Rutenberg Homes,* 29 F. 2d at 1531. However, the failure to properly register a work will preclude an infringement action predicated on that work. And, while the Court's ruling here does not cancel the registrations,[21] it does bar Plaintiffs from bringing an infringement action because no valid registration exists.

<div align="center">C.   Ownership of the Exclusive Right Infringed</div>

As the court in *Olander Enterprises, Inc. v. Spencer Gifts, LLC*, 812 F. Supp. 2d 1070, 1075 (C.D. Cal. 2011) noted, because Plaintiffs "cannot prove that [they] own[] a valid copyright registration, which is a required element of [Plaintiffs'] claims for copyright infringement, the Court need not decide whether [Plaintiffs] ha[ve] standing to assert its copyright infringement claims in the first place." Although the Court need not address this ultimate question, the Court will illustrate[22] some of the problems with Plaintiffs' contention that they are "the legal and/or beneficial copyright owners of the musical work at issue, *Hustlin*'." (DE 228).

Ownership of a copyright "initially vests in the author or authors of the work" or "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 202. In the event there are authors of a joint work, they are considered co-owners of the copyright in the work. *Id.*

Roberts, Harr, and Jackson are authors of the composition *Hustlin'*. (DE 376 ¶

---

[21] "We hold that courts have no authority to cancel copyright registrations because there is no statutory indication whatsoever that courts have such authority." *Brownstein*, 742 F.3d at 75.

[22] In an effort to understand the evolution of Plaintiffs' ownership interests, the Court has charted the various assignments and transfers scattered throughout the record. *See* Appendix.

1).  Prior to the transfer of any copyright interests to any third parties, "Roberts began with 50% ownership of *Hustlin'*."  (*Id.*).[23]  Under the June 25, 2001 recording agreement with SNS/FNG, Roberts assigned to SNS "fifty (50%) percent of Writer's right, title, interest, and ownership of every kind including, but not limited to, the copyright thereof" to his compositions, including *Hustlin*', and granted SNS/FNG "the right to arrange, adapt, and create derivative works from the Compositions, together with all copyrights and any and all other rights therein . . . together will all claims, demands, and causes of action . . . for the use of the Compositions or infringement of the copyrights therein."  (*Id.* ¶¶ 8, 13; DE 228-1 at 14).  Consequently, SNS acquired a 25% interest and Roberts retained a 25% interest in the exclusive rights to *Hustlin*'.

On January 31, 2006, SNS and Roberts amended their agreement so that FNG would own 25% of Roberts' share of "the publishing portion of the copyrights" in *Hustlin*'.[24]  (DE 376 ¶ 16).  Following that amendment, FNG owned 12.5% of the exclusive rights of *Hustlin'* and Roberts owned 37.5%.  (*Id.* ¶ 17).  In an undated letter, SNS/FNG wrote to Sony stating that "as of May 1, 2005" it held a 25% interest of Roberts' interest in *Hustlin*' and informing Sony that "Warner/Chappel Music Inc. ("W/C") currently administers on behalf of us the remaining twenty-five percent (25%) interest in all of the Compositions," or 12.5% of the whole.  (DE 235-2 at 32-33).[25]

---

[23] There is no document reflecting the initial distribution between the authors of the exclusive rights to *Hustlin*'.  (DE 376 ¶ 43).  And, as mentioned previously, none of the documents regarding the transfer of any exclusive right was recorded with the Copyright Office.

[24] It is unclear whether the other rights granted to SNS/FNG in the June 25, 2001 agreement were also redistributed under this agreement. Nonetheless, the Parties have proffered as an undisputed fact that following the January 31, 2006 amendment, the "copyright" was distributed such that FNG had a 12.5% interest and Roberts held a 37.5% interest.

[25] As noted *supra,* FNG took inconsistent positions regarding its ownership share in moving to intervene.  (DE 172; 179).

