**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 13-24700-CIV-WILLIAMS**

WILLIAM L. ROBERTS, II, *et al.*,

Plaintiffs,

vs.

STEFAN KENDAL GORDY, *et al.*,

Defendants.

_____/

## OMNIBUS ORDER

**THIS MATTER** is before the Court following the November 14, 2018 status conference, when the Court heard argument on certain ownership and damages issues. The Court's rulings on these issues follows.

## I.    BACKGROUND

The Court divides its background discussion into three sections: (A) a brief procedural history of the case before the Court's April 8, 2016 Order dismissing Plaintiffs' claims; (B) the Court's Dismissal Order; and (C) the Eleventh Circuit's Opinion reversing the Court's Dismissal Order and remanding for further proceedings.

### A.    Procedural History

Plaintiffs William L. Roberts, II, p/k/a Rick Ross, Jermaine Jackson, and Andrew Harr filed this action in December 2013 alleging that the musical composition *Party Rock Anthem* infringed on their copyright to the musical composition *Hustlin'*. (DE 1). Plaintiffs sued the authors of *Party Rock Anthem* and various individuals and entities involved in marketing, advertising, and otherwise exploiting that song.

In the operative second amended complaint (DE 158), Plaintiffs alleged four claims: Count I–Defendants' musical composition *Party Rock Anthem* infringes their copyright to the musical composition *Hustlin'*; Count II—Defendants' licensing their musical composition *Party Rock Anthem* to KIA Motors for use in advertisements infringes their copyright to *Hustlin'*; Count III—Defendants' marketing merchandise, including T-Shirts, bearing the phrase "Everyday I'm Shufflin" infringes on their copyright to *Hustlin'*; and Count IV—Defendants' marketing merchandise, including T-Shirts, with the phrase "Everyday I'm Shufflin" infringes on their trademark to the phrase "Everyday I'm Hustlin.'"

For their part, Defendants asserted many defenses to Plaintiffs' claims, including, among others, that (1) Plaintiffs do not own a valid copyright in *Hustlin'* and (2) *Party Rock Anthem* does not infringe on *Hustlin'*, based on the fair use doctrine. In May 2015, Plaintiffs dismissed their trademark claim (Count IV). (DE 201). Several months later, the Court granted Defendants' motion for summary judgment on Count III of the second amended complaint (DE 331), but denied their motion for summary judgment on fair use. (DE 347). The Court held that because Defendants' use of *Party Rock Anthem* does not constitute parody, they could not argue this at trial, but they could pursue their fair use defense outside the parody context. (DE 347).

The Parties also filed competing summary judgment motions on the merits elements of Plaintiffs' copyright infringement claims: (1) ownership of a valid copyright; and (2) copying. The Parties subsequently filed pretrial motions *in limine*, *Daubert* motions, as well as proposed jury instructions and a pretrial stipulation. The Court held a pretrial conference in October 2015. (DE 367). Following the pretrial conference, the Court issued a Request to the Register of Copyrights regarding the multiple registrations

2

for the *Hustlin'* copyright.[1] The Parties then submitted supplemental briefing based on the Registrar's response that it would not have issued any of the three copyright registrations to *Hustlin'* had it known of the various inaccuracies in the registrations.

## B. The Court's April 2016 Order Dismissing This Case

On April 8, 2016, the Court entered its Order dismissing Plaintiffs' claims. (DE 399). In the Order, the Court initially set out to resolve this issue: "Was the musical composition *Hustlin'* validly registered with the Copyright Office, and, if so, do Plaintiffs have an ownership interest in the exclusive right to prepare derivative works for the musical composition *Hustlin'*?" *Id.* at 1.

As to copyright validity, the Court held that none of Plaintiffs' three copyright registrations were valid under 17 U.S.C. § 411, because (1) each contained inaccurate information and Plaintiffs had knowledge of the inaccuracies; and (2) the Registrar had established that the inaccuracies, if known, would have caused her to refuse registration for the copyrights.[2] Because registration is a prerequisite to filing an infringement suit,

---

[1] As explained in detail in the Court's Dismissal Order (DE 399 at 10-12), the musical composition *Hustlin'* is the subject of three different registrations with the Copyright Office, each of which contains inaccurate and contradictory information.

[2] Title 17 U.S.C. § 411 provides:

(a) . . . . [N]o action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title. . . .

(b)(1) A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

the Court held Plaintiffs' infringement claims were barred and dismissed the case. (DE 399 at 16-29).

As to copyright ownership, the Court first stated that because it had determined Plaintiffs lacked a valid copyright registration, it "need not decide whether Plaintiffs have standing to assert [their] copyright infringement claims in the first place." *Id.* at 29. Even so, the Court proceeded to "illustrate some of the problems with Plaintiffs' contention that they are 'the legal and/or beneficial copyright owners of the musical work at issue, *Hustlin'*.'" *Id.*

The Court then explained the facts about Roberts', Harr's, and Jackson's legal ownership interests. *Id.* at 29-39. The Court noted—without deciding—many legal and factual disputes relating to Plaintiffs' purported legal ownership of *Hustlin'*, including: (i) the validity and effect of Roberts' 2006 assignment of his interest in *Hustlin'* to his wholly-owned company, 3 Blunts Lit at Once, LLC ("3 Blunts"), given that 3 Blunts was administratively dissolved in 2004 (*Id.* at 32); (ii) whether Harr & Jackson created *Hustlin'* as a "work for hire" for their wholly-owned company, Trac-N-Field Entertainment, LLC ("TNF") (*Id.* at 34); (iii) whether Harr and Jackson ever assigned their interest in *Hustlin'* to TNF (*Id.* at 35 FN 35); (iv) the effect and impact of the October 2005 SNS/TNF agreement, signed by Harr but not Jackson (*Id.* at 35); (v) the effect and meaning of the May 2006 co-publishing agreement (*Id.* at 36); (vi) the effect and meaning of the November 2006 NottingDale agreement (*Id.* at 37); and other legal and factual disputes on legal ownership.[3] But the Court never ruled on any of these legal and factual disputes

---

[3] The Court even created a chart in an attempt to clarify the tangled web of purported transfers and assignments of Plaintiffs' legal interest in *Hustlin'*. (DE 399 at 43).

relating to legal ownership, nor did it otherwise resolve the Parties' respective legal ownership interests. (Indeed, with regard to Jackson and Harr, the Court presented *five* possible scenarios.) However, the Court did observe that "[u]nfortunately, as of this date, neither Harr, nor Jackson, nor Roberts, nor TNF, nor FNG, nor Sony, nor Defendants, nor their counsel, nor the Court can 'figure out' who owns what with regard to the musical composition *Hustlin*'." *Id.* at 39.

The Court similarly did not address the crux of the Parties' dispute on beneficial ownership: their competing legal arguments about the definition and scope of beneficial ownership under 17 U.S.C. § 501(b).[4] Instead, it determined there was no evidence that any of the Plaintiffs ever received—or were even entitled to receive—royalty payments for the preparation of derivative works based on *Hustlin*':

> The Court has not found in the voluminous briefing, nor have the Parties identified, any record evidence demonstrating *any* royalty payment to Roberts, Harr, or Jackson relating to the right to prepare derivative works of *Hustlin*'. Nor is there any evidence that Plaintiffs, themselves, are even entitled to royalties for the exploitation of *Hustlin*'. Roberts has not produced any royalty statements showing any royalties he received from 3 Blunts or FNG in exchange for any transfer of his ownership interest in *Hustlin*'. Likewise, Harr and Jackson have produced no royalty statements showing any royalties received from TNF or FNG in exchange for any transfer of any ownership interest in *Hustlin*. . . . And each of the agreements signed by TNF, 3 Blunts, Roberts, Harr or Jackson make clear that Roberts, Harr and Jackson do not have any right to authorize or create derivative works of *Hustlin*'; rather, that exclusive right belongs to Sony/ATV, FNG, and NottingDale/Warner. In sum, there is no evidence that Harr, Jackson, or Roberts personally receive any royalties for the licensing or commercial exploitation of *Hustlin*'.