In May of 2006, 3 Blunts entered into a *Hustlin'* Publishing Split Agreement with TNF and FNG.  In that agreement, the parties agreed that "they had secured a copyright interest" in *Hustlin'*, that they "wish to divide their respective publishing interests in the composition" *Hustlin'*, and that their respective shares of *Hustlin'* were 37.5% (3 Blunts), 12.5% (FNG), and 50% (TNF).  (DE 376 ¶ 28).

Also in May of 2006, Sony/ATV Tunes entered into a co-publishing agreement with 3 Blunts, furnishing the services of Roberts.  (*Id.* ¶ 22).  Under the 2006 Sony/ATV agreement, Sony/ATV was granted the exclusive rights to license *Hustlin'*, to administer and grant rights in the composition, to publish and sell the composition, to "exercise all of such rights as fully as if the copyrights were registered in Sony's name alone," and to collect and distribute royalties to 3 Blunts for *Hustlin'*.  (*Id.* ¶ 26).  As part of that agreement, Roberts assigned his entire interest (37.5%) in *Hustlin'* to 3 Blunts effective January 1, 2006.[26]  (*Id.* ¶ 23).  In turn, 3 Blunts simultaneously assigned to Sony/ATV "an undivided fifty (50%) percent of [its] entire right, title, and interest in and to the Compositions" and "the copyrights therein."  (*Id.* ¶ 24; DE 230-5 at 11).  Accordingly, effective January 31, 2006 (assuming the transfer through 3 Blunts was valid given its dissolved status) Roberts had a 0% interest in *Hustlin'*, Sony/ATV had an 18.75% interest, 3 Blunts had an 18.75% interest, and FNG/SNS had a 12.5% interest (totaling Roberts' initial 50% interest).  As part of the exclusive license agreement with Sony/ATV, 3 Blunts agreed that "at no time during the term or retention period shall [3 Blunts] or the Controlled Songwriter grant to any Person any license with respect to any Composition."  (DE 230-5 at 23).

---

[26] Roberts signed and notarized this portion of the agreement on May 8, 2006, one month before the second copyright registration was filed.

Then, in July of 2006, Sony/ATV and 3 Blunts amended the 2006 Sony Agreement to provide that "3 Blunts d/b/a 4 Blunts Lit At Once Publishing (BMI)" rather than 3 Blunts Lit At Once LLC d/b/a/ 3 Blunts Lit At Once (ASCAP) would assign, effective, January 1, 2006, 50% of its 37.5% interest in *Hustlin'* to Sony/ATV Songs LLC (BMI).  The parties otherwise ratified and reaffirmed all of the terms of the May 2006 Sony agreement.  (DE 376 ¶ 30; DE 230-5 at 36-37).

Plaintiffs argue that because 3 Blunts was an administratively dissolved entity at the time of the Sony agreement, "such transfer of rights was legally ineffective and Roberts, therefore, did not part with his copyright to 3 Blunts Lit at Once, LLC."  (DE 228 at 5).  Nonetheless, Plaintiffs argue that the Court should deem the agreement valid in one respect – the transfer to Sony.  (*Id.*).  Curiously, Plaintiffs never reference the July addendum to the agreement, even though the addendum is the only document that could explain 4 Blunts' presence as a claimant on the third copyright registration.  And, although Plaintiffs assert that Roberts personally (not 3 Blunts or 4 Blunts) is a party to the Sony/ATV agreement, in responding to interrogatories, Roberts asserted that his revenue share from *Hustlin'* was "18.75% through 4 Blunts Lit at Once," which would comport with his assignment to 4 Blunts in the July addendum.  (DE 230-4 at 49).

On June 12, 2007, Roberts and Island Def Jam entered into a recording agreement.  (DE 47-3).  It appears from that agreement that on February 26, 2006 (two days prior to the filing of the first registration), SNS fully assigned its 2001 recording agreement with Roberts to Island Def Jam.[27]  (*Id.*).  The June 12, 2007 Def Jam

---

[27] No copy of this agreement was produced to the Court.

agreement superseded the SNS agreement in its entirety except with respect to the Port of Miami Album, which featured *Hustlin*'.  (*Id.*).