(DE 399 at 41).

---

[4] As discussed below, Defendants argue that a "beneficial owner" of an exclusive right under a copyright is a legal owner who has parted with legal title in exchange for percentage royalties based on sales or license fees. Plaintiffs argue for a much broader definition of beneficial ownership that includes "authors who receive royalty payments for a creative work . . . through companies owned and controlled by them[.]" (DE 353 at 47).

In the conclusion section of the Dismissal Order, the Court stated that none "of these Plaintiffs, either legally or beneficially, hold the kind of clearly delineated exclusivity over at least one strand of the bundle of rights that would permit [them] to sue for infringement." *Id.* at 42 (internal quotation omitted). The Court then ruled: "Because Plaintiffs do not hold a valid copyright registration and because Plaintiffs have not established either legal or beneficial ownership of the exclusive right to prepare derivative works for *Hustlin'*, Plaintiff's motion for summary judgment is **DENIED** and this case is **DISMISSED**." *Id.*

## C.    The Eleventh Circuit's Opinion

The Eleventh Circuit reversed this Court's ruling on the validity of the registrations. *Roberts v. Gordy*, 877 F.3d 1024 (11th Cir. 2017). At the outset of its Opinion, it stated: "The Court need not reach a decision on the ownership issue because the district court misapplied the law by invalidating the copyright registrations." *Id.* at 1025.

On copyright validity, it held that this Court had misapplied the law by holding the copyrights were invalid with no evidence of scienter. "A proper application of 17 U.S.C. § 411(b) under the framework of *Original Appalachian* and *St. Luke's*"—which, according to the Eleventh Circuit's Opinion, requires a showing of scienter—"would have yielded the result of validity of registration—albeit plural registrations." *Roberts*, 877 F.3d at 1030. "And while '[a]s a general rule only one copyright registration can be made for the same version of a particular work,' specific exceptions are recognized by a federal regulation . . . . [L]ogic would dictate that *Original Appalachian* and *St. Luke's* would support at least one more—a good faith, redundant registration for a published work." *Id.*

6

On copyright ownership, the Eleventh Circuit's statements were limited. After initially[5] stating that it "need not reach a decision" on the issue, it later noted while discussing validity that "there is no dispute by any party that Appellants authored and created *Hustlin'*, and there is no dispute that they continue to receive the writers' share[6] of royalties from their musical composition." *Id.* In its conclusion, the Eleventh Circuit said:

> Notwithstanding the merits of infringement or parody/fair use, Appellants are the undisputed authors of *Hustlin'*, and they should be afforded the opportunity to protect their copyright from what they view as an unlawful use. . . . Having found that the registrations remain valid under *Original Appalachian* and *St. Luke's*, the Court need not consider the district court's analysis for actual or constructive[7] ownership because Appellants have met their burden of production for establishing a *prima facie* case of ownership and copyright validity.

*Id.* at 1031.

## II.   ANALYSIS: OWNERSHIP

Only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for infringement of that particular right[.]"  17 U.S.C. § 501(b). The exclusive right here is the right to prepare derivative works.[8]  *See, e.g.,* (DE

---

[5] The Court also remarked that "it was on the grounds of invalid copyright registrations and failure to demonstrate ownership that the district court dismissed this case at summary judgment. . . . Notably, a copyright registration provides a presumption of copyright ownership. Invalidation of a registration eliminates this presumption." *Roberts v. Gordy*, 877 F.3d 1024, 1026, FN 3 (11th Cir. 2017) (citing *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986)).

[6] As the Court explains below—and as Plaintiffs concede—receiving "writer's share" royalties does not demonstrate standing to sue for infringement as a copyright owner.

[7] The Court assumes the reference to "actual or constructive" ownership refers to legal or beneficial ownership.

[8] Under 17 U.S.C. § 106, a copyright owner's exclusive rights under the copyright are (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the

7

158, Second Am. Compl., ¶¶ 46, 55). The Parties continue to disagree if Plaintiffs have presented enough evidence of legal or beneficial ownership of that right to proceed to trial on their infringement claims. And the Eleventh Circuit's Opinion has only added another dimension to their disagreement: The Parties now contest whether the Eleventh Circuit determined Plaintiffs' ownership status for purposes of summary judgment, and what ownership issues remain for adjudication by this Court.

Defendants insist that the Eleventh Circuit only analyzed and ruled on the multiple registrations and copyright validity issue. According to Defendants, the Eleventh Circuit did not resolve the ownership issue, and so this Court must revisit the merits of the issue "while now giving appropriate consideration and weight to the rebuttable evidentiary presumption that attaches to facts stated in a valid copyright registration or registrations[.]" (DE 447 at 6). Defendants believe the undisputed facts firmly establish that Plaintiffs lack standing as legal or beneficial owners to sue for infringement.

Plaintiffs disagree. They argue "the registrations themselves take care of the ownership issue, at least for purposes of proceeding to trial, and the Court need not, therefore, wade into the various agreements, etc." *Id.* According to Plaintiffs, the Eleventh Circuit's statements that "[t]here is no dispute by any party that Appellants authored and created Hustlin' and there is no dispute that they continue to receive the writers' share of

---

copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

royalties from their musical composition" necessarily "lead to the conclusion that the Plaintiffs are, at a minimum, beneficial owners." *Id.* Plaintiffs also argue that "[i]f the Eleventh Circuit had determined, based on the record before it, that Plaintiffs had definitively failed to show legal or beneficial ownership (an issue squarely before it), it would have affirmed on that basis." Plaintiffs believe "it is apparent that the Eleventh Circuit deemed the registrations and the record on ownership sufficient for this case to proceed to trial where Defendants will have the burden of proof on this issue."[9] *Id.*

After careful consideration of the complete record and applicable law, the Court determines that the Eleventh Circuit did not clear Plaintiffs of the summary judgment hurdle on ownership, and the Court will resolve the issue now. After applying the rebuttable presumption of copyright ownership that attends a valid copyright registration, the Court rules that Plaintiffs have presented no evidence of beneficial ownership, so summary judgment will be granted for Defendants on this issue. Because the undisputed facts demonstrate that Roberts is also not a legal owner of the copyright, the Court will grant final summary judgment against him. But because genuine issues of material fact remain regarding Harr and Jackson's legal ownership of *Hustlin'*, they are entitled to a jury trial on this issue and on their infringement claims. Finally, as to their damages (should they prevail at trial), the Court rules that Plaintiffs Harr and Jackson's recoverable damages are limited to their respective ownership interests in *Hustlin'*.

---

[9] Plaintiffs have not fully explained who (judge or jury) should "wade into the various agreements" and resolve the many legal and undisputed factual issues on ownership, when these issues should be resolved (they acknowledged at the November status conference that some issues must be decided before trial), or in what context the issues should be decided (they claim the Eleventh Circuit Opinion precludes this Court from making any summary judgment rulings on ownership).

## A.    The Eleventh Circuit Did Not Resolve The Summary Judgment Ownership Issues

Based on the record and the Eleventh Circuit Opinion, the Court concludes that the Eleventh Circuit did not resolve the summary judgment arguments on ownership. Under the mandate rule, district courts cannot revisit "matters decided expressly or by necessary implication in an earlier appeal of the same case." *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 579 F.3d 1268, 1270 (11th Cir. 2009). A lower court does not run afoul of the mandate rule when, following a remand, it issues a ruling that "in no way disturb[s] the panel's answers" to the questions in the original appeal. *Id.* at FN 3; *Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, & Helpers, Dist. Lodge No. 57,* 841 F.2d 1067, 1070–73 (11th Cir. 1988) ("The lower court may consider anew issues not within [the mandate's] compass.").