Then, on December 4, 2008, Roberts transferred to Maybach Music Group, LLC[28] "all of Artist's right, title, and interest in, and to under the Agreement" between Def Jam and Roberts, "dated as of June 12, 2007 . . . (as such Agreement supersede the agreement between Artist and Slip N Slide Records, Inc., dated June 25, 2001 [as such agreement was previously assigned to IDJ])."  (*Id.*).  It is unclear whether all of Roberts' interest in the compositions subject to the SNS Agreement (*i.e.*, including the Port of Miami album) was transferred to Maybach under this agreement.

For their part, Plaintiffs Harr and Jackson have been musical and business partners since 2003 and formed TNF to conduct their entertainment business.  (DE 376 ¶¶ 35, 36).  Harr and Jackson are the sole members and owners of TNF and "TNF is authorized by Harr and Jackson to commercially exploit their musical works, enter into contracts for that purpose, and collect and pay monies from the commercial exploitation of their musical works including *Hustlin*'."  (*Id.* ¶¶ 37, 95).  Although Harr and Jackson make all decisions concerning TNF's business, there is no agreement setting forth the contractual, business, or employment relationship of Harr, Jackson, and TNF.  Nonetheless, Jackson and Harr testified that they receive a fixed amount of money each month from TNF, which they set annually.  (*See* DE 230-3 at 33-41, 46-49).[29]

---

[28] Roberts is the sole shareholder, owner, and executive officer of Maybach.  (DE 47-2 at 31).

[29] There is no evidence regarding how much, if any, of that money is attributable to *Hustlin*' and Jackson testified during his deposition that he personally did not receive any money from SNS or TNF for his work on *Hustlin*'.  (DE 230-3 at 34-37).  He also testified that he receives a W-2 tax form from TNF for those payments.  After his deposition, through the filing of an errata sheet, Jackson attempted to change all of his testimony regarding these matters.  (*See Id.* at 35, 36, 43).

In October of 2005, TNF, furnishing the services of Jackson and Harr, entered into a producers' agreement regarding *Hustlin*' with SNS.  (DE 376 ¶ 38).  The Parties dispute whether or not *Hustlin*' was a work for hire.[30]  If it was, then TNF would be considered the author and it would own 50% of the rights comprised in the copyright for *Hustlin*' unless the Parties expressly agreed otherwise in writing.  *See* 17 U.S.C. § 101; *Moran v. London Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987).  If not, Plaintiffs submit that Jackson and Harr each acquired a 25% interest in *Hustlin*' when it was created.  (DE 376 ¶ 92).

The October 2005 Agreement refers to Harr and Jackson collectively as "The Runners" or "you."  (DE 230-5 at 46).  The agreement states that "You will furnish to us your services as a record producer in connection with the recording of the master musical recording (Master) presently entitled 'Hustlin'."  (*Id.*).  The agreement further provides that:

> You warrant and represent that you are the copyright owner of fifty-percent (50%) of the Controlled Composition resulting from your authorship contributions.  You, and any company or person controlled by you, hereby assign to First & Gold Music, Inc. ("FNG") a fifty-percent (50%) interest of your interest in the Controlled Composition.  You and FNG agree to be bound the terms of the Transfer of Copyright and Royalty Agreement attached hereto as Exhibit "1" and incorporated herein by this reference.

---

[30] Under Title 17 U.S.C. § 101, a work is "for hire" if it is "a work prepared by an employee within the scope of his or her employment."  17 U.S.C. § 101.  A work for hire "can arise through one of two mutually exclusive means, one for employees and one for independent contractors, and ordinary canons of statutory interpretation indicate that the classification of a particular hired party should be made with reference to agency law."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989). Given that the relevant contracts relating to Harr and Jackson were entered into by TNF either for itself or furnishing the services of Harr and Jackson and were signed by an authorized signatory of TNF, and because both Harr and Jackson admit that all royalties for their services are paid to TNF, there appears to be substantial record evidence to support Defendants' contention that *Hustlin*' was a work for hire.