Here, the Eleventh Circuit did not "decide[] expressly" that Plaintiffs had presented sufficient evidence to defeat summary judgment on ownership. Nothing it said in its Opinion demonstrates that it determined any of the myriad issues the Parties and this Court identified on legal and beneficial ownership, or that it otherwise held Plaintiffs had adduced sufficient evidence of ownership to defeat summary judgment and present their claims to a jury. Indeed, the opposite is true: the Eleventh Circuit expressly said it was not "consider[ing]" the issue. *Roberts*, 877 F.3d at 1031.

Nor did the Eleventh Circuit rule on ownership "by necessary implication." Apart from saying that it "need not reach a decision on the ownership issue," these are the Eleventh Circuit's only other statements relating to Plaintiffs' ownership of *Hustlin'*: "there is no dispute by any party that [Plaintiffs] authored and created *Hustlin'*"; "there is no dispute that they continue to receive the writers' share of royalties from their musical

10

composition"; "[Plaintiffs] are the undisputed authors of *Hustlin'*"; and "the Court need not consider the district court's analysis for actual or constructive ownership because Appellants have met their burden of production for establishing a *prima facie* case of ownership and copyright validity." None of these remarks—on their own or together—mean that the Court definitively ruled that Plaintiffs have developed a sufficient record to advance their ownership claims to a jury.

First, just because Plaintiffs are "undisputed authors" and "creators" of *Hustlin'* does not mean that they are owners with standing to sue for infringement. Only "authors/creators" who have a legal or beneficial ownership interest in the copyright when it is infringed may sue. 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411 [of the Copyright Act], to institute an action for any infringement of that particular right committed *while he or she is the owner of it.*") (emphasis added); *See, e.g., Fathers & Daughters Nevada, LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160, 1164 (D. Or. 2018) (holding on summary judgment that plaintiff/author—which held a valid copyright registration listing it as author—lacked standing to sue for copyright infringement because it could not show legal or beneficial ownership of the right allegedly infringed; it had assigned away all ownership interests in the copyright).[10] As a result, merely being an "undisputed author" or "creator" does not demonstrate standing to sue for infringement.

---

[10] The plaintiff/author in *Fathers & Daughters* argued—like Plaintiffs argue here—that "it is the legal owner [of the copyright] because it registered the copyright and the copyright remains registered in its name." *Fathers & Daughters Nevada, LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160, 1164 (D. Or. 2018). The court explained that "[t]his simplistic view of ownership of a copyright misunderstands that copyright 'ownership' can be transferred . . . . [A]fter a copyright owner has fully transferred an exclusive right, it is the transferee who has standing to sue *for that particular exclusive right.* . . . [T]he [former] copyright

For the same reasons, establishing a *prima facie* case of ownership through valid registrations is also insufficient to defeat summary judgment on standing to sue as copyright owner. *See, e.g., Fathers & Daughters*, 284 F. Supp. 3d at 1167-68 (plaintiff/author who could establish *prima facie* case of ownership through valid registrations still could not survive summary judgment on ownership because it had transferred away its ownership interest). Establishing a "*prima facie* case" and "presumption" of ownership merely shifts the summary judgment burden to defendants to prove that the plaintiffs have transferred, and do not retain, legal or beneficial ownership of the exclusive right allegedly infringed. *See Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1232-33 (11th Cir. 2002) (explaining that, on summary judgment, a defendant "can fully negate" a *prima facie* case of copyright infringement); *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986) (explaining that if a plaintiff presents "*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate," "[t]he burden then shifts to the defendants to rebut this presumption of validity."); *see also Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir. 2003) (agreeing with Register's statements to the court that "a certificate of registration creates no irrebuttable presumption of copyright validity. Extending a presumption of validity to a certificate of copyright merely orders the burdens of proof. Furthermore, where other evidence in the record casts doubt on the question, validity will not be assumed. Thus, all that the statutory presumptions flowing from the certificates of registration do is to shift the burden of going forward"); *Universal Furniture*

---

owner no longer has standing to sue for the rights that have been transferred. *Id.* at 1167-68 (emphasis in original).

*Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010) ("When a []
certificate [of registration] exists, the burden shifts to the defendant to prove that the
claimed copyrights are invalid. However, the Copyright Office's practice of summarily
issuing registrations (perhaps even the day of filing the application, as in this case)
counsel against placing too much weight on registrations as proof of a valid copyright.
Accordingly, a reviewing court should assess other relevant indicia of ownership, such as
the parties' intent and the terms of transfer agreements and other documents establishing
a chain of title."). As a result, the Eleventh Circuit's statement that "Plaintiffs have met
their burden of production for establishing a *prima facie* case of ownership and copyright
validity" does not "necessarily imply" that Plaintiffs defeat summary judgment on
ownership.[11]

Nor does receiving "writer's share" royalties relate to Plaintiffs' standing to sue for
infringement of the exclusive right to prepare derivative works of *Hustlin'*. Indeed,
Plaintiffs concede that this is not the case. (DE 265 at 2) ("Nor do Plaintiffs argue that
their receipt of direct royalty payments from performing rights societies, by itself, make
them beneficial owners[.]"); (DE 228 at 3 FN 3) ("'[W]riter's share' refers to the percentage

---

[11] For example, if an artist creates a song, and then properly registers the copyright, that
artist is the owner of all rights in the copyright and may sue for infringement. But the artist
may decide to contract away all interest the artist has or could ever have in the song to a
company for an immediate lump sum payment. If the artist later sued for infringement of
the copyright, then as the author/creator with a valid copyright registration listing the artist
as the author/creator, the artist could establish a *prima facie* case of copyright ownership.
But if on summary judgment the defendant presented the agreement assigning away all
of the artist's interest in the copyright, then the *prima facie* case would be rebutted, and
the defendant would be entitled to summary judgment on ownership. *See Fathers &
Daughters*, F. Supp. 3d at 1164, 1167-68; *Calhoun v. Lillenas Publishing*, 298 F.3d 1228,
1232-33 (11th Cir. 2002); *see also* 17 U.S.C. § 501(b) (permitting only a legal or beneficial
owner of an exclusive right under a copyright to sue for infringement of that right).

13

of the income generated from the exploitation of the musical composition that is payable to the writer(s) of the musical composition, *irrespective* of who owns the copyright in such musical composition.") (citing Nimmer on Copyright § 30.02) (emphasis added). Because the right to receive "writer's share" royalties is not an exclusive right under 17 U.S.C. § 106, it cannot give rise to an infringement suit under 17 U.S.C. § 501(b), which permits only the owner of an exclusive right under a copyright to sue for infringement. It also cannot demonstrate beneficial ownership, because it is not received in exchange for parting with legal title to a copyright. *See, e.g., Smith v. Casey*, 741 F.3d 1236, 1242 (11th Cir. 2014) (holding that the plaintiff was a beneficial owner because he had parted with legal title in exchange for the right to receive royalties). As this Court explained in the Dismissal Order, "[b]ecause the exclusive right at issue in this case is the right to prepare derivative works, Plaintiffs' citation to their receipt of the so-called 'writer's share' for public performances of the work is an insufficient basis for standing in this action. The same is true for Plaintiffs' reliance on their (or more accurately, their companies') receipt of mechanical royalties for *Hustlin*'." (DE 399 at 40 FN 39). *See Fahmy v. Jay-Z*, 908 F.3d 383, 394 (9th Cir. 2018) (holding that although Plaintiff was entitled to receive royalties from the public performance and reproduction of the copyright, he was not entitled to receive royalties based on the *exclusive* right at issue in the case—the right to prepare derivative works—so he lacked standing to sue for infringement as beneficial owner).

Next, the Court again notes that in its Dismissal Order, it identified—without resolving—many legal and factual disputes regarding Plaintiffs' purported ownership of *Hustlin'. See supra*, 4-5. That this Court never ruled on these issues—Plaintiffs conceded at the November 14 status conference that many of these issues are for the Court, not a

14

jury, to resolve—undermines Plaintiffs' argument that the Eleventh Circuit ruled on ownership. A district court should resolve legal and factual disputes in the first instance; "[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings. . . ." *Pullman-Standard v. Swint*, 456 U.S. 273, 291-92 (1982); *see, e.g., Canupp v. Paul*, 716 F. App'x 836, 843 (11th Cir. 2017) ("[S]ince the district court did not rule on that issue, neither do we."). Accordingly, this Court must now resolve the undecided legal issues in light of the Eleventh Circuit's ruling that Plaintiffs have established a *prima facie* case of ownership.