(*Id.* at 54).  Harr signed the agreement with SNS as TNF's authorized signatory.  (*Id.* at 55).  The agreement was not signed by Jackson.[31]  (DE 376 ¶ 39).  Once again, the Parties disagree as to the effectiveness and impact of this agreement.

As a result, five possible scenarios (*see* appendix) have emerged regarding the effect of the agreement on TNF/Harr/Jackson's 50% interest in *Hustlin*':

1.  Defendants contend that Harr and Jackson created *Hustlin*' as a work-for-hire for TNF and therefore TNF began with a 50% interest.  According to Defendants, following the October 2005 Agreement, TNF had a 25% interest, and FNG had a 37.5% interest, made up of a 25% interest from TNF and 12.5% from Roberts. (DE 230).

2.  Plaintiffs contend that Harr and Jackson each began with a 25% interest. According to Plaintiffs, the agreement, were it valid, would only be effective as to Harr, because Jackson did not sign the agreement, such that Harr retained a 12.5% interest in *Hustlin*, FNG acquired a 12.5% interest in *Hustlin'* from Harr in addition to their 12.5% interest from Roberts, and Jackson retained a 25% interest in *Hustlin*'. However, Plaintiffs contend that FNG never acted as publisher for Harr, never accounted to Harr, and never made any royalty payments to Harr for *Hustlin*'.[32]  (DE 228).  Consequently, Plaintiffs believe that the agreement had no effect whatsoever and that both Harr and Jackson retained a 25% interest in *Hustlin*'.[33]  (*See* DE 228 at 7-8).

---

[31]  Although the agreement was signed by TNF's authorized signatory, Plaintiffs contend that Jackson did not transfer his copyright interest in *Hustlin*' to FNG.  Plaintiffs take this position despite positing the following undisputed facts:  (1) "On October 11, 2005, Harr *and Jackson* entered into a producer agreement with SNS . . .for the sound recording of *Hustlin'*." (DE 376 ¶ 97) (emphasis added); and (2) "TNF is authorized by Harr and Jackson to commercially exploit their musical works, enter into contracts for that purpose, and collect and pay monies from the commercial exploitation of their musical works including *Hustlin'*." (*Id.* ¶ 95).  At his deposition, Jackson testified that he recalled signing a producers' agreement for *Hustlin'* but in a subsequent errata sheet he corrected his testimony, stating that he did not recall signing the agreement. (DE 230-3 at 37, 43).

[32]  At his deposition, Harr testified:  Q: And what—what do you mean by First-N-Gold did not act as your publisher?  A: They didn't – I don't know the details, my lawyers know.  But I'm just being told that they didn't – they never accounted or anything to me that I'm aware of. (DE 245-3 at 5).  Of course, if TNF owned the exclusive rights in *Hustlin*', FNG would have no reason to account to Harr personally.  (DE 376 ¶ 111(a)).

[33]  At no point—not even in their own motion for summary judgment on ownership—have Plaintiffs taken a definitive position regarding their ownership shares, whether they are legal or beneficial owners, or what exclusive right(s) they own.  Plaintiffs contend that Harr and Jackson, individually, each have a 25% interest in *Hustlin*'.  (DE 228 at 7).  Two pages later, Plaintiffs contend that "there are documents that lend support to an assignment from the Runners to their wholly owned company, Trac N Field Entertainment, LLC. . . it is submitted that there is at least a suggestion in the record of having treated the Runners' interest as though it had been assigned to Trac N Field. If that is the case, then, Harr and Jackson are beneficial owners of copyright for the same reason as Roberts if

3. Under the third scenario, Harr and Jackson each began with a 25% interest, and each of them transferred 50% of their interest to FNG through the October 2005 agreement, resulting in Harr owning a 12.5% interest, Jackson owning a 12.5% interest, and FNG having a 25% interest attributable to Harr and Jackson, in addition to a 12.5% interest attributable to Roberts.