Finally, Plaintiffs ignore the practical implications of this Court simply deciding, based on the Eleventh Circuit's comments in dicta on ownership, that the ownership issue has been "take[n] care of," "at least for purposes of proceeding to trial, and the Court need not, therefore, wade into the various agreements, etc." (DE 447 at 7). Plaintiffs readily acknowledged at the November 14 status conference that numerous, "purely legal" ownership issues remain for the Court, not a jury, to decide. But besides saying that the time to resolve these issues is "not now,"[12] Plaintiffs' counsel offered no procedural or substantive proposal for how, or when, the Court would rule on these purely legal issues. For all these reasons, the Court finds that the Eleventh Circuit did not resolve the Parties' summary judgment arguments on ownership. The Court will therefore turn to the Parties'

---

[12] Presumably, Plaintiffs' counsel meant that the Court should not resolve these issues in the summary judgment context. Counsel never identified, however, another appropriate context in which to resolve the issues.

15

competing positions, accepting that Plaintiffs have established a *prima facie* case of ownership, and are thus entitled to a rebuttable presumption on the issue.[13]

## B.    Legal Ownership

The background facts regarding Plaintiffs' purported legal ownership interests are set forth in the Court's 2016 Dismissal Order. *See* (DE 399 at 29-39; 43). Based on these facts and the Parties' arguments, the Court now determines that there are no genuine issues of material fact on Roberts' legal ownership interest: He is not a legal owner of *Hustlin'*. Triable issues of fact remain, however, regarding Harr and Jackson's legal ownership interests.

### i.    Roberts Is Not A Legal Owner Of *Hustlin'*

The Parties agree that Roberts' legal ownership claim depends on the validity and effect of his May 2006 assignment of his interest in *Hustlin'* to 3 Blunts, given that 3 Blunts administratively dissolved in 2004. As discussed, neither the Court's Dismissal Order nor the Eleventh Circuit's Opinion resolved this question.

Plaintiffs argue that the assignment was ineffective and void, and therefore legal ownership of *Hustlin'* remained with Roberts, because: (1) Section 15.01 of the Sony/ATV

---

[13] The Court notes that, on appeal, Plaintiffs argued that "[t]o the extent there is any conflict [in the registrations], Plaintiffs may not be entitled to simply rely on the usual presumption that attends a registration but would have to present evidence of the underlying facts. . . ." Plaintiffs cited the following cases: *M & D Intern. Corp. v. Chan,* 901 F. Supp. 1502, 1510 (D. Hawaii 1995) (competing registrations cancel each other out regarding presumption of originality); *NBC Subsidiary, Inc. v. Broadcast Information Services, Inc.,* 717 F. Supp. 1449, 1451 (D. Colo. 1988) (conflicting statements regarding publication in multiple registrations would "neutralize" each other's presumption, requiring court to analyze and adjudicate evidence). Even though Plaintiffs seem to have acknowledged that they are not entitled to an evidentiary presumption of ownership, the Court will analyze Defendants' ownership arguments presuming that Plaintiffs are entitled to this initial, rebuttable presumption.

16

Agreement provides that upon 3 Blunts' dissolution, Roberts would individually be substituted as the contracting party in place of 3 Blunts; (2) under Florida law, dissolved entities may only "wind up" their business, and cannot engage in conducting "new business," and here, acquiring ownership of *Hustlin'* from Roberts constitutes "new business"; and (3) the assignment language in the agreement describes the assignee as "3 Blunts Lit at Once, LLC, its successors and assigns," and Roberts is a "successor" of 3 Blunts given its dissolution.

Defendants respond that the assignment of copyright per the agreement was effective, and stripped Roberts of his legal ownership, because: (1) Section 15.01 only provides for the substitution of Roberts in place of 3 Blunts if Sony/ATV exercises an option—by sending a notice—which never occurred here; (2) dissolved entities are allowed to "marshal" and "collect" assets, which 3 Blunts was doing when it obtained Roberts' copyright; and (3) "Florida law accords very little significance to the fact that a company is administratively dissolved."

The Court agrees with Defendants that Roberts conveyed his legal ownership interest in *Hustlin'* to 3 Blunts, despite 3 Blunts' status as administratively dissolved. Section 15.01 of the Sony/ATV Agreement—which Roberts relies on to argue that he was "substituted" into the agreement for 3 Blunts—states, in part:

> In the event of your [(3 Blunts')] dissolution . . . then at any time after the occurrence of any such event, in addition to any other remedies under this agreement or otherwise, Sony shall have the option **by notice** to require that Controlled Songwriter [(Roberts)] render his personal services directly to it for the remaining balance of their Term, including any extensions thereof, for the purpose of writing, delivering and releasing musical compositions upon all the same terms and conditions as are contained herein. In such event Controlled Songwriter shall be deemed substituted for you as a Party to this agreement.

17

(DE 235-2) (emphasis added). This provision does not support Roberts' argument. It provides that if 3 Blunts is dissolved, then Sony/ATV has "the option" of substituting Roberts for 3 Blunts as a party to the Sony/ATV Agreement, but only after providing "notice" of invoking the option. That never happened here, and therefore Roberts was never substituted into the agreement under Section 15.01. And even if such substitution had occurred under Section 15.01, that provision only applies to the agreement between 3 Blunts and Sony/ATV; it has no bearing on the separate assignment of copyright from Roberts to 3 Blunts. Nor does the agreement's description of the assignee as "3 Blunts Lit at Once, its *successors and assigns*" support Plaintiffs' position that Roberts remained legal owner of *Hustlin'*. There is no support for this argument in law or fact.

The actions of Roberts and 3 Blunts after the May 2006 Sony/ATV Agreement demonstrate that Roberts conveyed his interest in *Hustlin'* to 3 Blunts. It was 3 Blunts— not Roberts—that, more than six years later, entered into an agreement with Sony that purported to grant 3 Blunts the right to sue for alleged infringement of the *Hustlin'* copyright. And during this litigation, Plaintiffs maintained that the agreement was effective insofar as 3 Blunts transferred its interest in *Hustlin'* to Sony/ATV, which would not be so if the initial assignment to 3 Blunts was "legally ineffective." Roberts, in responding to Defendants' interrogatories, also stated that his *Hustlin'* revenue share was "18.75% through 4 Blunts," consistent with the assignment to 4 Blunts in the July 2006 addendum.

Florida law does not support Roberts' argument that his assignment to an administratively dissolved was void *ab initio*. Under the Florida Limited Liability Act in effect at the time of Roberts' transfer to 3 Blunts and 3 Blunts transfer to Sony/ATV, 3 Blunts "continue[d] its existence," notwithstanding its administrative dissolution. Fla. Stat.

§ 608.4431(1) (repealed 2014); Fla. Stat. § 605.0714 (5) (2014) (same). "Dissolution of a limited liability company *does not*: (a) *Transfer title to the limited liability company assets*." Fla. Stat. § 608.4431 (2) (repealed 2015) (emphasis added); Fla. Stat. § 605.0717 (2015) (same). Therefore, Plaintiffs' assertion that Roberts retained any interest in *Hustlin'* because of 3 Blunts' administrative dissolution in 2006 is legally untenable. *See United States v. All Funds in the Account of Prop. Futures, Inc.*, 820 F. Supp. 2d 1305, 1331 (S.D. Fla. 2011) (holding that the express terms of Fla. Stat. § 608.4431 are "contrary to the position [] that dissolution of [an LLC] allowed Claimants to step into the void created . . . and confer standing" to file claims on the LLC's behalf) *aff'd sub nom. United States v. ADT Sec. Servs., Inc.*, 522 F. App'x 480 (11th Cir. 2013). Because Roberts assigned his legal interest in *Hustlin'* to his company 3 Blunts, he lacks standing to sue for infringement as a legal owner.