4. In the fourth scenario, Harr and Jackson each began with a 25% interest and only Harr, not Jackson, transferred half of his interest to FNG, and that transfer is effective. Under this scenario, Jackson would have a 25% interest, Harr would have a 12.5% interest, and FNG would have a 12.5% interest attributable to Harr and a 12.5% interest attributable to Roberts.

5. Finally, under the fifth scenario, TNF began with a 50% interest and the transfer to FNG was invalid in its entirety because FNG never acted as a publisher for Harr and because Jackson never signed the agreement, such that TNF retained a 50% interest in the copyright.

As referenced above, in May 2006 TNF, FNG, and 3 Blunts recognized that they had "secured a copyright interest" in *Hustlin*' and divided their publishing interests such that 3 Blunts had a 37.5% publishing interest, FNG had a 12.5% interest, and TNF had a 50% interest. (DE 376 ¶ 28).[34] This agreement is signed by Harr as the "authorized signatory of Trac-n-Field Entertainment" and states that the share for TNF "whose principles are Andrew Harr and Jermaine Jackson – [is] 50%." (DE 228-18). As one might have come to expect, this agreement is subject to dispute. Notwithstanding that the agreements relating to Harr/Jackson/TNF's interest in *Hustlin*' were entered into by

the Roberts/Sony/ATV assignment were given legal effect, namely, they have in reality parted with copyright in exchange for continuing receipt of royalties from Hustlin' via their wholly owned company. If, on the other hand, there has been no transfer, then Jackson and Harr remain legal owners of copyright." (*Id.* at 9). In a later filing, Plaintiffs "submit that Harr and Jackson remain legal owners due to the fact that they do not recall ever assigning their individual rights to their wholly owned company, nor has any assignment running from Harr and Jackson to their wholly owned company ever been located despite diligent search and, additionally, no legally effective assignment was ever made by either Harr or Jackson to Slip N Slide/First N Gold." (DE 245 at 3).

[34] It is unclear what exclusive right(s) this agreement is intended to convey as the Parties claim that this agreement reflects TNF, 3 Blunts, and FNG's shares of "the Hustlin' copyright." (DE 376 ¶ 44). To the extent this agreement is intended to reflect ownership of an exclusive right, it is incongruent with any of the theories posited by the Parties. The only scenario in which this agreement is consistent with the Parties' other contracts is if the October 2005 agreement was invalidated in its entirety *and* TNF – not Harr and Jackson – owned 50% of the exclusive rights of *Hustlin*', a position not advocated by any Party in any pleading.

TNF and signed by Harr as TNF's authorized signatory, Harr and Jackson testified they have no recollection of assigning their interests in *Hustlin'* to TNF and there is no written agreement governing TNF, Harr and Jackson's relationship.  (DE 376 ¶¶ 51-52).

Then, on November 17, 2006, TNF, furnishing the services of Harr and Jackson, entered into an exclusive agreement with Notting Dale Songs, Inc., under which TNF granted Notting Dale "the exclusive right to license and administer all of TNF's interest in certain compositions, including 37.5% of *Hustlin'*, and required that royalties be paid to TNF with respect to the exploitation of *Hustlin'*."  (*Id.* ¶¶ 47-48).  Both Harr and Jackson signed the agreement and represented that "we Trac-N-Field Entertainment f/s/o Andrew Harr and Jermaine Jackson have granted to Notting Dale . . . the exclusive right, throughout the world, in respect of compositions of which the undersigned is the copyright proprietor, including those compositions listed on schedule A."  (DE 230-5 at 77-78).  Schedule A indicates that TNF's share of the exclusive rights for the musical composition of *Hustlin'* was 37.5%.  (*Id.* at 75-78).[35]

Plaintiffs assert that the Notting Dale agreement "is an administration agreement only and is not an assignment of any copyrights."  (DE 376 ¶ 148).  But, as noted previously, Plaintiffs misapprehend the divisibility of exclusive rights.  It is clear that the Notting Dale agreement is an assignment of the six exclusive rights comprised in the *Hustlin'* copyright as it expressly conveys:

---

[35] No explanation has been given as to the origin of the 37.5% that TNF transferred to Notting Dale or what happened to the other 12.5% (initially attributed to either TNF or Harr and Jackson).  As best the Court can surmise, this figure represents TNF's 25% share (attributable to Jackson) and TNF's 12.5% share (attributable to Harr), with the other 12.5% having been assigned to FNG under the 2001 agreement.  This interpretation is wholly inconsistent with the May 2006 Publishing Agreement and with Plaintiffs' contention that Harr and Jackson, not TNF, hold ownership of the exclusive rights in the *Hustlin'* copyright.

(a)     The sole and exclusive right to print, copy and otherwise graphically reproduce the Works in any form and by any means whatsoever . . . and to sell, distribute, hire, lend to the public or otherwise dispose of such reproductions and copies including the right to licence lyrics only for publication

(b)     The sole and exclusive right publicly to perform, broadcast and transmit via any means the Works

(c)     The sole and exclusive right to record, transcribe and otherwise mechanically or electronically record or reproduce the Works

(d)     [T]he exclusive right in the Licensed Territory to issue licences for the recording and/or synchronization of the Works with films, tapes or other permanent visual images produced in the Licensed Territory

(e)     The right to secure copyright registration and renewal copyright registration in respect of the Works in the name of the copyright owner under any applicable law now in effect or hereafter enacted

(g)     The Licensee shall be entitled to license any third party or to authorize or permit any third party to exercise any or all rights of the Licensee. . .

(DE 230-5 at 66-68).

Subsequently, on August 1, 2010, TNF entered into an agreement with Warner/Chappell Music.  (DE 228-23).  On October 1, 2014, the Warner Agreement was extended and all compositions listed on the "Notting Hill"[36] agreement, including *Hustlin*', were deemed to be subject to the Warner agreement effective January 1, 2015.  (*Id.* at 29-32).  Although this agreement was only signed by Harr, Plaintiffs do not argue, as they do for the October 2005 Agreement, that is it ineffective as to Jackson.

Unsurprisingly, given the numerous transfers outlined above, during his April 28, 2015 deposition, taken after more than a year of litigation, Harr testified that he did not know what his ownership share was in the exclusive rights:

---

[36] The Court presumes that this refers to the Notting Dale agreement.  (DE 228-23).

> Q: Okay. What's the percentage ownership you have in *Hustlin*'?
>
> A: Right now that's kind of – we're still deciding.  It might be higher because right now we're claiming, out total claim, both of us, is 37.5, but mind would be – I would have to look at it.  It was – (witness mumbling).  So 12.5 minus – 12.5.  But I don't agree with – I think it should be higher possibly.  We're trying to figure that out.[37]

(DE 245-3 at 2).  Unfortunately, as of this date, neither Harr, nor Jackson, nor Roberts, nor TNF, nor FNG, nor Sony, nor Defendants, nor their counsel, nor the Court can "figure out" who owns what with regard to the musical composition *Hustlin*'.

Having recited the tortured presentation of legal ownership of the exclusive rights, the Court turns to Plaintiffs' allegations that they are beneficial owners of an exclusive right.  A beneficial owner includes "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."  H.R.Rep. No. 94–1476, at 159 (1976), 1976 U.S.C.C.A.N. 5659, 5775.; *Smith v. Casey*, 741 F.3d 1236, 1241 (11th Cir. 2014) ("An "author who assigns his legal rights to a work in exchange for royalties from its exploitation has a beneficial interest sufficient for statutory standing under § 501(b).");  *Viesti Associates, Inc. v. Pearson Educ., Inc.*, No. 11-CV-01687-PAB-DW, 2014 WL 1053772, at *6 (D. Colo. Mar. 19, 2014) ("Beneficial owners are those without legal title, but with an interest in royalties or licensing fees flowing from an exclusive right.").[38]

---

[37] Harr later testified that "[i]t's a possibility that we should be at 50 percent instead of 37.5 percent because First-N-Gold did not operate as my publisher.  So we're going to make a play for a higher percentage."  (DE 245-3 at 5). As discussed, the record does not support "a play" for any percentage of ownership of an exclusive right.