### ii. The Court Cannot Resolve Harr And Jackson's Legal Ownership Status On Summary Judgment

Harr's and Jackson's legal ownership interest in *Hustlin'* is less clear. Indeed, the Court determines that genuine disputes of material fact preclude entry of summary judgment on this issue.

#### (a) The Court Cannot Determine If *Hustlin'* Was Created As A "Work For Hire" On Summary Judgment

Under Title 17 U.S.C. § 101, a work is "for hire" if it is "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. If a work is made "for hire," then the employer owns the work, and the individuals who created it have no ownership interest. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir. 2003).

19

A work for hire "can arise through one of two mutually exclusive means, one for employees and one for independent contractors." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989). In *Reid*, the Supreme Court instructed that general common-law agency principles, as defined in the *Restatement,* govern the resolution of whether an employee has created a work within the scope of his or her employment. *Id.* at 739–40 (citing *Restatement (Second) of Agency* § 228). This inquiry is highly fact specific. *See Reid*, 490 U.S. at 751-52 (identifying thirteen factors potentially relevant to the work for hire inquiry, including skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party).

Harr and Jackson argue that the undisputed evidence establishes that they did not create *Hustlin'* as a work for hire for TNF. According to them, the evidence shows that they do not receive a salary from TNF, that they jointly make all decisions about how much money they make and when they get paid from the company, and that they have "staff," not that they are employees themselves. They also note that there is no songwriting agreement relating to the Runners' composition of *Hustlin'*.

In response, Defendants argue that no written contract need exist for a work to have been made "for hire," and assert that Harr and Jackson are the ones who have failed to point to documentary evidence to refute their creation of *Hustlin'* as a work for hire.

20

They also cite to testimony from Jackson and Harr that they receive a fixed amount of money each month from TNF, which they set annually.[14] (*See* DE 230-3 at 33-41, 46-49). And it is undisputed that all royalties earned from their entertainment business are paid to TNF—not to Harr or Jackson.

Although this Court did not fully analyze the work for hire issue in the Dismissal Order, it did comment: "Given that the relevant contracts relating to Harr and Jackson were entered into by TNF either for itself or furnishing the services of Harr and Jackson and were signed by an authorized signatory of TNF, and because both Harr and Jackson admit that all royalties for their services are paid to TNF, there appears to be substantial record evidence to support Defendants' contention that *Hustlin'* was a work for hire." (DE 399 at 24 FN 30).

The relevant law and record compel the conclusion that genuine disputes of material fact exist on whether Harr and Jackson created *Hustlin'* as a work for hire for their company, TNF. On the one hand, Harr and Jackson's testimony about their relationship with TNF and TNF's operation suggest that Harr and Jackson—and not TNF—controlled all aspects of work that go into their entertainment business and went into the creation of *Hustlin'*. On the other hand, TNF owns and receives all royalties from works created by Harr and Jackson, and it is TNF who enters into all contracts relating to their musical compositions. And the record is unclear how Harr and Jackson are compensated by TNF for their work. Accordingly, because the work for hire inquiry is

---

[14] Jackson testified during his deposition that he personally did not receive any money from SNS or TNF for his work on *Hustlin'*. (DE 230-3 at 34-37). He also testified that he receives a W-2 tax form from TNF for those payments. After his deposition, through the filing of an errata sheet, Jackson attempted to change all of his testimony regarding these matters. (*See Id.* at 35, 36, 43).

highly fact specific, and because there is conflicting evidence, the issue is inappropriate for resolution on summary judgment, and must be determined by a jury.

### (b) Genuine Disputes Of Material Fact Exist Regarding Whether Harr And Jackson Assigned Their Interest In *Hustlin'* To TNF

Even if *Hustlin'* were not created as a work for hire, Defendants argue that Harr and Jackson are not legal owners because they have assigned all their legal ownership interest to TNF. The Court agrees with Defendants that ample evidence supports the conclusion that Harr and Jackson assigned their interest in *Hustlin'* to TNF.[15] For example, all[16] three copyright registrations list TNF as a "claimant"—defined as "as either the author of the work or an organization 'that has obtained ownership of all rights under the copyright initially belonging to the author'"—by "written assignment" or "agreement." *Aurora World, Inc. v. Ty Inc.*, 09-08463, 2011 WL 13176413, at *10 (C.D. Cal. Mar. 14, 2011) (citing 37 C.F.R. § 202.3.). Moreover, the May 2006 Copyright Splits Agreement, and the November 2006 Nottingdale Agreement, both provide that TNF owns the Runners' legal ownership interest in *Hustlin'*. Finally, Leonard Zackheim, the Runners' entertainment lawyer who filed the first copyright registration, testified that he prepared a

---

[15] Even Harr and Jackson concede "there is at least a suggestion in the record of having treated the Runners' interest as though it had been assigned to Trac N Field." (DE 228 at 9) ("there are documents that lend support to an assignment from the Runners to their wholly owned company, [TNF].").

[16] Although Registration PA 1-367-972 lists a claimant as "J. Jackson & A. Harr Trac-N-Field Entertainment First-N-Gold," the Court finds that this shows that TNF was the claimant, not Harr or Jackson. That is because the claimant is listed as a claimant "by assignment." It would make no sense, and no one has argued, that Harr and Jackson ever received an assignment from anyone.

transfer of copyright transferring the Runners' copyright interests in *Hustlin'* to their wholly owned company, Trac N Field Entertainment, Inc.[17] (DE 228-19 at 62-65; 228-20).

However, the express language of 17 U.S.C. § 204(a) fatally undermines Defendants' argument that they are entitled to summary judgment on Harr and Jackson's legal ownership claim. That statute provides that a "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." Defendants have made no argument—other than the work for hire argument, which the Court cannot resolve on summary judgment for reasons already explained—that the Runners' legal interest in *Hustlin'* was assigned to TNF "by operation of law." Thus, without a written agreement conveying Jackson and Harr's legal interest in *Hustlin'* to TNF, the Court cannot rule on summary judgment that their interest was conveyed. There is no assignment agreement in the record, and both Harr and Jackson attest that they "do not recall either seeing or ever signing an assignment of [their] copyright interest in *Hustlin'* to Trac N Field." (DE 228-11 ¶ 8, Harr Aff.; DE 228-12 ¶ 7, Jackson Aff.). A triable issue of fact for the jury therefore exists on whether Harr and Jackson conveyed their interest in *Hustlin'* to TNF by written agreement, consistent with 17 U.S.C. § 204(a).

---

[17] Mr. Zackheim first testified he had not prepared such a transfer, but when he was shown an application for copyright registration indicating "transfer by written agreement," he changed his testimony, saying "I must have prepared that." (DE 228-19 at 63; 228-20).

### (c) The Effect Of The October 2005 SNS/TNF Agreement Must Also Be Decided By A Jury

If Harr and Jackson did not create *Hustlin'* as a work for hire, and if they never assigned their interest to TNF, then the extent of their legal ownership in *Hustlin'* will depend, in part, on the effect of the October 2005 SNS/TNF Agreement. In October 2005, TNF, furnishing the services of Jackson and Harr, entered into a producers' agreement regarding *Hustlin'* with SNS. (DE 376 ¶ 38). The October 2005 Agreement refers to Harr and Jackson collectively as "The Runners" or "you." (DE 230-5 at 46). The agreement states that "You will furnish to us your services as a record producer in connection with the recording of the master musical recording (Master) presently entitled 'Hustlin'." *Id.* The agreement further provides:

> You warrant and represent that you are the copyright owner of fifty-percent (50%) of the Controlled Composition resulting from your authorship contributions. You, and any company or person controlled by you, hereby assign to First & Gold Music, Inc. ("FNG") a fifty-percent (50%) interest of your interest in the Controlled Composition. You and FNG agree to be bound the terms of the Transfer of Copyright and Royalty Agreement attached hereto as Exhibit "1" and incorporated herein by this reference.