[38] Merely being an author of a work does not automatically make one a beneficial owner.  Only an author who retains a "present financial interest in the exploitation of his work," by virtue of receiving royalties in exchange for parting with an exclusive right can be a beneficial owner.  *See Hearn v. Meyer*, 664 F. Supp. 832, 844 (S.D.N.Y. 1987).  Similarly, an author who creates a work-for-hire is

In order to bring suit, a beneficial owner must show that he owns at least one exclusive right and that the right he owns has been infringed. *See* 17 U.S.C. § 501 ("The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for infringement *of that particular right.*"); *see also Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1293 (11th Cir. 2011) ("It follows, however, that each could only bring a copyright infringement claim based upon the infringement of the exclusive right(s) each holds."); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) ("[U]nder § 501(b) the plaintiff must have a legal or beneficial interest in at least one of the exclusive rights described in § 106. Additionally, in order for a plaintiff to be 'entitled to institute an action' for infringement, the infringement must be 'committed while he or she is the owner of' the particular exclusive right allegedly infringed."); *Screen Media Ventures, LLC v. Does 1-48*, No. 2:13-CV-845, 2013 WL 5346441, at *3 (S.D. Ohio Sept. 23, 2013) ("That is, "to have standing to bring suit, a party must have some ownership rights over at least part of the exclusive right for which he wishes to sue."); *Silberman v. Innovation Luggage, Inc.*, No. 01 CIV. 7109 (GEL), 2003 WL 1787123, at *7 n.5 (S.D.N.Y. Apr. 3, 2003) ("Even if Silberman were no longer the legal owner of that right, he could still have standing to sue as beneficial owner *of that right*, based on royalties received or other indicia of control.").[39]   Plaintiffs have

---

not a beneficial owner, even if he receives royalties for the work. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1143 (9th Cir. 2003).

[39] Because the exclusive right at issue in this case is the right to prepare derivative works, Plaintiffs' citation to their receipt of the so-called "writer's share" for public performances of the work is an insufficient basis for standing in this action.  The same is true for Plaintiffs' reliance on their (or more accurately, their companies') receipt of mechanical royalties for *Hustlin'*.  Again, Plaintiffs have produced no royalty statements or contracts showing that they personally are entitled to receive royalties for the preparation of derivative works based on *Hustlin'*.

never identified what exclusive right they own, but rather continually make a blanket assertion that they are the legal or beneficial owners of "the copyright."

The Court has not found in the voluminous briefing, nor have the Parties identified, any record evidence demonstrating *any* royalty payment to Roberts, Harr, or Jackson relating to the right to prepare derivative works of *Hustlin*'.  Nor is there any evidence that Plaintiffs, themselves, are even entitled to royalties for the exploitation of *Hustlin*'. Roberts has not produced any royalty statements showing any royalties he received from 3 Blunts or FNG in exchange for any transfer of his ownership interest in *Hustlin*'. (DE 376 ¶ 34).   Likewise, Harr and Jackson have produced no royalty statements showing any royalties received from TNF or FNG in exchange for any transfer of any ownership interest in *Hustlin*.' (*Id.* ¶ 56).  In addition, to the extent Harr and Jackson receive royalties for their compositions, both testified that all royalties are paid to TNF, not to Harr and Jackson.  (*Id.* ¶ *101;* DE 230-3 at 49; DE 245-3 at 3).  As Harr and Jackson explain, all royalties earned "from *Hustlin'* (other than the writer's share which is paid to me personally) are paid initially to Trac N. Field.  Harr and I are paid by Trac N Field through draws or distributions."  (DE 228-12 at ¶ 5, Affidavit of Jermaine Jackson, dated July 11, 2015; DE 228-11 at ¶ 5, Affidavit of Andrew Harr, dated July 11, 2015; *see also* DE 230-4 at 52, 56 (stating that Harr's revenue share from *Hustlin*' was a publisher's share of 12.5% *through* TNF, and Jackson's  share from *Hustlin*' was a publisher's share of 25% *through* TNF). (emphasis added).  And each of the agreements signed by TNF, 3 Blunts, Roberts, Harr or Jackson make clear that Roberts, Harr and Jackson do not have any right to authorize or create derivative works of *Hustlin*'; rather, that exclusive right belongs to Sony/ATV, FNG, and Notting