(*Id.* at 54). Harr signed the agreement with SNS as TNF's authorized signatory. (*Id.* at 55). Jackson did not sign the agreement. (DE 376 ¶ 39).

### (i) Jackson Not Signing

Jackson claims that the agreement was not effective as to him because he "never signed an assignment of copyright assigning any of my copyright interest in *Hustlin'* to Slip N Slide Records, nor was Harr ever authorized to execute any such assignment on my behalf." DE 228-12. Plaintiffs take this position despite positing the following undisputed facts: (1) "On October 11, 2005, Harr *and Jackson* entered into a producer agreement with SNS . . .for the sound recording of *Hustlin'*." (DE 376 ¶ 97) (emphasis

24

added); and (2) "TNF is authorized by Harr and Jackson to commercially exploit their musical works, enter into contracts for that purpose, and collect and pay monies from the commercial exploitation of their musical works including *Hustlin'*." (*Id.* ¶ 95). At his deposition, Jackson testified that he recalled signing a producers' agreement for *Hustlin'*, but in a subsequent errata sheet he corrected his testimony, stating that he did not recall signing the agreement. (DE 230-3 at 37, 43). Thus, despite Jackson's statements, there is also record evidence to show that either (i) Jackson separately assigned his interest in *Hustlin'* to FNG; or (ii) TNF was authorized to assign Jackson's interest in *Hustlin'* to FNG. This issue is therefore inappropriate for resolution on summary judgment.

## (ii) **Failure Of Consideration**

Harr and Jackson also argue that the agreement had no effect for another reason. They assert that the assignment was intended as consideration for FNG to act as publisher for Harr's interest and to make royalty payments pursuant to the Royalty Agreement that is part of the SNS Producer Agreement. (DE 230-5/54, 56). But Plaintiffs contend that FNG never acted as publisher for Harr, never accounted to Harr, and never made any royalty payments to Harr for *Hustlin'*. (DE 228). Plaintiffs therefore believe that the agreement fails for lack of consideration, it had no effect whatsoever, and both Harr and Jackson retained a 25% interest in *Hustlin'*. (*See* DE 228 at 7-8; DE 228-11 ¶7, 228-12 ¶7).

Once again, the Court determines that it cannot resolve this issue—whether the October 2005 SNS/TNF Agreement fails for lack of consideration—on summary judgment. The agreement, on its face, does not fail for lack of consideration, because in exchange for Harr and Jackson's services as producers, FNG promised to pay them cash

and ongoing royalty payments. But such payments were never made, and Plaintiffs maintain that FNG is an owner of *Hustlin'* based on a transfer from Roberts, not Harr and Jackson. What happened after the agreement was signed, and whether the entire agreement is void as a result, is the subject of disputed and undeveloped facts. For example, at his deposition, Harr could not recall any significant details on the issue:

> Q: And what—what do you mean by First-N-Gold did not act as your publisher?  A: They didn't – I don't know the details, my lawyers know.  But I'm just being told that they didn't – they never accounted or anything to me that I'm aware of.

(DE 245-3 at 5).   For these reasons, summary judgment on this discrete issue is inappropriate.

### C.     Beneficial Ownership

Plaintiffs argue that if they cannot sue as *legal* owners of *Hustlin'*, they can sue as *beneficial* owners.   The Court disagrees.   Plaintiffs' novel argument that beneficial ownership extends to an author whose separate, legally distinct company receives royalties—but who is not entitled to receive, and does not receive, royalties himself—fails as a matter of law.   Based on the undisputed facts, Plaintiffs are not beneficial owners of the right to prepare derivative works of *Hustlin'*.

### i.     The Scope Of Beneficial Ownership

"The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411 [of the Copyright Act], to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).   "The paradigmatic—and only—example of an approved 'beneficial owner' suit is set forth in the legislative history of the Copyright Act, which describes the term 'beneficial owner' as 'includ[ing], for example, an author who had parted with legal

title to the copyright in exchange for percentage royalties based on sales or license fees.'"
*John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 414 (2d Cir. 2018) (quoting H.R.
Rep. No. 94-1476, at 159). Indeed, in *John Wiley*, the Second Circuit explained that it
had never extended beneficial ownership "beyond the circumstance of an author
transferring exclusive rights in exchange for royalty payments." *Id.* So too the Eleventh
Circuit has only ever found "beneficial ownership" under this precise scenario: an author
who parts with legal title to the copyright in exchange for royalties. *See Smith v. Casey*,
741 F.3d 1236, 1242 (11th Cir. 2014) (applying the definition of "beneficial owner" found
the Copyright Act's legislative history and holding that plaintiff was a beneficial owner
because he "assigned his rights to the musical composition in exchange for royalties").[18]

Plaintiffs urge this Court to apply a much more expansive definition of beneficial
ownership. They argue that they can demonstrate beneficial ownership in the *Hustlin'*
copyright merely by showing that "they are authors of the work who maintain a financial
interest in, and continue to benefit from, the commercial use of the work." (DE 353, Pls.
Proposed Jury Instruction, at 47). According to Plaintiffs, even though they personally do
not receive any royalty payments from *Hustlin'*, they are still beneficial owners because
"[b]eneficial owners include authors who receive royalty payments for a creative work
either directly or through companies owned and controlled by them, and who have a
continuing present right to make decisions about the commercial use and exploitation of
the work." *Id.*; *see also* Pls. Reply Brief on Appeal ("the author continues to be the
equitable owner even if the copyright is assigned to his or her company and royalties from

---

[18] Based on this Court's review, the decision in *Smith* is the only case where the Eleventh
Circuit has discussed what constitutes beneficial ownership under 17 U.S.C. § 501(b).

27

the commercial exploitation of the assigned work are paid to the company"); Pls. Opening Brief on Appeal ("[T]he fact of ownership (even part-ownership) of the company to whom copyright had been assigned and/or other indicia of control and the company's right to receive royalties from third parties [is] sufficient to render the authors 'equitable' owners of copyright.").

Plaintiffs' novel legal argument has no basis in law. No court has found beneficial ownership under these circumstances. None of the cases Plaintiffs cite held that a plaintiff could sue for infringement as beneficial owner without demonstrating that they assigned their legal interest in the copyright in exchange for the right to receive royalties, and that they, in fact, received such royalties themselves.

In *Cortner v. Israel*, for example, the court held that authors who had parted with legal ownership to their copyright were nonetheless beneficial owners because the copyright assignee had also assumed the prior publisher's "obligation . . . *to pay the appellants such royalties* as might be earned ... resulting in *the payment of royalties to the composers*." 732 F.2d at 270 (emphasis added). "[T]heir *right to royalties* . . . gave them a sufficient beneficial interest in the copyright to give them standing" to sue. *Id.* at 270-71. Here, Plaintiffs never contracted[19] for, and are not entitled to receive, any royalties in exchange for assigning their legal interest in *Hustlin'*. Nor have they

---

[19] The Second Circuit reasoned in *Cortner* that "[w]hen a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of that copyright." Thus, under this scenario, the author remains an owner because the right to receive royalties is directly tied to the legal ownership that has been assigned. Here, no "equitable trust" of the kind referenced in *Cortner* was established between the Parties, because Plaintiffs did not transfer their legal ownership in *Hustlin'* in exchange for royalties.

identified—after more than five years of litigation—any royalty payments they received based on the exclusive right to prepare derivative works of *Hustlin'*. *Cortner*, therefore, actually undermines Plaintiffs' beneficial ownership theory.