Dale/Warner. In sum, there is no evidence that Harr, Jackson, or Roberts personally receive any royalties for the licensing or commercial exploitation of *Hustlin'*.

## IV. CONCLUSION

For the foregoing reasons, the Court cannot find that any of the Plaintiffs, either legally or beneficially, hold "the kind of clearly delineated exclusivity over at least one strand of the bundle of rights that would permit [Plaintiffs'] to sue for infringement." *HyperQuest, Inc. v. N'Site Sols., Inc.*, 632 F.3d 377, 384-85 (7th Cir. 2011). The undisputed evidence shows that Plaintiffs were aware of the competing registrations, knew of the inaccuracies in the registrations, and took no steps to correct, amend, or address the registrations during two years of litigation until after discovery was closed and the Parties had moved for summary judgment on the issues of registration and ownership. Plaintiffs have asked this Court to grant summary judgment in their favor and bear the burden of establishing both compliance with statutory formalities and ownership. Because Plaintiffs do not hold a valid copyright registration and because Plaintiffs have not established either legal or beneficial ownership of the exclusive right to prepare derivative works for *Hustlin'*, Plaintiffs' motion for summary judgment (DE 228) is **DENIED** and this case is **DISMISSED.** All pending motions are **DENIED AS MOOT.**

**DONE and ORDERED** in Chambers in Miami, Florida this $\underline{8^{th}}$ day of April, 2016.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

Hustlin'
50%
50%
Roberts 50%
Oct. 2005 SNS/TNF Agreement
2001 Agreement
Roberts 25%
Slip N Slide 25%
Scenario 1
TNF 50%
FNG 25%
TNF 25%
Scenario 2
Jackson 25%
Harr 25%
Scenario 3
Jackson 25%
Harr 25%
50%
50%
50%
50%
Jackson 12.5%
FNG 25%
Harr 12.5%
Scenario 4
Jackson 25%
Harr 25%
50%
50%
Harr 12.5 %
FNG 12.5%
Scenario 5
TNF 50%
only scenario consistent with May 2006 Co-Publishing agreement
January 31, 2006
50%
50%
Roberts 37.5%
12.5%
FNG 12.5%
If SNS/TNF agreement Scenario 1,3 valid, FNG 37.5%
If scenario 4, FNG 25%
Only scenario in which TNF could acquire 37.5% after 10/2005 Agreement
TNF 37.5%
3 Blunts dissolved 2004
3 Blunts Lit at Once 37.5%
May 1, 2006 Sony Agreement
May 2006 Co-Publishing Agreement
3 Blunts 37.5%
FNG 12.5%
TNF 50%
November 17, 2006
50%
50%
3 Blunts 18.75%
Sony Songs 18.75%
Sony Agreement acknowledges FNG's 12.5% interest
TNF 37.5%
100%
FNG 12.5%
NottingDale 37.5%
Roberts 37.5%
July 24, 2006 Sony Amendment
On Registration PA 1-334-589, FNG c/o Warner is listed as a claimant. To the extent the companies are related, Warner may in fact have a 50% interest (or more), due to FNG's 12.5%, 25% or 37.5% interest
October 1, 2014
3 Blunts d/b/a 4 Blunts 37.5%
50%
Sony Tunes 18.75%
100%
50%
3 Blunts d/b/a 4 Blunts 18.75%
Warner 37.5%