The other cases Plaintiffs rely on are similarly inapposite. In *Sasnett v. Convergent Media Sys.*, No. 95-12262, 1997 WL 33142149, at *4 & n.9 (D. Mass. Aug. 29, 1997), the court did not find—as Plaintiffs suggest—that a 50% owner of a company that held legal title to a copyright had standing; the court never even considered this issue. In dicta, the court remarked "it may be" that the company owner was a beneficial owner. In *Silberman v. Innovation Luggage, Inc.*, No. 01-Civ-7109 (GEL), 2003 WL 1787123, at *7 (S.D.N.Y. Apr. 3, 2003), the court's holding was that "Silberman retained legal ownership" of the right he sought to enforce, because that right was never assigned. *Id.* at 7. He therefore had standing to sue. The court then commented—again in dicta—that hypothetically, even if the plaintiff were not a legal owner, "he could still have standing to sue as beneficial owner of that right, based on royalties received or other indicia of control." *Id.* at FN 5. The court did not rule on beneficial ownership, nor did it support or explain its comment regarding "other indicia of control." And in *Love v. The Mail on Sunday*, No. 05-7798, 2006 WL 4046180, at *10 (C.D. Cal. Aug. 15, 2006), as Plaintiffs admit, the court only found that the plaintiffs were beneficial owners because they received royalties for exploitation of the compositions. But here, Plaintiffs' companies—not Plaintiffs—receive the royalties for the exploitation of the right to prepare derivative works of *Hustlin'*.

The decisions in *Wildlife Internationale, Inc. v. Clements*, 591 F. Supp. 1542, 1546 (D. Ohio 1984) and *Drake v. Malouf*, No. 99-0315, 1999 WL 1007642 *4 (N.D. Tex. Nov. 5, 1999) are inapplicable and unpersuasive for similar reasons. In *Wildlife*, the court

applied the example of a beneficial owner found in the copyright act's legislative history: "A 'beneficial owner' for this purpose would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." 591 F. Supp. at 1546 (quotation omitted). The court then said that this example "describes exactly the contractual relationship between" the plaintiff (named Ruthraven) and the assignee of his copyright, DeSales: "Desales received certain reproduction and distribution rights *in exchange for* Ruthven's right to royalties." *Id.* After reaching this conclusion, the court hypothesized, without any legal support, that the artist could also be a beneficial owner "[g]iven [his] position as owner and president of Wildlife and given that any reproduction by Wildlife was to be done under Ruthven's 'direct supervision and control[.]'" *Id.* In *Drake*, the court relied exclusively on this statement in dicta to rule, on a motion to dismiss, that the plaintiff could proceed as a beneficial owner because, applying *Wildlife*, Malouf was an owner and officer of the company that retained control over the copyrights at issue. Setting aside that *Drake* is an out-of-circuit, district court case involving a motion to dismiss, it relies on dicta from one other case—*Wildlife v. Clements* (also an out-of-circuit, district court case)—that supports Defendants' theory, not Plaintiffs', because it held that the artist was a beneficial owner since he had assigned his legal ownership *in exchange for* royalties. And even if *Drake* and *Wildlife* could be interpreted as expanding the definition of beneficial ownership, they would conflict with the only definition of beneficial owner that the Eleventh Circuit has recognized: an author who "had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." *Smith*, 741 F.3d at 1241.

30

Second, basic tenets of corporate law prohibit Plaintiffs from essentially treating their LLCs as shams. "Unless otherwise provided in the articles of organization or the operating agreement, property acquired with limited liability company funds is limited liability company property." § 608.425(2), Fla. Stat (2006). Here, the *Hustlin'* copyright is owned by Plaintiffs' companies. Allowing Plaintiffs to call themselves "owners" of the copyright when the copyright is company property would ignore the corporate distinction. *See Wallert v. Atlan*, 141 F. Supp. 3d 258, 276–77 (S.D.N.Y. 2015) ("First, the FAC's claim that Wallert, as owner of Moonstruck, is also the owner of Moonstruck's copyright ownership of The Rock composition, is legally wrong. A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. Therefore, an individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets.") (internal citations, quotations, and alterations omitted).

Third, even if "control" over a copyright's exploitation were a factor in determining beneficial ownership—and it is not—none of the agreements among TNF, 3 Blunts, Roberts, Harr, or Jackson state that Plaintiffs retained "any right to authorize or create derivative works of *Hustlin'*". To the contrary, that exclusive right belongs to the entities to which it was assigned. Because only a beneficial owner of the right to prepare derivative works would have standing to bring this infringement suit, Plaintiffs' vague references to "control" over other unrelated aspects of *Hustlin'*'s exploitation are irrelevant. *See, e.g., Fahmy*, 2018 WL 5781357 at *8.

Fourth, Plaintiffs' contention that a "financial interest" in a copyright is enough to confer standing belies the plain text of the copyright statute, which provides that only a legal or beneficial "owner" can sue for infringement. Being an owner of a copyright is

different than having an interest in one. "It is therefore not enough that a putative

beneficial owner obtains a mere interest in a copyright, even if that interest is valuable."

*See Cortner*, 732 F.2d at 271.  Accepting Plaintiffs' argument that individuals with "a

current economic interest in the commercial exploitation of" a copyright may sue for

infringement would ignore the legislative requirement that only an "owner" can sue and

greatly expand the number of individuals who may sue for infringement.  As discussed,

nothing in the law supports this result.  Accordingly, the Court holds that a beneficial

owner is a legal owner who has parted with legal title to an exclusive right under a

copyright *in exchange* for the right to receive royalties based on the commercial

exploitation of that right.

### ii.    **Plaintiffs Are Not Beneficial Owners**

Having defined the contours of beneficial ownership, the Court concludes that

Plaintiffs cannot sue as beneficial owners. After conducting a thorough and

comprehensive review of the record on summary judgment, this Court explained that

nothing in the record showed that Plaintiffs received, or were even entitled to receive,

royalties relating to the right to prepare derivative works of *Hustlin'*:

> The Court has not found in the voluminous briefing, nor have the Parties
> identified, any record evidence demonstrating *any* royalty payment to
> Roberts, Harr, or Jackson relating to the right to prepare derivative works of
> *Hustlin'*.  Nor is there any evidence that Plaintiffs, themselves, are even
> entitled to royalties for the exploitation of *Hustlin'*. Roberts has not produced
> any royalty statements showing any royalties he received from 3 Blunts or
> FNG in exchange for any transfer of his ownership interest in *Hustlin'*.
> Likewise, Harr and Jackson have produced no royalty statements showing
> any royalties received from TNF or FNG in exchange for any transfer of any
> ownership interest in *Hustlin'*. In addition, to the extent Harr and Jackson
> receive royalties for their compositions, both testified that all royalties are
> paid to TNF, not to Harr and Jackson.  As Harr and Jackson explain, all
> royalties earned "from *Hustlin'* (other than the writer's share which is paid
> to me personally) are paid initially to Trac N. Field.  Harr and I are paid by

32

Trac N Field through draws or distributions." And each of the agreements signed by TNF, 3 Blunts, Roberts, Harr or Jackson make clear that Roberts, Harr and Jackson do not have any right to authorize or create derivative works of *Hustlin'*; rather, that exclusive right belongs to Sony/ATV, FNG, and Notting Dale/Warner. In sum, there is no evidence that Harr, Jackson, or Roberts personally receive any royalties for the licensing or commercial exploitation of *Hustlin'*.

(DE 399 at 41-42) (internal citations omitted).[20]

At the November 14 status conference, Plaintiffs repeated their claim that they have produced royalty statements showing they personally receive royalties from *Hustlin'*. But these six pages of purported royalty statements (DE 228-9) do not demonstrate beneficial ownership. To begin, Plaintiffs have not explained—through witness testimony or otherwise—what these documents show. And it is impossible for the Court to decipher them. The first page, for example, identifies Sony/ATV Music Publishing at the top, and the alleged royalty payment is directed to "client" 4 Blunts Lit At Once Llc and "payee" William Roberts. The following percentages are reflected: "Song Share %" (50%); "Cntrl Coll %" (75%); and "Royalty %" (75%). Plaintiffs do not explain, and the Court cannot

---

[20] In a footnote on the final page of their recent supplemental memorandum on ownership issues, Plaintiffs argue that "[i]f the Court [] disagrees with [their] position and deems either 3 Blunts Lit at Once, LLC and/or Track N Field, LLC to be 'real parties in interest,' then the remedy, pursuant to Rule 17(a)(3) Fed. R. Civ. P., is to join them as parties, not dismiss the whole case." (DE 459 at 8, FN 7). That rule does not apply here. The "rule was designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought. Thus, it has been held that the rule should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice, and not when the determination of the right party to bring the action was not difficult and when no excusable mistake had been made." *Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 641 (E.D. Mich. 2014) (citing Wright & Miller, 6A Fed. Prac. & Proc. § 1555 (3d ed.) (collecting cases)) (internal quotations omitted). Plaintiffs' years-long effort to convince the Court that they, and not their companies, are proper plaintiffs demonstrates that no "understandable mistake" has been made, and no injustice would result from denying this eleventh-hour suggestion to substitute viable plaintiffs into this case.

determine, how any of these numbers align with royalty payments due to Plaintiff Roberts under any of the copyright transfer agreements in this case. The Court cannot tell, from this page or the five others, what the payments are, why the payments are being made, who is being paid, and whether the payments relate in any way to the right to prepare derivative works of *Hustlin'*.[21] Accordingly, they are not useful or relevant to this Court's analysis on beneficial ownership.

The documents cannot demonstrate beneficial ownership for other reasons. On the first page, the purported royalty payment is from Sony/ATV, an entity that is not a direct assignee of Roberts in any of the relevant transfer agreements. Instead, as explained, Roberts assigned his legal interest in *Hustlin'* to 3 Blunts. The purported royalty statement from Sony/ATV therefore does not appear to show royalty payments being made in exchange for Roberts' assignment of his legal title to *Hustlin'*. The second and third pages of alleged "royalty statements" are from BMI, a performing rights society. As such, they likely reflect payment of "writer's share" or publishing royalties that, as explained above, do not demonstrate beneficial ownership. And finally, none of the statements are tied to the right to prepare derivative works of *Hustlin'*. As discussed, to demonstrate beneficial ownership Plaintiffs must show that they receive royalties based

---

[21] As stated previously, Plaintiffs have not cited—in any of their numerous filings regarding ownership—any testimony or other evidence that explains how these purported "royalty payment" invoices demonstrate beneficial ownership. The Eleventh Circuit has made clear that district courts "may decide a motion for summary judgment without undertaking an independent search of the record," and "need not consider materials not cited by the parties." *A.L. v. Jackson Cty. Sch. Bd.*, 635 F. App'x 774, 786 (11th Cir. 2015) (citing Fed R. Civ. P. 56(c)(3)). "Indeed, [the Eleventh Circuit has] cited with approval the Seventh Circuit's memorable quote that appellate judges 'are not like pigs, hunting for truffles buried in briefs.'" *Id.* (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

on the right to prepare derivative works. *Fahmy*, 908 F.3d at 394. They have not done so, and thus cannot demonstrate standing to sue as beneficial owners.[22]

## III.   ANALYSIS: DAMAGES

The Parties also dispute the percentage of total infringement damages that the Plaintiffs are permitted to pursue and ultimately recover if they succeed. Plaintiffs argue that they "are entitled to pursue and be awarded 100% of the damages in this case, subject to whatever contractual obligations exist among and between all of the various rights holders." Defendants disagree. They argue that Plaintiffs may only pursue, and ultimately recover, damages that are limited by their respective ownership interests in the *Hustlin'* copyright. After careful review of the Parties' arguments and applicable law, the Court agrees with Defendants.

"[R]ecovery in a copyright case is 'confined to the [plaintiff's] own part; that is to say, to its own actual damages, to its proper share of any statutory damages, and to its proper share of the profits.'" *Manno v. Tenn. Prod. Ctr., Inc.*, 657 F. Supp. 2d 425, 432 (S.D.N.Y. 2009) (quoting *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 268, 270 (2d Cir. 1944)) (citing Nimmer *supra*, § 12.03). The rationale behind this

---

[22] At the November 14 status conference, Plaintiffs argued—for the first time—that Roberts is a beneficial owner of *Hustlin'* under the June 25, 2001 SNS Recording Contract, because that agreement assigned SNS part of his interest in *Hustlin'* in exchange for royalties. Plaintiff has since disclaimed this argument, based on the terms of a subsequent agreement that relieved SNS of any obligation to pay Roberts royalties. *See* (DE 460 at 2 FN 1) ("Contrary to Defendants' assertions, Roberts does not maintain it is a beneficial owner of Roberts' 12.5% interest that was transferred to SNS. Prior to the January 31, 2006 Roberts/SNS agreement, Roberts could have asserted beneficial ownership because it was a transfer by an author to a publisher in exchange for royalties. Plaintiffs' counsel repeatedly stated at the hearing that this agreement was being used solely as an example of this 'classic' type of beneficial ownership interest. The amendment in January, 2006 terminated SNS' obligation to pay royalties to Roberts.").

rule is sound. A joint owner of a copyright is not required to join his other co-owners in an action for infringement, and where one co-owner acts alone in bringing suit, the co-owner cannot affect the rights of the other co-owners who are not parties to the action. Thus, if plaintiff co-owners "were allowed to recover 100% of statutory damages in this case, defendants could be subject to multiple liability in the event that [the non-party co-owners] decide to pursue [their] own infringement claim. Second, limiting [Plaintiffs] damages based on [their] ownership interest will not unjustly enrich defendants. To the contrary, it is [Plaintiffs] who would be unjustly enriched if [they] were permitted to recover a greater amount of damages than that to which [they are] entitled." *Jacino v. Illinois Tool Works Inc.*, No. 16 CIV. 1704, 2017 WL 4480752, at \*3 (E.D.N.Y. Oct. 6, 2017) (limiting plaintiff Jacino's statutory damages to his 50% share if he prevails on the copyright claim).

Plaintiffs provide the Court no reason to deviate from this general rule. The primary case on which they rely—*In re Isbell Record, Inc.*, 774 F.3d 859, 872 (5th Cir. 2014)—does not allow the recovery they seek. In *Isbell*, the Fifth Circuit allowed the plaintiff co-owner to sue for 100% of the total damages because "[t]here was testimony that [he] is the administrator of 100 percent of the royalties and is responsible for accounting to Tag Team." That is not the case here. No other case cited by Plaintiffs supports their position.

For these reasons, at trial, Plaintiffs Harr and Jackson will have the burden of proving that they are legal owners of the *Hustlin'* copyright, and they further must prove the extent of their ownership interests. They will then be limited in their recovery to their pro rata, "proper share of the profits."

V.     **CONCLUSION**

Accordingly, the Court **ORDERS AND ADJUDGES** that:

1.     Defendants' motion for summary judgment (DE 230) is **GRANTED IN PART AND DENIED IN PART**.

2.     Plaintiff William Roberts has no standing as an owner to sue for copyright infringement, and thus the Court will enter final judgment against him.

3.     A genuine issue of material fact exists regarding Plaintiffs Andrew Harr and Jermaine Jackson's legal ownership interest in *Hustlin'*.   That issue, along with their copyright infringement claims, must be presented to a jury as set forth above.

4.     Plaintiffs Harr and Jackson have not raised a genuine issue of material fact regarding their beneficial ownership interest in *Hustlin'*; they are not beneficial owners, and they may not present this theory to the jury.

5.     At trial, the jury must determine the percentage ownership interests of Plaintiffs Harr and Jackson, and they will be limited in their recovery of the total infringement damages by their respective interests.

6.     The Parties' shall comply with the following deadlines:

| | |
|---|---|
| January 14, 2019 | The Parties' shall file a joint notice explaining what issues remain to be decided by the Court before trial, not including the Parties' motions *in limine* and *Daubert* motions. |
| January 30, 2019 | The Parties' shall file their joint deposition designations pursuant to the Court's instructions.  *See* (DE 455 at 2). |
| February 8, 2019 at 10:00 A.M. | The Parties shall appear before the undersigned for a status conference. |

**DONE AND ORDERED** in chambers in Miami, Florida, this ⫶⫶ day of January

2019.

_____
KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE